## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| **AMANDA MIRACLE, *et al.*,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case. No. 23-4056-JAR-GEB** |
| | ) | |
| **KEN HUSH, *et al.*,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## DEFENDANTS' MOTION TO DISMISS AND MEMORANDUM IN SUPPORT

Defendants Kansas Board of Regents ("KBOR"), Emporia State University ("ESU"), and the individual defendants move the Court to dismiss the Amended Complaint ("Complaint") (Doc. 25[1]) under Fed. R. Civ. P. 12(b)(1) and (b)(6) or, alternatively, to stay the case under abstention doctrines until related state-court proceedings have completed. Defendants attach eleven exhibits containing documents from related state-court proceedings as follows:

| INDEX OF EXHIBITS | |
|---|---|
| **Exhibit** | **Description** |
| A | Behrens – OAH Final Order, Petition for Review, and Answer |
| B | Catlett – OAH Final Order, Petition for Review, and Answer |
| C | Colson – OAH Final Order, Petition for Review, and Answer |
| D | Emmer – OAH Final Order, Petition for Review, and Answer |
| E | Koerner – OAH Final Order |
| F | Lidzy – OAH Final Order |
| G | C. Lovett – OAH Final Order |
| H | McCoy – OAH Final Order |
| I | Miracle – OAH Final Order, Petition for Review, and Answer |
| J | Morales – OAH Final Order, Petition for Review, and Answer |
| K | Sievert – OAH Final Order, Petition for Review, and Answer |

---

[1] The undersigned has inquired of opposing counsel and been assured by them that Doc. 24 is identical to Doc. 25. According to opposing counsel, Doc. 25 was filed for the purpose of adding Defendant John Dicus to the case caption during the filing process. Defendants address Doc. 25 as the operative complaint, but their arguments would apply equally to Doc. 24.

Plaintiffs assert federal claims related to the termination of their employment with ESU. However, plaintiffs' claims fail for the following reasons:

1)    Eleventh Amendment immunity bars claims against the entities ESU and KBOR;

2)    Plaintiffs fail to establish constitutional standing against all defendants except Hush due to lack of causation and/or redressability;

3)    Qualified immunity bars all of plaintiffs' claims;

4)    Plaintiffs have failed to allege their constitutional claims with specificity;

5)    Plaintiffs' conspiracy claims lack specificity, lack an underlying deprivation of rights, and fail under the intra-corporate conspiracy doctrine;

6)    Plaintiffs' Section 1985 claims lack allegations of racially discriminatory animus;

7)    Plaintiffs' ADEA claims fail to allege an appropriate disparity and a valid causal connection; and

8)    State court proceedings related to this action have preclusive effects and are grounds for abstention.

## Statement of Facts

1.    Before January 21, 2021, KBOR policy mandated that "faculty who have been awarded tenure may be terminated only for adequate cause, *except in the case of program or unit discontinuance or under extraordinary circumstances because of financial exigency*." (Complaint, ¶ 48) (Emphasis added)

2.    On January 20, 2021, KBOR held a meeting.  (Complaint, ¶¶ 54-56.  See also Complaint Exhibit 3, KBOR minutes of the 1/20/21 meeting (Doc. 25-3))

3.    At the meeting, KBOR was presented with temporary amendments to the Suspensions, Terminations, and Dismissal policy ("Workforce Management Plan" or "WMP") "because of the extreme financial pressures that the state universities are facing due to the COVID-19 pandemic, decreased program and university enrollments, and the state's declining fiscal support."  (Exhibit 3, p. 12)

4.      The WMP was to create an additional tool for university CEOs to use as they deal with the financial challenges at the universities.  (Exhibit 3, p. 12, 13)

5.      The WMP applied to all university employees state-wide.  (Exhibit 3, pp. 12-16)

6.      Multiple KBOR members commented on the financial challenges that faced Kansas universities.  Regent Bangerter stated that he "understands that the proposed policy is very extreme, but it is needed because the universities are facing extreme financial challenges, including the Governor's current recommendation to cut approximately $13 million in state funding."  (Exhibit 3, p. 13)

7.      Regent Hutton stated that the WMP "provides the CEOs with an additional tool to deploy to ensure the financial strength of the university."  Regent Hutton further stated that "tenure does not mean that a job is guaranteed regardless of financial circumstances."  (Exhibit 3, p. 13)

8.      Regent Harrison-Lee stated that "the universities are in a position where they need to be leaner, more efficient, and more effective."  Regent Harrison-Lee further stated that she also sees "this policy as another option for the CEOs during these unprecedented times." (Exhibit 3, p. 13)

9.      KBOR approved the WMP unanimously with an expiration date of December 31, 2022.  (Exhibit 3, p. 13-14)

10.     During KBOR's May 2022 meeting, KBOR removed the July 1, 2021 deadline for universities to propose a framework for a university's decision-making under the WMP.  In doing so, KBOR recognized that "the enrollment and financial challenges at the universities are still a concern."  (Complaint, ¶ 62)

11.     During KBOR's meeting on September 14-15, 2022, defendants Ken Hush ("Hush") and Dr. Brent Thomas ("Thomas") presented ESU's Framework ("ESU Framework") for the WMP.  (Complaint, ¶ 70.  See also Complaint Exhibit 11, KBOR minutes of the 9/14-9/15/22 meeting (Doc. 25-11))

12.     Hush informed KBOR that starting in January 2022, ESU communicated with faculty and staff about its plan to review ESU's operations, which included looking at ESU's programs and curriculum offerings.  (Exhibit 11, p. 3)

13.     Faculty and staff were asked to provide feedback on what they would change to create a better experience for students, colleagues, alumni, community, or state, and how ESU could evolve its programs and curriculum in response to regional economic needs.  (Exhibit 11, p. 3)

14.     ESU held four in-person forums to gather feedback and sent out several campus-wide communications reiterating ESU's intentions.  (Exhibit 11, p. 3)

15.     In the past, ESU had taken measures such as hiring freezes, spending restrictions, and voluntary retirement opportunities to address financial challenges.  (Exhibit 11, p. 3)

16.     ESU had repeatedly absorbed budget cuts over the years by reducing its operating budgets, eliminating annual equipment funds, and eliminating positions.  (Exhibit 11, p. 3)

17.     Those prior measures had pushed ESU's financial challenges forward but did not resolve those issues.  (*See* Exhibit 11, p. 3)

18.     Hush informed KBOR that the ESU Framework would not be just another budget-cutting tool, but rather a mechanism that would allow ESU to fundamentally change what it can offer students.  (Exhibit 11, p. 3)

19.     The ESU Framework was intended for ESU to operate differently and make fundamental changes to how it approaches academic offerings.  (Exhibit 11, p. 3)

20.     ESU and KBOR received and took into consideration feedback from the ESU Faculty Senate, ESU faculty, ESU students, and the Council of Faculty Senate Presidents. Some of the suggestions offered by ESU's shared governance groups were incorporated into the ESU Framework.  (Exhibit 11, pp. 2-4)

### The ESU Framework

21.     The ESU Framework expressed the necessity for its implementation:

Ongoing changes in industry demands, locally and nationally, as well as changes in student demographics and commitments to higher education affect the historical mission of ESU.  The University's primary sources of revenue are student tuition and taxpayer dollars provided through the legislature.  Increases in student tuition revenue are dependent on increased enrollment, which is very difficult to achieve for any university during these times.  Because ESU has experienced extreme financial pressures accelerated by the COVID-19 pandemic, decreased program and university enrollment, and state fiscal issues, the University continues to face increases in the cost of operations across campus as well as substantive changes in the educational marketplace.  These increased costs include higher costs being charged by providers and suppliers, as well as the necessity to properly maintain and support facilities, equipment, systems, security, and personnel.

(Complaint Exhibit 12, p. 1 (Doc. 25-12))

22.     The ESU Framework further stated that "financial and market situations do require a prudent review and restructuring, which will require modification, reorganization, suspension, or elimination of certain operations, programs and curriculum."  (Exhibit 12, p. 1)

23.     ESU recognized that the financial conditions required "immediate action notwithstanding any other Board or institutional policy."   (Exhibit 12, p. 1)

24.     The ESU Framework's long-term impact would save ESU an expected $5 million. (Exhibit 11, p. 4)

25.     A decision to suspend, dismiss, or terminate any university employee under the ESU Framework was to be based on factors such as, but not limited to:

> Low enrollment;
> Cost of operations;
> Reduction in revenues for specific departments or schools;
> Current or future market considerations as to the need for a program or department;
> Restructuring of a program, department, or school as determined to be necessary by the university;
> Realignment of resources;
> Performance evaluations;
> Teaching and research productivity; and
> Low service productivity.

(Exhibit 12, p. 1)

26.     The ESU Framework also provided for a procedure to be followed to suspend, dismiss, or terminate a university employee's employment.  (Exhibit 12, p. 2-3)

27.     The ESU Framework provided for written notice to be provided no less than 30 days prior to any action taken against an affected employee.  (Exhibit 12, p. 2)

28.     The notice would include a statement that the action was being taken pursuant to the ESU Framework.  (Exhibit 12, p. 2)

29.     The ESU Framework informed the employee of the right to appeal to the Office of Administrative Hearings.  (Exhibit 12, p. 2)

30.     The ESU Framework informed the employee that to appeal the President's decision, the employee must submit an appeal to the KBOR office within 30 days of receiving notice of the action taken.  The ESU Framework also informed the employee of the materials that should be submitted as part of an appeal.  (Exhibit 12, p. 2)

31.     KBOR approved the ESU Framework.  (Complaint, ¶ 71; Exhibit 11, p. 4)

32.     On September 15, 2022, plaintiffs received written notice that their employment would end on May 16, 2023 – 243 days after the notice.  (Complaint, ¶ 73)

33.     In their notices, plaintiffs were informed their employment was terminated because of: "[E]xtreme financial pressures accelerated by COVID-19 pandemic, decreased program and university enrollment, continuing and ongoing increases in the cost of operations across campus, and substantive changes in the educational marketplace."  (Complaint, ¶ 73; Complaint Exhibit 9 (Doc. 25-9))

34.     Plaintiffs were also informed that the action taken was based on more specific factors such as low enrollment, current or future market considerations as to the need for a program or department, and restructuring of a program, department, or school as determined to be necessary by ESU.  (Complaint, ¶ 73; Exhibit 9)

35.     A copy of the ESU Framework was also included in the notices.  (Complaint, ¶ 73; Exhibit 9)

36.     Plaintiffs were also notified of their right to appeal the decision, and how to appeal.  (Complaint, ¶ 73)

37.     All of the plaintiffs exercised their right to appeal the decision to the Kansas Office of Administrative Hearings ("OAH").  (Complaint, ¶ 74)

38.     All plaintiffs participated in their respective OAH pretermination hearings.  (Complaint, ¶¶ 78-79)

39.     All plaintiffs had their respective OAH pretermination hearings between January 18, 2023, and March 2, 2023.  The March 2, 2023 pretermination hearing for plaintiff Koerner occurred 75 days before her proposed May 16, 2023 termination date.  (Complaint, ¶¶ 79-80)

40.     The final orders from each of these appeals are attached as exhibits.[2] Four cases resulted in the OAH affirming those plaintiffs' terminations.[3]

41.     In the remaining seven cases, the hearing officer reversed termination[4] and ESU appealed to the state district court.[5]

42.     In all seven of those cases, the plaintiffs filed an answer raising the issue of unconstitutionality.[6]

43.     Plaintiffs claim that before January 20, 2021, "unknown John Doe Defendants and Individual Defendants . . . conspired in a movement to undermine tenure without due process through the vehicle of anti-tenure rhetoric and in the creation, adoption and implementation of the WMP and ESU's Framework."  (Complaint, ¶ 52)

44.     Plaintiffs further claim:  "The Individual Defendants saw tenure as an impediment to terminating tenured faculty who were 'problematic' concerning issues disfavored by the ESU Administration.  These issues included being members or former members of the Faculty Senate Committee, being perceived to or having friction with the Administration, policy sticklers,

---

[2] The Court can consider the OAH orders on a motion to dismiss as documents the Complaint references that are central to the claims. *Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010); *see also, e.g.,* (Doc. 25 at ¶¶ 74-82, 88-89, 91-93, 100).

[3] Exhibit E at 9; Exhibit F at 5; Exhibit G at 5; Exhibit H at 9.

[4] Exhibit A at 7; Exhibit B at 7; Exhibit C at 5; Exhibit D at 6; Exhibit I at 7; Exhibit J at 7; Exhibit K at 6.

[5] Exhibit A at 10-18; Exhibit B at 10-18; Exhibit C at 8-17; Exhibit D at 9-18; Exhibit I at 10-18; Exhibit J at 10-20; Exhibit K at 9-22. The Court can take judicial notice of these related court proceedings. *Gee*, 627 F.3d at 1191.

[6] (Exhibit A at 21 ("due process"), 22 ("unconstitutional"); Exhibit B at 21-22 ("due process"), 23 ("unconstitutional"); Exhibit C at 20 ("due process," "wholly deficient substantive and procedural due process"), 21-22 ("unconstitutional"); Exhibit D at 21 ("due process," "wholly deficient substantive and procedural due process"), 22-23 ("unconstitutional"); Exhibit I at 21 ("due process"), 22-23 ("unconstitutional"); Exhibit J at 23-24 ("due process," "wholly deficient substantive and procedural due process"), 25 ("unconstitutional"); Exhibit K at 25-26 ("due process"), 27 ("unconstitutional").)

liberals, advocates, unionizers, and department or campus leaders."  (Complaint, ¶ 53)

45.     Plaintiffs also claim that "ESU Individual Defendants and some or all of the KBOR Individual Defendants" were aware certain plaintiffs were advocates or perceived to be advocates for unionization.  (Complaint, ¶ 67)

46.     Plaintiffs claim that "ESU Individual Defendants and some or all of the KBOR individual Defendants" were aware plaintiffs were not members of the Republican party and were thought to be members of or allies of other political parties opposed to the Republican party.  (Complaint, ¶ 68)

## Argument and Authorities

## I.     The Eleventh Amendment bars Plaintiffs' claims against ESU and KBOR.

"The Eleventh Amendment bars suits in federal court against a nonconsenting state brought by the state's own citizens." *Williams v. Utah Dep't of Corr.*, 928 F.3d 1209, 1212 (10th Cir. 2019) (citing *Edelman v. Jordan*, 415 U.S. 651, 662-63 (1974)). A narrow exception allows a plaintiff to seek prospective injunctive relief against a state *official* for ongoing violations of federal law. *Muscogee (Creek) Nation v. Pruitt*, 669 F.3d 1159, 1166 (10th Cir. 2012) (citing *Verizon Md. Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002)). "Once effectively asserted, Eleventh Amendment immunity constitutes a bar to the exercise of federal subject matter jurisdiction." *Williams*, 928 F.3d at 1212.

Although the Age Discrimination in Employment Act of 1967 (ADEA) purports to abrogate Eleventh Amendment immunity, the Supreme Court has found that "purported abrogation" to be "invalid" because it was "not a valid exercise of Congress' power under § 5 of the Fourteenth Amendment." *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 91 (2000). Accordingly, "Kansas is immune from discrimination suits under the ADEA because Congress has not abrogated Eleventh Amendment immunity from ADEA claims and Kansas has not voluntarily

waived its Eleventh Amendment immunity." *Allen v. Knowlton*, No. 22-4049-EFM, 2023 WL 3496237, *2 n.11 (D. Kan. May 17, 2023) (quoting *Overfield v. Kansas*, No. 21-4093-JWB, 2022 WL 2072723, *3 (D. Kan. June 9, 2022)).

Here, Plaintiffs request prospective injunctive relief (*see, e.g.,* Doc. 25 at 33, 55).  This particular remedy is exempt from Eleventh Amendment immunity with regard to alleged violations of federal law against state *officials* such as Defendant Hush. But ESU and KBOR are not *officials*, so claims even for injunctive relief against them are barred. Therefore, all claims against ESU and KBOR should be dismissed in their entirety for lack of subject-matter jurisdiction due to Eleventh Amendment immunity.[7]

## II.    **Plaintiffs fail to establish constitutional standing against all defendants except Hush due to lack of causation and redressability.**

To establish federal subject matter jurisdiction, plaintiffs must show that they have standing. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 (1998). The "irreducible constitutional minimum of standing" contains a triad of requirements: injury in fact, causation, and redressability. *Id*. at 102-03. This triad "constitutes the core of Article III's case-or-controversy requirement, and the party invoking federal jurisdiction bears the burden of establishing its existence." *Id.* at 103-04. To establish causation, "there must be . . . a fairly traceable connection between the plaintiff's injury and the complained-of conduct of the defendant." *Id*. at 103. Redressability is established when the relief sought serves to either

---

[7] Even if the ADEA claims had been brought in an individual capacity, the court would still lack subject-matter jurisdiction over those claims because claims under the ADEA cannot be brought in an individual capacity. *Perrigo v. Unified Sch. Dist. No. 500*, No. 13-2363-EFM, 2014 WL 1767184, at *3 n.27 (D. Kan. May 2, 2014) (citing *Butler v. City of Prairie Village*, 172 F.3d 736, 744 (10th Cir. 1999)). Further, Plaintiffs have not brought their ADEA claims under *Ex Parte Young*, so that exception does not apply to those claims. *See Raj v. La. State Univ.*, 714 F.3d 322, 328 (5th Cir. 2013); *Peirick v. Ind. Univ.-Purdue Univ. Indianapolis Athletics Dep't*, 510 F.3d 681 (7th Cir. 2007).

reimburse the plaintiff for losses or to eliminate lingering effects of losses. *See id.* at 105-06. Plaintiffs "must demonstrate standing separately for each form of relief sought." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000).

Here, plaintiffs allege that the KBOR defendants engaged in a conspiracy to violate plaintiffs' rights that resulted in plaintiffs' employment termination. However, the KBOR defendants could not have terminated plaintiffs' employment, as KBOR and ESU are separate state agencies. *See* K.S.A. 76-711, -712. The hiring authority and general affairs of ESU are administered by the President, defendant Hush, who is deemed to be the chief executive officer for the university. K.S.A. 76-714, -715, -725. Nothing in plaintiffs' pleadings show that the KBOR defendants terminated plaintiffs' employment or caused it. At best, the KBOR defendants knew that *some* ESU employees *might* be terminated by adopting the ESU Framework, but not specifically these plaintiffs. The ESU Framework provides a reason for termination, and it provides for notice and process for termination, but it does not dictate who will be terminated, if anyone. There is no fairly traceable connection between KBOR's quasi-legislative actions to enact general policy and executive action by a separate agency, ESU, to terminate the employment of specific persons. Therefore, plaintiffs fail to establish standing against the KBOR defendants because plaintiffs cannot show causation.

Likewise, the ESU defendants Kevin Johnson and Steven Lovett could not have terminated plaintiffs' employment, as they were only attorneys for ESU. These two ESU defendants did not personally subject plaintiffs to any alleged deprivation, nor did they cause plaintiffs to be subjected to it. The decision to implement and carry out the policies and procedures of the WMP and the ESU Framework was made by others. Accordingly, plaintiffs fail to establish standing against them for lack of causation.

Similarly, plaintiffs do not establish a fairly traceable connection between Brent Thomas's ("Thomas") actions and plaintiffs' employment. Plaintiffs claim that Thomas presented the ESU Framework to the KBOR for adoption at the September 14-15, 2022, meeting. If KBOR's quasi-legislative actions are not grounds for causation, as argued above, then surely someone even more removed, who merely discussed "operations and budget" (Doc. 25 at ¶ 70) with a quasi-legislative body, has not crossed that threshold either. Plaintiffs also claim that Thomas was present at *some* meetings, at *some* times, along with *some* plaintiffs. But plaintiffs fail to directly connect Thomas's presence at those meetings with any action to terminate their employment. They fail to establish standing against Thomas for lack of causation.

Plaintiffs request prospective injunctive relief against KBOR in the form of reinstatement. Because ESU, not KBOR, terminated plaintiffs' employment, KBOR cannot redress this alleged harm. *See* K.S.A. 76-715 (placing the hiring authority in the hands of the President of ESU). Plaintiffs nevertheless insist that, since "KBOR is able to approve policies affecting the rights of tenured faculty at ESU," "surely KBOR has the power to implement new policies to reinstate Plaintiffs." (Doc. 22 at 9.) But under the federal structure of the United States Constitution, the federal government cannot command the states how to use their legislative or quasi-legislative authority. *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 474-77 (2018) ("A more direct affront to state sovereignty is not easy to imagine."); *Fed. Energy Regul. Comm'n v. Mississippi*, 456 U.S. 742, 761 (1982) ("the ability of a state legislative (or, as here, administrative) body—which makes decisions and sets policy for the State as a whole—to consider and promulgate regulations of its choosing must be central to a State's role in the federal system"). The Supreme Court "warned that it [has] never sanctioned explicitly a federal command to the States to promulgate and enforce laws and regulations."

*Murphy*, 584 U.S. at 476. So the remedy Plaintiffs seek, a command from the federal government to a state agency to promulgate a policy under its quasi-legislative authority, is not legally available.[8] Accordingly, Plaintiffs have failed to establish standing against KBOR for injunctive relief due to lack of redressability.

Therefore, claims against the KBOR defendants and defendants Kevin Johnson, Steven Lovett, and Brent Thomas, along with claims for injunctive relief against KBOR, should be dismissed for lack of subject-matter jurisdiction due to lack of constitutional standing.

## III.   Defendants are entitled to qualified immunity.

Government officials are generally shielded from liability for damages if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Tonkovich v. Kan. Bd. of Regents*, 159 F.3d 504, 516 (10th Cir. 1998). "The key to the qualified immunity inquiry is the 'objective reasonableness of the official's conduct in light of the legal rules that were clearly established at the time the action was taken.'" *Id.* (Citation omitted)  Qualified immunity is an immunity from suit rather than a mere defense to liability. *Mitchell v. Forsyth,* 472 U.S. 511, 526 (1985). "[O]fficials enjoy a presumption of immunity when the defense of qualified immunity is raised." *Pahls v. Thomas*, 718 F.3d 1210, 1227 (10th Cir. 2013). To overcome this presumption, the burden shifts to the plaintiff to show (1) the defendant's alleged conduct violated a federal statutory or constitutional right, and (2) that right was clearly established at the time of the alleged violation. *Janny v. Gamez*, 8 F.4th 883, 913 (10th Cir. 2021). "The court has discretion to decide which of the two prongs of the qualified-immunity analysis to address first." *Grissom v. Roberts*, 902 F.3d 1162, 1167 (10th Cir.

---

[8] This remedy would also be unavailable in state-court proceedings due to separation of powers between the Kansas judicial and legislative branches under the Kansas Constitution. *See Duggan v. City of Emporia*, 84 Kan. 429, 114 P. 235, 238 (1911) (citing *New Orleans Water Works Co. v. City of New Orleans*, 164 U.S. 471, 481 (1896)).

2018) (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

> **A.    Plaintiffs have not sufficiently alleged that the defendants violated a statutory or constitutional right.**

A plaintiff must "**identify *specific* actions taken by *particular* defendants**" in order to make out a viable § 1983 claim. *Pahls v. Thomas*, 718 F.3d 1210, 1226 (10th Cir. 2013) (Citations omitted) (Emphases in original).  It is insufficient to generally allege that "defendants" infringed on plaintiffs' rights when officials have taken different actions regarding plaintiffs. *Pahls*, 718 F.3d at 1225–26.  In all cases, plaintiffs must show that each defendant acted with the requisite state of mind.  *Id.*

In the case at bar, it is not at all clear who is alleged to have done what to whom.  The use of the collective term "Defendants" makes no distinction of what improper acts were done by specific KBOR defendants or ESU defendants.  Presumably, the alleged constitutional violations would have been carried out in different ways by different people.  There is simply no allegation that any defendant personally participated in any specific, improper act or what improper act he or she is accused of performing.  There is no evidence that any individual defendant terminated any plaintiff's employment because the defendant believed a particular plaintiff was problematic, on the Faculty Senate Committee, having friction with the ESU administration, a policy stickler, a liberal, an advocate, a unionizer, a campus leader, or opposed to the Republican party.

> **B.    Plaintiffs' claimed property right in light of the extraordinary circumstances was not clearly established.**

"Property interests are not created by the Constitution, but arise from independent sources such as state statutes, local ordinances, established rules, or mutually explicit understandings." *Snyder v. City of Moab*, 354 F.3d 1179, 1189 (10th Cir. 2003). "Whether an employee has a property interest in her employment is determined under state law." *Id.* Even

where a property interest in employment is created under state law, the entity by whose power the right was created retains the power to later modify or remove it through ordinary lawmaking or policymaking processes. *See Scribner v. Bd. of Educ.*, 308 Kan. 254, 258, 267-70 (2018) (citing *Bi-Metallic Inv. Co. v. State Bd. of Equalization*, 239 U.S. 441, 445-46 (1915) and *Minn. State Bd. for Cmty. Colls. v. Knight*, 465 U.S. 271, 283-85 (1984)) (upholding the Kansas Legislature's removal of due process protections for K-12 teachers).

Here, Plaintiffs have not clearly identified the state-law basis ("such as state statutes, local ordinances, established rules, or mutually explicit understandings," *Snyder*, 354 F.3d at 1189) for their *particular* claim to a property interest in their *particular* employment. The Complaint states that "the clearly established law regarding tenure under Kansas law was that it was a property right," and cites two Kansas cases for this proposition. (Doc. 25 at ¶ 43.) The first case, *Gorham v. City of Kansas City*, 225 Kan. 369 (1979), is about a property right of "police officers" in their employment under a particular "Memorandum of Understanding" to which those police officers were a party. *Id.* at 374. The second case, *Kosik v. Cloud Cnty. Cmty. Coll.*, 250 Kan. 507 (1992), is about a possible property right of a university library director. *Id.* at 508, 512. *Kosik* specifically noted that "neither party spells out the source of Dr. Kosik's right to due process," but because on appeal the parties did not dispute that Dr. Kosik had a protected property interest, the court so held. *Id.* at 512. The court did not need to dig further into the existence of a property right because it found no due process violations regardless. *See id.* at 519. Neither case was about university professors, and neither case identified a state-law basis for a property interest that would apply to university professors in Kansas.

The Complaint also cites a *federal* case, *Tonkovich v. Kan. Bd. of Regents*, 159 F.3d 504 (10th Cir. 1998). (Doc. 25 at ¶ 43.) But this *federal* case cannot itself be the basis for a *state-law*

property right. *Tonkovich* appears to indirectly base its holding off of the now-repealed Kansas statute that previously granted tenure only to K-12 teachers in Kansas. The Tenth Circuit in *Tonkovich* did not directly identify a state-law basis for the property interest in that case. *See Tonkovich*, 159 F.3d at 517, 528. But the district court opinion, *Tonkovich v. Kan. Bd. of Regents*, No. 95-2199-GTV, 1996 WL 705777, at \*15 (D. Kan. Nov. 22, 1996), cited for the proposition that tenured professors in Kansas have a property right only the federal case *Hartwick v. Board of Trustees*, 782 F. Supp. 1507, 1511 (D. Kan. 1992). The federal court in *Hartwick* in turn cited another federal case, *Bogart v. Unified School District No. 298*, 432 F. Supp. 895, 903 (D. Kan. 1977). *Bogart* in turn cited a state statute, K.S.A. 72-5411, <u>which has been repealed, and which only applied to K-12 teachers even when it was in effect</u>, not university professors. To the extent *Tonkovich* may be construed by Plaintiffs to hold that tenure is now a matter of federal law rather than state law, then it would have been abrogated by *Snyder*, 354 F.3d at 1189. That way of reading *Tonkovich* also would be unconstitutional under the Tenth Amendment as property law is a matter of state authority, not federal authority. Presumably, the Tenth Circuit did not encroach so egregiously on state sovereignty, so, more likely, either the parties in that case did not dispute the existence of a property right or the court did not find the existence of a property right essential to the decision as it found no violation of law regardless.

Even if KBOR's general tenure policy created a mutually explicit understanding of a property interest in plaintiffs' employment (which Plaintiffs have not stated), KBOR would have retained the power to later modify or remove that right. *See Scribner* 308 Kan. at 267-70; K.S.A. 76-712 ("For . . . control, operation, management or supervision [of the state educational institutions], the board of regents may . . . adopt . . . policies"). So even if a property interest in plaintiffs' employment was created by KBOR's general tenure policy (which, again, Plaintiffs

have not argued), KBOR's amendments to the WMP and its approval of the ESU Framework would have modified or removed that right in the circumstances described in the WMP and ESU Framework.

What is more, the terminations occurred under circumstances already previously exempted from the scope of tenure. Prior to the enactment of the WMP in January, 2021, KBOR policy had been that tenured faculty may be terminated only for adequate cause, *except in the case of program or unit discontinuance or under extraordinary circumstances because of financial exigency*. None of the plaintiffs were terminated for cause, nor were they ever told they were terminated for cause.

But prior to 2021, it had already been KBOR policy that plaintiffs could have been terminated because of extreme financial pressures, which were accelerated by COVID-19. There was decreased program and university enrollments. There was also continuing and ongoing increases in the cost of operations across campus. State funding was cut by millions of dollars. ESU had already had hiring freezes, spending cuts, and voluntary retirement opportunities. ESU had repeatedly absorbed budget cuts over the years.

Plaintiffs were also told in writing that their employment was terminated because of program or unit discontinuance. Plaintiffs' employment was terminated because of specific factors such as current or future market considerations as to the need for a program or department, and restructuring of a program, department, or school.

In looking at the objective reasonableness of terminating plaintiffs' employment, it was not clearly established that ESU employees in plaintiffs' position could not be terminated because of extraordinary circumstances because of financial exigency or program or unit discontinuance. In fact, it was clearly established that plaintiffs' employment could be

terminated for those reasons.  "Exigency" is defined in the Merriam-Webster Dictionary as "that which is required in a particular situation."  Tenure did not guarantee a job regardless of circumstances.  Reasonable persons in defendants' positions could not have known that their conduct violated any statutory or constitutional right.  Therefore, defendants are entitled to qualified immunity.

IV.        **Plaintiffs have failed to allege their constitutional claims with specificity.**

Other than identifying the individual defendants, none of them are alleged to have committed any specific act against any individual plaintiff.  It is particularly important in § 1983 cases "that the complaint make clear exactly *who* is alleged to have done *what* to *whom,* to provide each individual with fair notice as to the basis of the claims against him or her, as distinguished from collective allegations against the state." *Robbins v. Oklahoma*, 519 F.3d 1242, 1249–50 (10th Cir. 2008) (emphasis in original).  The Tenth Circuit has repeatedly emphasized the importance of connecting defendants to misconduct in pleadings: a plaintiff has to "show that such Defendant personally participated in the alleged constitutional violation." *Shrum v. Cooke*, 60 F.4th 1304, 1312 (10th Cir. 2023) (citation omitted).

In *Robbins*, the plaintiff's Complaint failed to isolate the allegedly unconstitutional acts of each defendant.  Plaintiff claimed six named and ten unnamed "Defendants" committed various tortious acts. *Robbins*, 519 F.3d at 1250.  The court found that the alleged tortious acts committed by the separate defendants were "[p]resumably … entirely different in character and therefore are mistakenly grouped in a single allegation." *Id.*  The court held that the Complaint failed to give adequate notice of its claims against the defendants:

> We need not speculate, because the burden rests on the plaintiffs to provide fair notice of the grounds for the claims made against each of the defendants. Given the complaint's use of either the collective term "Defendants" or a list of the defendants named individually but with no distinction as to what acts are

attributable to whom, it is impossible for any of these individuals to ascertain what particular unconstitutional acts they are alleged to have committed.

*Id.*

As stated above, it is not at all clear who is alleged to have done what to whom. The use of the collective term "Defendants" makes no distinction of what improper acts were done by specific KBOR defendants or ESU defendants. There is simply no allegation that any defendant personally participated in any specific, improper act.

## V. **Plaintiffs' conspiracy claims fail for lack of alleging specific facts, lack of racially-discriminatory animus, lack of an underlying deprivation of rights, and because of the intra-corporate conspiracy doctrine.**

### A. Section 1985 Conspiracy Claims

Plaintiffs cite § 1985, but they do not allege that Defendants attempted to prevent an officer from performing duties under § 1985(1) or to intimidate a party, witness, or juror under the subpart of § 1985(2) before the semi-colon. That leaves the rest of § 1985(2) and § 1985(3).

To state a claim under § 1985(3), a plaintiff must show: (1) a conspiracy, motivated by racially-discriminatory animus; (2) to deprive plaintiff of equal protection of the laws; (3) an act in furtherance of the conspiracy; and (4) a deprivation of rights resulting therefrom.

*Paris v. Sw. Bell Tel. Co.*, 94 F. App'x 810, 815 (10th Cir. 2004) (citing *Tilton v. Richardson*, 6 F.3d 683, 686 (10th Cir. 1993)). The same analysis applies to the subpart of § 1985(2) after the semi-colon. *See Taylor v. Gilmartin*, 686 F.2d 1346, 1356 (10th Cir. 1982).[9] Further, a plaintiff's "pleadings 'must specifically present facts tending to show agreement and concerted action.'"[10]

_____

[9] All parts of § 1985 require racially-discriminatory animus except the subpart of § 1985(2) before the semi-colon. *King v. Knoll*, 399 F. Supp. 2d 1169, 1179 n.57 (D. Kan. 2005); *Kush v. Rutledge*, 460 U.S. 719, 726 (1983).
[10] *King*, 399 F. Supp. 2d at 1180 (citing *Sooner Prods. v. McBride*, 708 F.2d 510, 512 (10th Cir. 1983)).

Here, Plaintiffs have alleged no specific facts tending to show agreement or that the various alleged actions were done in concert. Merely drafting, voting on, or enacting a policy or serving as an attorney does not connect someone to a conspiracy. Further, no racially-discriminatory animus is alleged. Alternatively, although § 1985 may apply to other class-based animus, it was not clearly established that anything other than racially-discriminatory animus was sufficient to form the basis of a § 1985 claim,[11] so qualified immunity bars any claim based on other class-based animus. Regardless, Plaintiffs do not plausibly allege any class-based animus here.[12] And no underlying deprivation of rights occurred.

Further, Defendants allegedly acted under the color of state law, which therefore means they acted as agents of the State of Kansas. But under the intra-corporate conspiracy doctrine, a "governmental body cannot conspire with itself."[13] Although the Tenth Circuit once declined to apply this doctrine to a § 1985 action (in the *Brever v. Rockwell International Corp.* case), "the Tenth Circuit has not yet ruled on the issue . . . in a case that did not involve one of the exceptions recognized by most circuits."[14] The Tenth Circuit has recently declined to clarify its position,[15] but if it were to hold that the doctrine *never* applies to § 1985 actions, it would be the

---

[11] *See Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 268-69 (1993) (citing *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971)) (saying of the phrase, "there must be some racial, *or perhaps otherwise class-based*, invidiously discriminatory animus," that "[w]e have not yet had occasion to resolve the 'perhaps'").

[12] *See id. at* 269 (saying "the term ['class'] unquestionably connotes something more than a group of individuals who share a desire to engage in conduct that the § 1985(3) defendant disfavors").

[13] *Dickerson v. Alachua Cnty. Comm'n*, 200 F.3d 761, 767 (11th Cir. 2000) (quoting *Runs After v. United States*, 766 F.2d 347, 354 (8th Cir. 1985)).

[14] *Id.* at 768 n.9 (citing *Brever v. Rockwell Int'l Corp.*, 40 F.3d 1119, 1127 (10th Cir. 1994)).

[15] *Frasier v. Evans*, 992 F.3d 1003, 1027 n.8 (10th Cir. 2021).

only circuit court to do so.

Nine circuits have applied the doctrine in at least some § 1985 actions.[16] The other two[17] have declined to rule on the matter.[18] And even in one of those two circuits, the D.C. Circuit, "judges within [that] district have consistently found that it does apply."[19]

The Supreme Court, in *Ziglar v. Abbasi*, 582 U.S. 120, 153-54 (2017) (plurality opinion), recognized a dispute regarding the *extent* to which the doctrine applies to § 1985 actions and accordingly held that qualified immunity barred the § 1985 claims in that case because the law was not well established. As the plurality stated, "When the courts are divided on an issue so central to the cause of action alleged, a reasonable official lacks the notice required before imposing liability." *Id.* at 154 (citing *Reichle v. Howards*, 566 U.S. 658, 669-70 (2012)).[20] Therefore, because it was not clearly established that the single legal entity consisting of the State of Kansas and its agents could conspire with itself as alleged in this case, qualified immunity bars the conspiracy claims here.

For all these reasons, Plaintiffs fail to state a claim under § 1985.

---

[16] *Dickerson*, 200 F.3d at 767-68 & n.9; *Runs After*, 766 F.2d at 354; *Rice v. President & Fellows of Harvard Coll.*, 663 F.2d 336, 338 (1st Cir. 1981); *Herrmann v. Moore*, 576 F.2d 453, 459 (2d Cir. 1978); *Abadi v. Target Corp.*, No. 23-1050, 2023 WL 4045373, at *1 (3d Cir. 2023); *Buschi v. Kirven*, 775 F.2d 1240, 1251-53 (4th Cir. 1985); *Benningfield v. City of Houston*, 157 F.3d 369, 378-79 & n.3 (5th Cir. 1998); *Hull v. Cuyahoga Valley Joint Vocational Sch. Dist. Bd. of Educ.*, 926 F.2d 505, 509-10 (6th Cir. 1991); *Wright v. Ill. Dep't of Child. & Fam. Servs.*, 40 F.3d 1492, 1508-09 (7th Cir. 1994).

[17] The Federal Circuit, does not handle § 1983 claims. *See* 28 U.S.C. § 1295.

[18] *Mustafa v. Clark Cnty. Sch. Dist.*, 157 F.3d 1169, 1181 (9th Cir. 1998); *Bowie v. Maddox*, 642 F.3d 1122, 1130-32 (D.C. Cir. 2011).

[19] *Martin v. Dist. of Columbia*, 968 F. Supp. 2d 159, 168 (D.D.C. 2013).

[20] The two-justice dissent in *Ziglar* did not express any disagreement with regard to this point made by the four-justice plurality. And although Justice Sotomayor (along with two other justices) did not participate in the consideration or decision in *Ziglar*, she was part of the majority opinion in *Reichle* that *Ziglar* cites for this point.

### B.  Section 1983 Conspiracy Claims

Similarly, Plaintiffs' § 1983 claims fail for lack of an underlying deprivation of rights,

*Dixon v. City of Lawton*, 898 F.2d 1443, 1449 (10th Cir. 1990), for only making conclusory

allegations of conspiracy, *Tonkovich v. Kan. Bd. of Regents*, 159 F.3d 504, 533 (10th Cir. 1998),

and due to the intra-corporate conspiracy doctrine for the same reasons argued above.

**VI.**  **In the alternative, Plaintiffs' ADEA claims fail to allege an appropriate disparity and a valid causal connection.**

Although to survive a motion to dismiss plaintiffs need not establish a prima facie case in

the complaint for an ADEA disparate impact claim, courts consider the elements of an ADEA

disparate impact claim to help determine whether a plaintiff's claim is plausible. *Frappied v.*

*Affinity Gaming Black Hawk, LLC*, 966 F.3d 1038, 1054 (10th Cir. 2020). Establishing a prima

facie case would require that plaintiffs show "a specific identifiable employment practice or

policy" that "caused a significant disparate impact" on the relevant protected group, which under

the ADEA is those aged forty and over. *Id.* An alleged disparity must be based on "appropriate

comparables." *See Mountain Side Mobile Ests. P'ship v. Sec'y of Hous. and Urb. Dev.*, 56 F.3d

1243, 1253 (10th Cir. 1995); *see also Frappied*, 966 F.3d at 1055 ("relevant comparables"). For

example, in reduction-in-force cases like this one, it would be improper to simply compare the

persons terminated under forty and the persons terminated over forty. *Frappied*, 966 F.3d at

1055. Rather, the plaintiff must allege and establish a disparity showing that the employer tended

to retain younger employees *in similar positions* to those of persons terminated or to hire

younger employees *in similar positions* to replace them. *Id.* at 1055, 1057.

Analogizing from failure-to-hire cases – where the appropriate comparison is between the

age composition of the at-issue jobs and that of the "qualified persons in the relevant labor

market," *Faulkner v. Super Valu Stores, Inc.*, 3 F.3d 1419, 1432 (10th Cir. 1993) – the

appropriate comparison in a reduction-in-force case should be between the age composition of the persons terminated from similar positions and that of those retained in similar positions (or hired to replace them in similar positions). And similarly to how "qualified persons in the relevant labor market" are considered in the failure-to-hire context, "similar positions" in the reduction-in-force context should properly refer to positions of a similar character requiring similar qualifications.

Further, an "imbalance . . . does not, without more, establish a prima facie case of disparate impact." *Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 542 (2015); *see also Frappied*, 966 F.3d at 1054 (applying disparate impact principles from *Tex. Dep't of Housing* to the ADEA). It is not enough to show a disparity, but rather "a disparate-impact claim that relies on a statistical disparity must fail if the plaintiff cannot point to a defendant's policy or policies causing that disparity." *Tex. Dep't of Hous.*, 576 U.S. at 542.

Here, although Plaintiffs' ADEA claims should be dismissed under Eleventh Amendment immunity, Plaintiffs also fail to state a claim. Plaintiffs do not allege a disparity with regard to appropriate comparables. Because Plaintiffs do not allege that they were replaced by younger employees, the comparison must then be between those terminated from similar positions and those retained in similar positions. Each Plaintiff was a tenured professor, so the only persons in similar positions at ESU would be other tenured professors or possibly tenure-track professors. Other positions are not of the same character and do not require similar qualifications.

Plaintiffs allege two disparities: (1) when comparing the terminated *professors* to *all* ESU *employees* (Doc. 25 at ¶ 241), which would include custodial staff, administrative staff, student jobs, etc.; and (2) when comparing the terminated tenured professors to *all* ESU professors (Doc. 25 at ¶ 106), which would include professors who were neither tenured nor tenure-track.

Plaintiffs' Complaint does not allege any disparity with regard to the appropriate comparables: tenured professors and/or tenure-track professors. Plaintiffs allege disparities only with regard to groups that include positions of an entirely different character and with different qualifications, which renders the alleged disparities inapplicable to what would need to be alleged and proven under an ADEA claim.

Plaintiffs have also not alleged a valid causal connection. Plaintiffs do not allege that policies or practices caused any disparity, but rather that the nature of the position itself caused a disparity. Plaintiffs' theory as to causation is quite literally that the policies "necessarily and significantly disproportionately impacted Plaintiffs *because it allowed the termination of tenured professors*." (Doc. 25 at ¶ 236 (emphasis added).) Plaintiffs then point out that tenured professors have necessarily worked a minimum of six years. (Doc. 25 at ¶ 237.) Elsewhere, Plaintiffs state their theory as follows: "*As obtaining tenure under ESU and KBOR policies necessarily requires a significant number of years of employment*, the WMP implicitly targeted older Professors." (Doc. 25 at ¶ 105 (emphasis added).) In other words, Plaintiffs believe that simply because tenured professors are more likely to be over forty than the general population, that *any* adverse actions toward tenured professors must necessarily be age discrimination. That is well beyond the pale of what the ADEA was meant to address. *See* 29 U.S.C. § 621 (providing Congress's statement of findings and purpose for the ADEA). It was not meant to sweepingly apply to *all* adverse employment actions in any industry or occupation where the work force is older on average than the general population. It was, as the name of the act makes clear, meant to prohibit *unlawful discrimination* against older workers, not *all adverse employment actions* against older workers.

Therefore, Plaintiffs have failed to state a plausible disparate impact claim under the ADEA for failure to allege an appropriate disparity and a valid causal connection.

VII.    **In the alternative, state-court proceedings related to this case have preclusive effects and are grounds for abstention.**

A.    **Preclusion.**

Decisions by administrative agencies can have preclusive effect. *B & B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138, 150 (2015). As the Tenth Circuit has stated:

> when a state agency (1) acts in "a judicial capacity"; (2) resolves "disputed issues of fact properly before it"; and (3) the parties have had "an adequate opportunity to litigate" the issue, we will grant the state agency's decision preclusive effect to the extent that it would have received preclusive effect in state court.

*Salguero v. City of Clovis*, 366 F.3d 1168, 1173 (10th Cir. 2004). Regarding the first element:

> An agency acts in a judicial capacity when the decision is likely to affect the rights and duties of specific individuals and is reached through the application of preexisting legal standards or policy considerations to present or past facts developed at a hearing.

*J.G. ex rel. Grimes v. Bimestefer*, No. 21-1194, 2022 WL 2965794, at *3 (10th Cir. July 27, 2022). The third element, "adequate opportunity," does not require cross-examination of witnesses or all of the procedures of a court, but can be satisfied with allowing counsel and the opportunity to present evidence. *See Williams v. City of Columbia*, 906 F.2d 994, 996 (4th Cir. 1990). Kansas courts give preclusive effect to Kansas administrative determinations when an agency acts in a judicial capacity and provides basic procedural protections like notice and a hearing, the application of legal criteria to specific facts, the presentation of evidence, or being allowed counsel. *In re Tax Appeal of Fleet*, 293 Kan. 768, 779 (2012). For issue preclusion (also called "collateral estoppel") specifically, Kansas courts require three elements:

(1) a prior judgment on the merits that determined the parties' rights and liabilities on the issue based upon ultimate facts as disclosed by the pleadings and judgment; (2) the same parties or parties in privity; and (3) the issue litigated must have been determined and necessary to support the judgment.

*Id.* at 777-78. A judgment sufficiently supports issue preclusion if its necessary factual findings resulted from a party failing to carry its burden of proof. *See Union Tel. Co. v. Qwest Corp.*, 495 F.3d 1187, 1195 (10th Cir. 2007) (citing *Yates v. United States*, 354 U.S. 298, 335-36 (1957)).

Here, issue preclusion bars the relitigation of whether the terminations of Koerner, Lidzy, Lovett, and McCoy were the result of unlawful bias or discrimination. The OAH decisions in their cases held that the burden of proof to show bias was on the employee. (Exhibit E at 6; Exhibit F at 4 (Conclusions of Law ¶¶ 5-6); Exhibit G at 4 (Conclusions of Law ¶¶ 5-6); Exhibit H at 6.) And the decisions stated that the evidence produced was insufficient to show bias. (Exhibit E at 8; Exhibit F at 5 (Analysis ¶ 3); Exhibit G at 4 (Analysis ¶ 2); Exhibit H at 8-9.) This failure to meet the burden of proof to show bias supports issue preclusion. The judgments were on the merits, and they determined the parties' rights and liabilities regarding Koerner's, Lidzy's, Lovett's, and McCoy's employment based upon ultimate facts regarding bias as disclosed by the pleadings and judgments.[21] Koerner, Lidzy, Lovett, and McCoy were parties to the prior judgments. All other Defendants were either party to the prior judgments or in privity

---

[21] The time has run for these plaintiffs to appeal to the state court under the Kansas Judicial Review Act (KJRA). *See* K.S.A. 77-613(b) (providing 30 days to seek judicial review of a final order). And even if they had appealed, Kansas courts give preclusive effect to a decision even if an appeal is pending. *State v. Wright*, 199 P.3d 188 (table opinion), 2009 WL 205224, at *4 (Kan. Ct. App. Jan. 23, 2009) (citing *Phelps v. Hamilton*, 122 F.3d 1309, 1318 (10th Cir. 1997)).

with those that were.[22] The lack of bias was determined (by a failure to meet the burden of proof by Koerner, Lidzy, Lovett, and McCoy) and was necessary to affirm the terminations. So the general elements of issue preclusion are met.

The decisions also satisfy the requirements for administrative decisions to have preclusive effect. The OAH acted in a judicial capacity, affecting the rights and duties of the parties regarding Koerner's, Lidzy's, Lovett's, and McCoy's employment and reaching its decisions by applying preexisting legal standards or policy considerations to facts regarding bias developed as part of the hearings. It resolved the disputed factual issue of bias, which was properly before it. And the hearings provided basic procedural protections (including notice and a hearing, the application of legal criteria to specific facts, the presentation of evidence, and being allowed counsel[23]), which means both that an adequate opportunity to litigate the issue was provided and that Kansas courts would extend preclusive effect to the decisions. Therefore, Koerner's, Lidzy's, Lovett's, and McCoy's failure to meet their burden of proof to show bias in their administrative hearings precludes them from asserting bias in this case. Their current First Amendment retaliation claim (Count 8, Doc. 25 at 48-50) would require a finding of bias. (*See* Doc. 25 at ¶ 210.) Therefore, the Court should dismiss Koerner's, Lidzy's, Lovett's, and McCoy's First Amendment retaliation claim under issue preclusion.

---

[22] *See Yung-Kai Lu v. Univ. of Utah*, 790 F. App'x 933, 936 n.1 (10th Cir. 2019) (citing *United States v. Rogers*, 960 F.2d 1501, 1509 (10th Cir. 1992)) (saying "officers of the same government" are considered in privity with one another and "are protected from relitigation of the same issue between the plaintiff and another officer of the government"); *Mambo v. Vehar*, 185 F. App'x 763, 764-65 (10th Cir. 2006) (finding an employee and employer to be in privity).
[23] *See* Exhibit G at 1 (plaintiff Lovett was represented by counsel); (Doc. 25 at 18 ("the hearing shall allow oral presentation to the administrative hearing officer by the employee and the university, each of whom may be represented by counsel"); Doc. 25-12 at 3 ("The employee . . . may be represented by counsel.")).

### B.     *Pullman* abstention.

The Tenth Circuit recognizes three requirements to justify abstention under *Pullman*:

(1) an uncertain issue of state law underlies the federal constitutional claim; (2) the state issues are amenable to interpretation and such an interpretation obviates the need for or substantially narrows the scope of the constitutional claim; and (3) an incorrect decision of state law by the district court would hinder important state law policies.

*Caldara v. City of Boulder*, 955 F.3d 1175, 1179 (10th Cir. 2020); *see also R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496 (1941). Abstention in monetary damages actions should result in a stay rather than dismissal. *See Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 730 (1996).

Here, Plaintiffs assert a property right in their employment under state law. The existence of that property right under these circumstances, along with its metes and bounds (that is, under what circumstances it applies), remains uncertain and yet to be resolved by Kansas courts, thus meeting the first factor. If the alleged property right does not apply to terminations under ESU's Framework under Kansas law, that would either obviate the need for or substantially narrow the scope of the constitutional claims here, meeting the second factor. And the third factor is met in cases (like this one) where state law determines property rights underlying the issue.[24] Therefore, this case should be stayed under *Pullman* abstention until the state court proceedings have completed.[25]

---

[24] *See Barrett v. Atl. Richfield Co.*, 444 F.2d 38, 41 (5th Cir. 1971); *United States v. Confederate Acres Sanitary Sewage & Drainage Sys., Inc.*, 935 F.2d 796, 800 (6th Cir. 1991); *Parm v. Shumate*, 73 F. App'x 78 (table opinion), 2003 WL 21756349, at *4 (5th Cir. 2003); *Stapleton v. Mitchell*, 60 F. Supp. 51, 54-55 (D. Kan. 1945).

[25] Although sometimes courts prefer certification over abstention to avoid delay, when "there is a case involving substantially identical issues pending in state court, the concern as to delay is mitigated." *Caldara*, 955 F.3d at 1183. Here, Plaintiffs already raised unconstitutionality in their answers in the ongoing state court proceedings (footnote 6, *supra*), so abstention is appropriate. This would provide state courts the opportunity to address the uncertain state-law issues here.

C.   *Colorado River* **abstention.**

"Suits are parallel if substantially the same parties litigate substantially the same issues in different forums." *Fox v. Maulding*, 16 F.3d 1079, 1081 (10th Cir. 1994). When a parallel case exists in state court, the Tenth Circuit recognizes eight pertinent factors for a federal court to abstain under *Colorado River*: (1) whether either court has assumed jurisdiction over property; (2) the inconvenience from litigating in the federal forum; (3) the avoidance of piecemeal litigation; (4) the sequence in which the courts obtained jurisdiction; (5) the "vexatious or reactive nature" of either case; (6) whether federal law provides the rule of decision; (7) the adequacy of the state court action to protect the federal plaintiff's rights; and (8) the possibility of impermissible forum shopping. *Wakaya Perfection, LLC v. Youngevity Int'l, Inc.*, 910 F.3d 1118, 1121-22 (10th Cir. 2018); *Fox*, 16 F.3d at 1082; *see also Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 818-19 (1976).

Here, the suits are parallel as the state court cases also contest the constitutionality of the terminations.[26] Six factors weigh in favor of abstention, one is neutral, and only one weighs against abstention. Neither case is *in rem*, so the first factor is irrelevant in this case.[27] Defendants do not assert an inconvenient forum, so the second factor weighs against abstention. The remaining factors weigh in favor of abstention. It is an inefficient use of judicial resources to litigate this matter piecemeal, simultaneously in state and federal court. The state court obtained

---

[26] *See* footnote 6, *supra*.

[27] *See Golden Gate Nat'l Senior Care, LLC v. Minich ex rel. Estate of Shaffer*, 629 F. App'x 348, 350 n.2 (3d Cir. 2015) (citing *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 19 (1983)) ("The first Colorado River factor applies only to *in rem* cases and is therefore irrelevant in this case.").

jurisdiction first. Although some federal law applies, federal law defers to state law to determine the property rights in dispute at the center of this suit. Plaintiffs raised unconstitutionality in their answers in the state court proceedings and the state court can adequately protect those asserted rights. *See* K.S.A. 77-621(c)(1). This federal case was filed about three weeks after Plaintiffs filed their first answer in the state court proceedings, so it appears to be a reaction to ESU appealing OAH decisions to state court.[28] Because Plaintiffs complain of a lack of discovery in the state administrative proceedings (Doc. 25 at ¶¶ 81-82, 89-91, 99, 111, 119, 144, 146-50, 184; *see also id.* at ¶ 56), and because the availability of traditional discovery in KJRA proceedings is unclear, *Bd. of Cnty. Comm'rs v. Kan. Racing & Gaming Comm'n*, 306 Kan. 298, 317-22 (2017), it appears that Plaintiffs are forum shopping for their preferred discovery rules. (*See also* Doc. 11 (opposing Defendants' Motion to Stay Discovery).) Overall, the factors weigh in favor of abstention under *Colorado River*.

## CONCLUSION

For the foregoing reasons, Defendants request that the Court dismiss Plaintiffs' claims for lack of subject-matter jurisdiction and failure to state a claim. In the alternative, Defendants request that the Court abstain and stay the case until the state court proceedings have completed.

---

[28] Plaintiffs also filed a mandamus action in state court in February 2023 (Doc. 25 at ¶ 83), making this federal case the third legal avenue Plaintiffs are attempting to use.

Respectfully Submitted,

KRIS W. KOBACH
ATTORNEY GENERAL OF KANSAS

/s/ Shon. D. Qualseth
Shon D. Qualseth, KS S Ct. #18369
First Asst. Attorney General/Sr. Trial Counsel
Matthew L. Shoger, KS S Ct. #28151
Assistant Attorney General
Office of the Attorney General
120 SW 10th Ave., 2nd Floor
Topeka, Kansas 66612-1597
Telephone:  785-368-8424
Telephone:  785-296-6244
FAX:  785-291-3767
Email: *shon.qualseth@ag.ks.gov*
Email: *matt.shoger@ag.ks.gov*
*Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 6th day of February, 2023, the foregoing document was filed with the clerk of the court by using the CM/ECF system, which will send notice of electronic filing to the following:

J. Phillip Gragson
Amanda S. Vogelsberg
John H. Hutton
Kara L. Eisenhut
Henson, Hutton, Mudrick, Gragson
& Vogelsberg, LLP
3649 SW Burlingame Rd., Ste. 200
Topeka, KS  66611-2155
*Attorneys for Plaintiffs*

/s/ Shon D. Qualseth
Shon D. Qualseth