## IN THE UNITED STATES DISTRICT
## COURT FOR THE DISTRICT OF KANSAS

AMANDA MIRACLE, et. al.                  )
                                          )
                    Plaintiffs,          )
v.                                        )    Case No. 23-4056-JAR-GEB
                                          )
KEN HUSH, et. al.                        )
                                          )
                    Defendants.          )

**RESPONSE MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO
DISMISS AND MEMORANDUM IN SUPPORT**

Plaintiffs, by and through their counsel, oppose Defendants' Motion to Dismiss and
Memorandum in Support [Doc 31], and respond as follows:

## I.   NATURE OF THE MATTER BEFORE THE COURT

Plaintiffs amended their factually specific and robust complaint and asserted an ADEA
claim for disparate impact. At the core of Defendants' motion is their argument and belief that
KBOR, ESU and the Individual Defendants can do "whatever" and "however" they want without
regard to Plaintiffs' clearly established property right in tenure and their interest in their dedicated
careers. Defendants' position is antithetical to the basic precepts of the 14th Amendment to the
United States Constitution. Plaintiffs request the Court deny Defendants' motion.

## II.    RESPONSE TO DEFENDANTS' SOFs

1. Defendants' SOF 1, 2, 4, 5, 7, 8, 9, 10, 11, 15, 16, 17, 18, 31, 35, 36, 37, 40, 41, 42[1],
43, 44, 45, and 46 are uncontroverted.

2. Defendants' SOF 3 is uncontroverted in that KBOR considered a temporary
amendment to its policy titled "Suspensions, Terminations, and Dismissal" and that the referenced
minutes contain the quotation in paragraph 3. However, Plaintiffs controvert that the actual reason

---

[1] Plaintiff Charles Emmer was never served with process of ESU's petition for judicial review.

KBOR considered the temporary amendment was "because of the extreme financial pressures that the state universities are facing due to the COVID-19 pandemic, decreased program and university enrollments, and the state's declining fiscal support." The temporary amendment carves out from the existing policy the requirement to declare a "financial exigency," as quoted in Defendants' SOF 1. See Doc. 25 and Doc. 25-12.

3.   Defendants' SOF 6 is uncontroverted that the KBOR minutes contain comments on financial challenges and contains the referenced quotation. However, the intimation to the reduction in funding is controverted as ESU was fully funded for the 22-23 academic year. See Doc. 25 at ¶ 63 (for the 22-23 academic year ESU was fully funded) and Doc. 7 ¶ 2.

4.   Defendants' SOF 12, 13, and 14 are uncontroverted to the extent that the KBOR minutes contain the referenced statements which reference communications and interactions with faculty, but substantively controverted to the extent the statements intimate that Hush communicated to tenured faculty that they had a constitutionally protected property right in tenure and that ESU was going to terminate tenured professors without due process. Doc. 25 at ¶¶ 72, 73 (the lack of notice given to faculty and Plaintiffs).

5.   Defendants' SOF 19 is uncontroverted in that the KBOR minutes reflect the referenced statement, but substantively controverted that the ESU Framework was intended for ESU to operate differently and make fundamental changes to how it approaches academic offerings. The intent was to attack tenure. Doc. 25.

6.   Defendants' SOF 20 is uncontroverted in that the statement is in the minutes but substantively controverted to the extent the statements intimate that the Framework incorporated any suggestions from tenured faculty to not strip tenured professors of their constitutionally protected property right in tenure without due process. Doc. 25. It is controverted that any of ESU's shared governance groups were given a reasonable amount of time to consider the implications of

the Framework, since according to the minutes, they were only given a copy of the proposed Framework "last week" before ESU formally presented the Framework to KBOR. Doc. 25-11 at 2-3. Doc. 25-11 only specifies that feedback was sought from "governance group" and "faculty and staff" and it is unclear exactly what was given to whom.

7.   Defendants' SOF's 21 22, 23, 24, 25, 26, 27, 28, 30 are uncontroverted in that the ESU Framework is quoted, in part, but substantively controverted that the Framework identifies the real reason for its implementation. Defendants miss the point that due to their refusal to provide procedural and substantive due process, Plaintiffs were, and still are, unable to obtain the evidence of the real reason for the Framework, i.e., eliminating tenure without due process. Doc. 25. Further, the "appeal" provided by the Framework prevented an administrative hearing officer from considering any theories of appeal that were not based on the three narrow reasons. Doc. 25-12. The Framework's appeal process put "the burden of proof on the employee" and prohibited discovery and the calling of witnesses. Doc. 25-11 at 6.

8.   Defendants' SOF 32 is uncontroverted regarding the effective date of their termination, but controverted to the extent Defendants intimate that the notices were "pretermination" notices as the notices clearly reflect the decision to terminate was predetermined. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 545, 105 S.Ct. 1487, 1495, 84 L.Ed. 2d 494 (1985).

9.   Defendants' SOFs 33 and 34 are uncontroverted in that the ESU Framework is partially quoted, but substantively controverted that the Framework identifies the real reason for its implementation. Further, the notice is contradictory in stating, "***While the University is not facing financial exigency,*** the financial and market situations do require a prudent review and restructuring, …, which may require immediate action notwithstanding any other Board or institutional policy." (Emphasis added) Docs. 25 & 25-12, p.1.

10. Defendants' SOF 38 is uncontroverted in that Plaintiffs participated under limitations

3

required by the Framework and by OAH, but controverted in that they were absolutely denied the ability to participate in a manner prescribed by the 14th Amendment. They were not provided with the reasons they were selected for termination over others similarly situated and less qualified and they were refused the ability to call witnesses or engage in discovery. See Doc. 25 and ¶ 78. All the hearings were post termination hearings. *Loudermill*, 470 U.S. at 545.

11. Defendants' SOF 39 is uncontroverted about the dates for the "hearings," but controverted in that they were absolutely denied the ability to participate in a "hearing" as prescribed by the 14th Amendment. Plaintiffs incorporate their response to SOF 38 above.

### III.     ARGUMENT & AUTHORITIES

#### A.  Standard of Review

Dismissal under Fed. R. Civ. P. 12(b)(6) is a harsh remedy to be used cautiously to prevent interference with the interests of justice and liberal rules of pleading. *Duran v. Carris*, 238 F.3d 1268, 1270 (10th Cir. 2001). To survive dismissal, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). Plaintiffs' claim is facially plausible if they plead sufficient factual content to allow the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The plausibility standard requires "more than a sheer possibility that a defendant has acted unlawfully" but "is not akin to a 'probability requirement.'" *Id.* If the court finds any claims deficient, it has discretion to dismiss without prejudice so Plaintiff may seek leave to amend to provide additional facts. *Kerr v. Polis*, 20 F.4th 686, 717 (10th Cir. 2021).

Under a Fed. R. Civ. P. 12(b)(1) motion, a party mounts a facial or factual attack. Here, Defendants mount at least a factual attack since some of their argument appends evidence. Accordingly, a court has "wide discretion to allow … other documents, and a limited evidentiary

hearing to resolve disputed jurisdictional facts." *Baker v. USD 229 Blue Valley*, 979 F. 3d 866, 872 (10th Cir. 2020).

**B.   The Eleventh Amendment argument against Plaintiffs' ADEA claim will be cured if allowed.**

Based upon Defendants' motion regarding Plaintiffs' ADEA claims against ESU and KBOR, Plaintiffs agree to dismiss those claims without prejudice while seeking leave to amend to assert Plaintiffs' ADEA claims against those responsible Individual Defendants in their official capacity, in conformity with Defendants' arguments.[2] Defendants also concede that the Eleventh Amendment does not bar any claims against the Individual Defendants in their personal capacity for monetary relief under Section 1983 (although they contest causation as to all but Hush).

**C.   Plaintiffs sufficiently established constitutional standing against all defendants.**

To establish constitutional standing, a plaintiff must satisfy three elements: injury in fact, causation, and redressability. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61, 112 S.Ct. 2130, 2136 (1992). In addition to the plaintiff suffering an injury, "there must be a causal connection between the injury and the conduct complained of – the injury has to be 'fairly … trace[able] to the challenged action of the defendant, and not … th[e] result [of] the independent action of some third party not before the court,'" and "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Id.* at 560-61 (internal citations omitted).

Defendants mistakenly argue that Plaintiffs fail to establish standing against the KBOR Individual Defendants because Plaintiffs cannot show causation and redressability as it was ESU that terminated Plaintiffs' employment. Plaintiffs' Amended Complaint is replete with allegations of how the Individual KBOR members acted in adopting the WMP and ESU's framework which directly led to Plaintiffs' terminations. If KBOR Individual Defendants did not modify their policy

---

[2] Plaintiffs will seek leave to amend as soon as possible and before the reply is due.

protections to remove the due process requirements provided to tenured professors, ESU Defendants could not have terminated Plaintiffs as they did. The KBOR Individual Defendants exercised control over the terms and conditions of Plaintiffs' employment. Control is the benchmark for determination of "joint employer status." *Knitter v. Corvias Military Living*, LLC, 758 F.3d 1214, 1227 (2014). *Knitter* cited to *Bristol v. Bd. of Cnty. Comm'rs*, 312 F.3d 1213 (10th Cir. 2002) (en banc). "Most important to control over the terms and conditions of an employment relationship is the right to terminate it under certain circumstances...." *Bristol*, 312 F.3d at 1219. As alleged and supported by facts in Doc. 25, KBOR and ESU "were joint employers." Notably, "[w]hether an entity [] satisfies this definition [joint employer] under the appropriate test, however, 'is a fact issue for the jury.'" *Id.* at 1221.

In concert with dismissing the ADEA claims against ESU and KBOR, Plaintiffs will be seeking leave to file a Second Amended Complaint to substitute those Individual KBOR Defendants in their official capacity under the ADEA as well as the conduct under Section 1983.

Under *Copelin-Brown v. New Mexico State Personnel Office*, 399 F.3d 1248, 1253 (10th Cir. 2005), their Complaint provides sufficient allegations of causation and available remedy under the §1983 counts and conspiracy counts. Plaintiffs only must make a *plausible* claim. Even in *Copelin-Brown*, where the summary judgment standard of review was much higher, the plaintiff was able to satisfy both causation and redressability. Plaintiffs have pleaded the facts necessary to satisfy the review standard at issue. "At the pleading stage, general factual allegations in injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" *Lujan*, at 561, 2137 (quoting *Lujan v. National Wildlife Federation*, 497 U.S. 871, 889, 110 S.Ct. 3177, 3189 (1990)).

Plaintiffs adequately establish standing against the KBOR Defendants in their Complaint.

Before January 2022, KBOR policy mandated that "faculty … awarded tenure may be terminated only for adequate cause, except in the case of program or unit discontinuance or extraordinary financial circumstances because **of financial exigency**." Doc. 25-2 at p. 1-13; Doc. 25 at ¶ 48. In January 2021, KBOR adopted the WMP, which "suspended" tenure rights of professors without any due process. *Id.* at ¶ 56; Doc.25-3. The WMP omits the necessity of a "financial exigency" as pre-WMP policy requirements for termination of *non-tenured employees before tenured employees*. KBOR adopted ESU's Framework which specifically says there is no "financial exigency." *Id*. at ¶¶ 70-71, 73; Docs. 25-11, 25-12. KBOR Defendants knew or clearly should have known under *Tonkovich* that Plaintiffs had protected property rights in tenure and that the WMP would be used to terminate tenured faculty without cause and due process under the Framework.

Defendants argue that the KBOR Individual Defendants cannot redress Plaintiffs' harm because ESU is the entity that terminated their employment, but Plaintiffs have demonstrated that KBOR is able to approve policies affecting the rights of tenured faculty at ESU. *See* KSA 76-712. ESU and KBOR are alter egos of the state, and if they do share Eleventh Amendment immunity because of being alter egos then KBOR must also function as an employer. Even KSA 76-715 indicates that the chief executive officer of each state education institution can only appoint "such employees are authorized by the board of regents." Further ESU's executive officer is subject to "rules and regulations of the board of regents." K.S.A. 76-725. Not unlike in *Brown v. Wichita State University*, 217 Kan. 279, 540 P.2d 66, vacated in part on rehearing 2019 Kan. 2, 547 P.2d 1015, appeal dismissed 97 S.Ct. 41, 429 U.S. 806, 50 L.Ed.2d 67, can KBOR purposely delegate to ESU/President Hush its responsibility for managing employees of state universities, directly control ESU/President Hush, and then disclaim any liability. Even Defendants' own facts support the collective effort by Individual Defendants and their institutions to terminate Plaintiffs and revoke due process. See Doc. 31 at ¶¶13-14, 19-20 ("ESU and KBOR received and took into

consideration feedback from the ESU Faculty Senate, ESU faculty…. Some of the suggestion offered by ESU's shared governance groups were incorporated in the ESU Framework."); ¶ 31 (KBOR approved). Therefore, Plaintiffs have successfully established standing against the KBOR Defendants.

Concerning Defendants' arguments about standing against Defendants Kevin Johnson and Steven Lovett, as quoted above, general factual allegations may be sufficient at the pleading stage. *Lujan*, at 561, 2137. Based upon information and belief, Defendant Hush's Termination Letter to Plaintiffs was aided by Defendants Kevin Johnson and Steven Lovett. *See* Am. Comp., at ¶ 142. Defendant Kevin Johnson clearly had knowledge of Plaintiffs' constitutionally protected property right in tenure. *See* Doc. 25 at ¶ 47; Doc. 25-1. And then as ESU's general counsel, Defendant Johnson took the opposite position in the "appeals." *See* Doc. 25 at ¶ 75. Defendant Johnson acted as ESU's general counsel with knowledge of Plaintiffs' rights and acted with ESU's president to deny those rights. As such, Plaintiffs have established a traceable connection between Defendant Johnson's actions and Plaintiffs' termination. Plaintiffs' allegations against Defendant Steven Lovett support the claims against him. *See* general allegations against the ESU Individual Defendants, and at Doc. 25 at ¶¶ 41, 61, 73, 147. Plaintiffs alleged that Defendant Lovett engaged in the ongoing violation of federal law through his involvement in the OAH hearings and decisions to bar Plaintiffs from maintained tenure. Plaintiffs have established a fairly traceable connection between Defendant Steven Lovett's actions and Plaintiffs' termination.

Defendants argue that Plaintiffs have not established a traceable connection between Defendant Thomas's actions and Plaintiffs' terminations. Yet, Plaintiffs alleged facts sufficient to establish a claim against Thomas. Doc. 25 at ¶¶ 41, 65, 70, 147, 155 (part of the conspiracy claim).

Plaintiffs are suing Defendants Johnson, Steven Lovett and Thomas in their individual capacities and are seeking nominal, actual, compensatory and/or punitive damages as available,

not reinstatement from them. Plaintiffs have satisfied standing requirements as to these Defendants.

Lastly, Plaintiffs' alleged facts establish a conspiracy among the Individual Defendants for their respective acts furthering the alleged conspiracy. Plaintiffs' First Amended Complaint sufficiently adds a 1983 Conspiracy Claim in Count 3. Their actions are obviously interrelated, and a conspiracy claim imbues the actions of one defendant to others. It is not necessary to establish in a conspiracy that every conspirator was personally connected to the result of the conspiracy, which as alleged in this case, is the termination of tenured professors without due process of law.

### D.  Defendants are not entitled to qualified immunity

The Individual Defendants are not entitled to qualified immunity because the law on tenure in Kansas and the Tenth Circuit was clearly established when they created and adopted the WMP and Framework. The law is that bestowed tenure is a property right subject to federal constitutional protections. Plaintiffs adequately pleaded that the Individual Defendants' conduct was unreasonable regarding clearly established law. *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011).

### 1.  Plaintiffs sufficiently identified specific actions taken by Defendants

Plaintiffs alleged specific allegations against each defendant: Miller proposed the temporary amendment to the Suspensions, Terminations, and Dismissals policy ("Workforce Management Policy" or "WMP"), and Hutton moved to adopt the policy with his amendment of extending the deadline from 2021 to December 31, 2022. Van Etten seconded the motion and Hutton, Van Etten, Bangerter, Brandau-Murguia, Feuerborn, Harrison-Lee, Kiblinger, Rolph and Schmidt approved the adoption of the WMP, which allowed for the violation of Plaintiffs' rights and provided no assurances that procedural and substantive due process must be provided. Doc. 25 at ¶¶ 54-5. The WMP suspended tenure rights without due process. Doc. 25 at ¶ 56. Plaintiffs asserted that Bangerter proposed to amend the deadline to submit framework under the WMP and

that Bangerter, Van Etten, Bradau, Feuerborn, Harrison-Lee, Hutton, Kiblinger, Rolph, and Schmidt approved the extension. Doc. 25 at ¶ 57. Steven Lovett advocated against tenure to ESU leadership members and members of KBOR. Doc. 25 at ¶61. Miller proposed removing the deadline for universities to submit a framework and Lane, Schmidt, Feuerborn, Harrison-Lee, Ice, Kiblinger, Rolph, and Winter approved the elimination of any deadline, which removed another hurdle for ESU to submit its framework, which was not submitted until after the initial two deadlines. Doc. 25 at ¶64. Hush and Steve Lovett proposed their framework to KBOR. Doc. 25 at ¶ 70 (blaming the budget and ESU's operations). KBOR Defendants Ice, Lane, Benson, Dicus, Harrison-Lee, Kiblinger, Mendoza, Rolph and Winter approved ESU's faulty Framework. Doc. 25 at ¶ 71. The Framework and WMP were not submitted to the Kansas Secretary of State for adoption and publication as is required for any policy change. Doc. 25 at ¶72.

KBOR Defendants took actions which were supposedly made due to a financial crisis even though ESU was fully funded for 2022-2023 (Doc. 25 at ¶ 63), the state of emergency was in place for more than one year before ESU's Framework was approved (Doc. 25 at ¶ 58), and KBOR approved ESU's program alignment proposal to continue all programs reviewed, including history, in March 2021, just two months after approving the WMP (Doc. 25 at ¶ 59). Even after all Plaintiffs appealed and participated in the sham appeals process before the OAH, ESU and its attorneys, Steven Lovett and Johnson, and Thomas, continued fighting the appeals, refused to reinstate several Plaintiffs who were reinstated by OAH, and denied maintenance of tenure, despite knowing about the established Kansas law and *Tonkovich*. Doc. 25 at ¶ 84.

Plaintiffs' allegations specify each Defendant's action and attach KBOR minutes which show these actions (or inaction). The conspiracy counts connect these Defendants for the action of some. Plaintiffs have sufficiently pleaded with specificity.

2. **The law regarding tenure in Kansas before January 20, 2021 was established, and Defendants knew about it.**

Before January 20, 2021—when KBOR and its board members temporarily eliminated long-standing policy which required due process to terminate a tenured employee—the clearly established law in Kansas was that tenure is a property right once it was given to an employee. Defendants mistakenly claim no Kansas authority exists to support tenure as a property right outside of K.S.A. 72-5411, and fail to acknowledge that once tenure becomes a property right, it is subject to protection under the Fifth through Fourteenth Amendments to the U.S. Constitution, which require procedural and substantive due process for a tenured employee to be terminated. *Gorham v. City of Kansas City*, 225 Kan. 369; *Kosik v. Cloud County Community College*, 250 Kan 507, 512 (1992). Moreover, irrespective of tenure rights, Plaintiffs' liberty interests in their good name, reputation, honor, and integrity were also constitutionally protected rights requiring proper due process by Defendants.

> The concept of liberty recognizes two particular interests of a public employee: 1) the protection of his good name, reputation, honor and integrity, and 2) his freedom to take advantage of other employment opportunities.'" The [way] a public employee is terminated may deprive him of either or both of these liberty interests. When the termination is accompanied by public dissemination of the reasons for dismissal, and those reasons would stigmatize the employee's reputation or foreclose future employment opportunities, due process requires that the employee be provided a hearing at which he may test the validity of the proffered grounds for dismissal. (all citations omitted.)

*Miller v. City of Mission, Kan*., 705 F.2d 368, 373 (10th Cir. 1983)

As alleged, the termination letter issued to all Plaintiffs without a pre-termination hearing clearly states that potential "secondary factors" for their terminations include: (1) Performance evaluations; (2) Teaching and research productivity; and (3) Low service productivity. Yet, as pled repeatedly, Plaintiffs have yet to ever be afforded the opportunity to engage in any process sufficient to determine the actual reasons they were chosen for termination. Moreover, they

received no pretermination hearing and the "post" termination hearing procedures they were "granted" were purposefully written to preclude procedural or substantive due process sufficient to afford Plaintiffs the opportunity to show these "secondary factors" do not apply to them. As the Tenth Circuit in *Miller supra* noted, "…except in emergency situations, due process requires that the hearing be held before termination becomes effective." *Id.* (citations omitted).

In *Wertz v. Southern Cloud Unified School Dist. No. 334, 343, 218 Kan. 25 (1975)*, the Kansas Supreme Court addressed tenure in a pre-K.S.A. 72-5411 procedure case, noting:

> At the time of appellant's discharge in 1972, Kansas had provided no statutory procedure for a hearing on discharge of a public schoolteacher, with one exception. The exception is set forth in a statute (K.S.A. 72-5407) . . . . Such statute does not apply to the defendant district or to appellant.

The Kansas Supreme Court then held:

> One of the interests protected is termed 'property'. It is a purpose of the constitutional right to a due process hearing to provide an opportunity for a person to secure certain benefits and support claims of entitlement to protected rights, such as an interest in property which is being threatened by the state and its agencies. For due process under the 14th Amendment to the U. S. Constitution to apply, there must be state action and deprivation of an individual interest of sufficient substance to warrant constitutional protection. *(*citation omitted*.)*
>
> The stigma which attaches to a mid-year dismissal of a ***non-tenured*** teacher for incompetence is sufficiently injurious to call for a hearing *and, even though a hearing is not accorded such teacher by state statute, constitutional requirements of due process operate to overcome the lack of statutory rule.* (citations omitted)

(emphasis added) *Id.* at 343-344.

The Kansas Supreme Court recognized in *Kosik* that once the State confers tenure, "the property interest cannot be taken without constitutional due process." *Kosik* at 512. "The tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." *Id.* at 513 (quoting *Loudermill*, 470 U.S. at 546, 105 S.Ct. at 1495); see also, *Tonkovich v. Kansas Bd. of Regents*, 159 F.3d 504, 528 (1998) (under Tenth Circuit law, a tenured professor "**possessed a property interest**

deserving of procedural due process protections"). The *Kosik* court recognized, in quoting *Loudermill*: "An essential principle of due process is that a deprivation of life, liberty, or property '**be preceded by notice and opportunity for hearing appropriate to the nature of the case**.'" *Id.* (Emphasis added). The *Tonkovich* Court made it very clear, "[t]he federal courts, and not the University of Kansas, are responsible for establishing the contours of the Due Process Clause of the Fourteenth Amendment." *Tonkovich.* at 522. These Due Process protections for the property interest of tenure in Kansas require a pre-termination hearing before the deprivation of tenure as a property right. *Id.* at 511.

As recently as April 2022, the Tenth Circuit reiterated tenure as a property right in *Shively v. Utah Valley University,* 2022 WL 1021614, p. 1 (unreported), stating: "**And we have held tenured professors have a property interest in their employment.** See, e.g., *Tonkovich v. Kan. Bd. of Regents*, 159 F.3d 504, 517 (10th Cir. 1998)." Emphasis added. There is no case law overruling ***Tonkovich***, no constitutional amendment, no legislative action that leads to any other conclusion than that Plaintiffs have a property interest in tenure. Defendants cite no contradictory case law. *Tonkovich* also makes it clear in its reference to *Loudermill* that more than just a notice and an opportunity to make a statement is required if there is no pre termination hearing.

Defendants cannot claim they did not know about tenure being a property right. As citizens of Kansas (and individuals working in Kansas higher education), Defendants are presumed to have known the law. *Flott v. Wenger Mixer Mfg. Co.*, 189 Kan. 80, 367 P.2d 44 (1961). While Defendants argue with the source of tenure rights, they clearly overlook *Tonkovich* in which the Court articulates the common law understanding of tenure, the effect of which "was to guarantee plaintiffs employment subject to involuntary termination only on specified terms and conditions." The *Tonkovich* District Court said that this right stemmed from "The University Faculty Handbook, the University Faculty Code of Conduct, the University's rules and regulations, and

administrative decisions governing the grievance and dismissal process comprised the terms and conditions of plaintiff's employment contract with the University." 1996 WL 705777, *3 (unreported) (reversed on other grounds by 159 F.3d 504 (10th Cir. 1998)). Plaintiffs pleaded the same theory of employment contract, i.e. that they had already been granted tenure under ESU and KBOR policies in effect before the WMP was enacted temporarily[3]. Once that tenure right was bestowed, common law principles of due process attached regardless of the WMP. Qualified immunity does not shield Defendants' actions in taking away Plaintiffs' due process rights because such action was not objectively reasonable under the facts plead.

As noted above, Individual Defendants were all personally involved in the removal of Plaintiffs' property rights, that is, they either conspired, voted and approved the implementation of KBOR's temporary policy which did not protect Plaintiffs' constitutional rights, extended the deadline for universities to submit their framework to the policy which allowed ESU to submit its framework after the original deadline, and/or approved (and drafted) ESU's Framework which allowed ESU and its decision-makers to terminate Plaintiffs the same or next day. Plaintiffs have sufficiently pleaded that the law was established in Kansas, that Defendants violated Plaintiffs' constitutional right, and thus these Defendants are not shielded by qualified immunity.

Defendants allege that KBOR retained the power to modify its policy and did so, so it did not matter if Plaintiffs had a property interest in their employment (or if federal law requires more procedure). Doc. 31 at 16. KBOR cites *Scribner v. Bd. Of Educ. Of USD No. 492,* 308 Kan. 254, 258, 267-70 (2018), which is a case that examines the Kansas Legislature's actions and amendment of the Teacher Due Process Act and is not applicable to this case. In *Scribner*, the court noted that the public received notice of the legislative change when the Senate adopted amendments to

---

[3] We believe that through discovery the KBOR policies in effect when *Tonkovich* was filed were substantively like the policies applicable to plaintiffs when they were granted tenure between 1 to 20 plus years ago, respectively.

proposed legislation and sent amendments to the House of Representatives for consideration. Plaintiffs alleged that there was no similar notice given when KBOR and ESU amended their policies; rather, they just amended without adoption or publication by the Kansas Secretary of State. See Doc. 25 at ¶ 72; and, notably, the WMP was not published as required by K.S.A. 76-712, which restricts KBOR from adopting policies or making rules and regulations which are not "…authorized by law or are appropriate for such purposes." KBOR does not have the authority to take illegal action or modify policies that violate federal law.

ESU and KBOR argue that they had a right to enact the WMP and ESU's Framework to comply with K.S.A. 76-712 which says KBOR "may make contracts and adopt orders, policies or rules and regulations and do or perform such other acts as are authorized by law or are appropriate for such purposes …" But under K.S.A. 77-415(b)(1), "…each rule and regulation issued or adopted by a state agency shall comply with the requirements of the rules and regulations filing act." Further, "Except as provided in [77-415], any standard, requirement or other policy of general application may be given binding legal effect *only if it has complied with the requirements of the rules and regulations filing act*." Emphasis supplied. K.S.A. 77-415(b)(1). There is no exception to K.S.A. 77-415 that would allow KBOR to forgo publication before it implemented the WMP. KBOR was required under the Rules and Regulations Filing Act ("Filing Act") to get the temporary policy approved by the Secretary of Administration, the Attorney General, and the Director of Budget. Then, KBOR should have given at least 60 days' notice of its intended action in the Kansas Register, the Secretary of State and to the Joint Committee on Administrative Rules and Regulations established by K.S.A. 77-436. See K.S.A. 77-421.

In *Taylor v. Kansas Department of Health and Environment*, *infra*, the Kansas Court of Appeals found that if a state agency fails to submit a policy that by content and effect is a regulation to the notice and publications requirements of the Filing Act, the policy is void. In considering an

internal "no-overtime" policy adopted by KDHE, the *Taylor Court* noted:

> If the disputed overtime policy individually or in conjunction with the rest of the procedures for … the Working Healthy program is, in fact, a regulation, it must be implemented in conformity with the [] Filing Act, K.S.A. 77–415 et seq. The Act requires that proposed regulations go through a public notice and hearing process and then be formally published before taking effect. [ ] Everyone agrees the Department did not adopt the overtime policy as a regulation. If a state agency fails to submit a policy that by content and effect is a regulation to the notice and publication requirements of the Act, the policy is void. (internal citations omitted).

The WMP and ESU's Framework are by content and effect regulations required to be submitted to the Kansas Secretary of State pursuant to K.S.A. 77-415(b)(1) and (2)(B), and (2)(E)'s exceptions are not applicable. Because neither KBOR nor ESU complied with the Filing Act, the WMP is void. Consequently, Defendants' use of the WMP to terminate Plaintiffs was illegal and qualified immunity cannot protect them.

Defendants argue that KBOR could have taken the action to terminate Plaintiffs regardless of the modification of the KBOR policy because plaintiffs were not terminated "for cause." Yet, they point to no real analysis of their policies to support such an argument. The Amended Complaint and its exhibits disprove their argument. To terminate tenured professors due to "financial exigency," Defendants had to follow policies which were still in effect! *See* Doc. 25-2 at 29 (3C.10 Financial Exigency policy and procedure—*defining*[4] exigency and requiring formal recognition; and 3C.11 Personal Retrenchment Policy—procedures for financial exigency and eliminated tenured faculty). Under both policies which were not modified by the WMP or Framework, ESU was required and failed to provide due process procedures like open hearings and committee work. Neither policy was followed. Defendants' actions were not objectively

---

[4] Defendants use Merriam-Webster instead of their own policy which defines exigency as formal recognition to the extent that "…further budget or position reductions would require the nonreappointment of tenured members of the faculty or the failure to meet the standards of notice for nonreappointment of faculty. . ." Doc. 25-2 at 29.

reasonable to be shielded by qualified immunity given the facts[5] that there was not a financial exigency, let alone that ESU/KBOR followed its policies to prove a financial exigency.

A reason not to dismiss is that "[o]ur nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us and not merely to the [professors] concerned. That freedom is therefore a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom." *Keyishian v. Board of Regents of University of State of N.Y.*, 385 U.S. 589, 603, 87 S.Ct. 675, 17 L.Ed 2d 629 (1967) (explaining that academic freedom in American universities is a staple in our democracy). Defendants have policies[6] that supposedly protect this freedom and were not suspended by WMP. See Doc. 25-2 at 75 referencing policy 1B.07 Academic Freedom: "[ESU] believes the policies and guidelines developed by the American Association of University Professors, in its *1940 Statement of Principles on Academic Freedom and Faculty Tenure with 1970 Interpretive Comments*[7], are reasonable and prudent. The University endorses them . . . ." The WMP did not modify 1B.07, including the University's policy awarding "permanent status to faculty members who have been judged, on the basis of academic credentials and systematic annual evaluation as stipulated in [the policies], worthy of **continuous appointment**,"[8] which calls into question its validity as it obviously conflicts with these policies and undermines defendants' argument that it can amend a policy that ensures due process and be immune from liability.

---

[5] Doc. 25 at ¶¶ 46-51, 58-60, 62 (successful in obtaining state funding increases), 63 (ESU was funded 100%), 71-72, 76-77 (ESU acknowledges tenured faculty member's right to additional employment protections in the event of a "for cause" termination), 88-89, 96 (awarding $137,741 in bonuses a few months after notifying tenured faculty they would be terminated in part to financial conditions), 97 (Hush's pay increase).

[6] See Board of Regents Policy For Tenure 1B.0805.01 which was not modified by the WMP at Doc. 25-1 at 77.

[7] For a full reading of this policy, see https://www.aaup.org/file/1940%20Statement.pdf.

[8] Emphasis added. See ESU Policy 1B.0805.02 University Policies and Procedures for Tenure, which was not modified by the WMP at Doc. 25-1 at 78.

**E.  Plaintiffs adequately alleged their constitutional claims with specificity.**

Defendants argue that Plaintiffs failed to allege their constitutional claims with specificity. Defendants cite *Robbins v. Oklahoma, infra*, arguing "that the complaint make clear exactly *who* is alleged to have done *what* to *whom*, to provide each individual with fair notice as to the basis of the claims against him or her, as distinguished from collective allegations against the state." 519 F.3d 1242, 1249–50 (10th Cir. 2008) (emphasis in original). In *Robbins*, one of the plaintiff's complaints grouped all the defendants together by listing "Defendants" without providing any other explanation as to which defendants she was referring to. *Id.* at 1250. The plaintiff sued the Director of DHS in his individual capacity, the private owner and operator of a daycare, and individual social workers, all of which "are entirely different in character and therefore are mistakenly grouped in a single allegation." *Id.* The Court of Appeals found in *Robbins* that, "Given the complaint's use of either the collective term 'Defendants' or a list of the defendants named individually but with no distinction as to what acts are attributable to whom, it is impossible for any of these individuals to ascertain what particular unconstitutional acts they are alleged to have committed." *Id.*

While the plaintiff in *Robbins* identified the defendants without clarification, Plaintiffs have identified the actions of each Individual Defendant in the following paragraphs of Doc. 25:

Shane Bangerter: ¶¶ 55, 57, 147; Blake Benson: ¶¶ 71, 148; Ann Brandau: ¶¶ 55, 57, 147; John Dicus: ¶¶ 71, 148; Bill Feuerborn: ¶¶ 55, 57, 64, 147; Cheryl Harrison-Lee: ¶¶ 55, 57, 64, 71, 147, 148; Mark Hutton: ¶¶ 54-55, 57, 147; Carl Ice: ¶¶ 64, 71, 147, 148; Shelly Kiblinger: ¶¶ 55, 57, 64, 71, 147-8; Cynthia Lane: ¶¶ 64, 71, 147-8; Diana Mendoza: ¶¶ 71, 148; Julene Miller: ¶¶ 54, 64, 146-7; Jon Rolph: ¶¶ 55, 57, 64, 71, 147-8; Allen Schmidt: ¶¶ 55, 57, 64, 147; Helen Van Etten: ¶¶ 55, 57, 147; Wint Winter: ¶¶ 64, 71, 147-8; Ken Hush: ¶¶ 70-1, 73, 75-7, 97, 101, 123, 138, 142, 147, 149, 152, 171, 188, 205, 215, 220, 230-1; Brent Thomas: ¶¶ 65, 70, 147; Kevin Johnson: ¶¶ 47, 75, 78, 91-2, 102, 142, 147; Steven Lovett: ¶¶ 73, 78, 91, 142, 147; John Doe: ¶¶ 52, 126, 146, 155, 175, 193, 218, 223.

Plaintiffs also distinguished the actions of Defendants on behalf of each institution: regarding ESU, see ¶¶ 49-52, 58-9, 61, 63, 65, 70-3, 75-9, 81, 83-7, 91, 93-6, 99, 102-3, 105, 111,

128, 130, 133, 135, 157, 159, 162, 167, 176, 178, 181, 194, 199, 201, 208, 218, 227, 235, and 238-42; and regarding KBOR see ¶¶ 48, 51-2, 54, 56, 58-60, 62, 70-3, 75-6, 83-6, 97, 99, 101-3, 105, 135, 142, 167, 201, 218, 227, 235, 238-9, and 241-2.

Courts have allowed pleading against a collective group of defendants in certain situations. *See Estate of Ward by and through Stamp v. Pueblo Cnty.*, Colo., 2023 WL 4744928, at *7 (D. Colo. July 25, 2023) ( allowed "…where it would be 'unfair to require Plaintiff to…identify which specific Defendant committed which specific act during the incident in question…based on the circumstances alleged.'"); *see e.g., Birdsong v. Unified Gov't of Kansas City, Kan.*, 2014 WL 2216904 at *4 (D. Kan. May 29, 2014) (not reported) ("While [the plaintiff] refers to the collective "defendants" in Count 3, he is only referring to four specific Defendants out of the fourteen Defendants named in the case.).

Plaintiffs also grouped together like Defendants, just as in the *Estate of Ward* case, and provided a list of which Defendants were subjected to each grouping. Plaintiffs grouped together Individual Defendants based on their actions they took against Plaintiffs. Plaintiffs grouped together all Individual Defendants, which separates actions against them from actions against KBOR and ESU. See Doc. 25 at ¶¶ 52, 53, 84, 87, 89, 100, 102, 107, 109, 11-114, 116, 119-23, 125-27, 135-38, 140, 144-46, 151, 154, 156, 164, 166-67, 169-171, 174, 183-85, 187, 190-192, 201, 203-05, 210-12, 214, 217, 218, 220, 222, 224-27, and 229-31.

Plaintiffs divided the Individual Defendants by categorizing them as KBOR or ESU Individual Defendants. KBOR Individual Defendants are identified in Doc. 25 at ¶ 40, and are referenced in ¶¶ 67, 68, 90, 155, 165, 175, 193, and 223. ESU Individual Defendants are identified in Doc. 25 at ¶ 41, and are referenced in ¶¶ 67, 68, 90, 94, 95, 134, 149, 150, 155, 163, 165, 175, 182, 193, 200, and 223. Plaintiffs also listed ESU Individual Defendants, ESU, KBOR Individual Defendants, KBOR, and John Doe as Conspirators. Doc. 25 at ¶ 126. Conspirators are specifically

identified as to their actions in paragraphs 132, 133, 155, 161, 162, 175, 180, 181, 193, 198, 199, 218, and 223. As such, Plaintiffs have pleaded with specificity against each Defendant.

**F.  Plaintiffs' conspiracy claims are adequately pleaded.**

Count III, while mislabeled as a §1985 claim, is pled as and intended to be a conspiracy claim under §1983. Plaintiffs will amend to clarify this, but regardless the facts as pled clearly establish it as a §1983 claim which should not be dismissed.

Section 1985 grants a cause of action to anyone subjected to a conspiracy to deprive that person of "the equal protection of the laws, or of equal privileges and immunities under the laws…." 42 U.S.C. § 1985(d). A § 1983 conspiracy claim requires that plaintiffs allege both (1) a conspiracy, and (2) an action to deprive plaintiff of equal protection or equal privileges and immunities. *Tilton v. Richardson*, 6 F.3d 683, 686 (10th Cir. 1993). To plead the conspiracy element, a plaintiff must allege "at least a combination of two or more persons acting in concert and an allegation of a meeting of the minds, an agreement among the defendants, or a general conspiratorial objective." *Brooks v. Gaenzle*, 614 F.3d 1213, 1227-28 (10th Cir. 2010), *abrogated on other grounds*, *Torres v. Madrid*, 141 S. Ct. 989 (2021). Tenth Circuit law, for a viable conspiracy claim, requires "specific facts showing an agreement and concerted action among the defendants." *Tonkovich v. Board of Regents*, 159 F.3d 504, 533 (10th Cir. 1998).

Section 1985(3) applies to conspiracies motivated by some racial, or otherwise class-based, invidiously discriminatory animus. A Section 1985(3) claimant must be a member of a statutorily protected class, and the actions taken by defendant must stem from plaintiff's membership in the class. *Ellibee v. Hazlett*, 122 Fed. Appx. 932, 935, 2004 WL 2850097 at *2 (10th Cir. 2004). Although the Tenth Circuit has not expanded Section 1985 to cover a class based on political loyalty or association, or teachers, it has not addressed a class of tenured professors who are both union sympathizers and faculty senate members, and a conspiracy against academic freedom. For

purposes of a Section 1985(3) conspiracy claim, Plaintiffs plead that they are a class of tenured professors who are problematic leaders at ESU (having served on faculty senate and knowing policies and rules) and being union sympathizers. Further, employees who are trying to organize a union or advocating collective bargaining rights are protected by federal law under the National Labor Relations Act, and thus Plaintiffs meet the element required for being a member of a statutorily protected class. 29 U.S.C. §§ 151-169. Also, under *Tonkovich*, tenure is recognized as a protected class. Plaintiffs' conspiracy counts under § 1985 have enough specificity.

Plaintiffs' claims are based on "other class-based factors"—tenure status, union sympathizers/organizers and faculty senate members or former members. For Plaintiffs' conspiracy theory, see Doc. 25 at ¶ 216-31, Counts IX and X, as they allege that Plaintiffs share a common classification as "tenured," and people who were, or were perceived to be "problematic" to the ESU Administration for the reasons plead. The classification of being "tenured" motivated the Defendant Conspirators; that the Conspirators had personal animus against Plaintiffs; and that one or more of the Conspirators believed Plaintiffs were problematic and used the WMP to terminate the tenured Plaintiffs. Defendants conspired and took action to deprive Plaintiffs of their liberty interest without due process and with knowledge that tenure was a protected property right. The injury is no due process, loss of job and benefits, damage to reputation, and loss of ability to maintain tenure. Doc. 25 at ¶¶ 216-31.

The main case that Defendants cite is at the summary judgment stage, as are several cases on the issue, after discovery when the elements of a 1985(3) claim could properly be analyzed by the court. *Busey v. Board of County Com'rs of County of Shawnee, Kansas*, 277 F.Supp. 2d 1095 (D. Kan. 2003). Since no discovery has taken place, dismissal at this stage would be premature. Afterall, the nature of conspiracies often makes it impossible to provide details at the pleading

stage and the pleader should be allowed to resort to discovery processes and not be subject to dismissal of the complaint. *Brever v. Rockwell Intern. Corp.*, 40 F.3d 1119, 1126 (10th Cir. 1994).

The second part of Section 1985(2) recognizes an action for persons conspiring to obstruct justice in state proceedings. This part requires that the conspirator's actions be motivated by an intent to deprive their victims of the equal protection of the laws and there is no class-based animus requirement. *Kush v. Rutledge*, 460 U.S. 719, 726, 103 S.Ct. 1483, 75 L.Ed.2d 413 (1983). Plaintiffs specifically pleaded the limited considerations available on appeal of ESU's notice of termination which repeated the language of KBOR's WMP and was pursuant to ESU's Framework. The limited nature of what the OAH's administrative law judges could consider was noted by several judges. Doc. 25 at ¶¶ 73 and 56, Doc. 25-12. Neither the WMP nor Framework provide for an avenue of appeal of the OAH's decisions, although ESU has filed petitions for review in several of the tenured Plaintiffs' cases. For these reasons, the claims should survive.

This court should not override Tenth Circuit precedent which does not recognize the intra-corporate conspiracy doctrine especially in the civil rights context applicable here. *See Brever v. Rockwell Intern. Corp.*, 40 F.3d at 1127.

### G. Plaintiffs sufficiently pleaded the statistical data necessary to raise an inference of a disparate impact.

Defendants argue that Plaintiffs "must allege and establish a disparity showing that the employer tended to retain younger employees *in similar positions* to those of persons terminated or to hire younger employees *in similar positions* to replace them." Doc. 31 at 22. However, Defendants' understanding of how to establish a prima facia case for disparate impact is flawed. "To establish a prima facie case of disparate impact discrimination under the ADEA, 'plaintiffs must show that a specific identifiable employment practice or policy caused a significant disparate impact on a protected group.'" *Frappied v. Affinity Gaming Black Hawk, LLC*, 966 F.3d 1038,

1054 (10th Cir. 2020) (quoting *Pippin v. Burlington Res. Oil & Gas Co.*, 440 F.3d 1186, 1200 (10th Cir. 2006)) (plaintiffs do not need to establish a prima facie case in the complaint).

Age-based disparity may be shown by comparing the effects on 40-and-older workers to those on younger-than-40 workers or by using a dividing line higher than 40 years of age (e.g., by comparing the effects on 50–and–older workers to those on younger than 50 workers). See *Karlo*, 849 F.3d at 72 ("A specific, facially neutral policy that significantly disfavors employees over 50 years old supports a claim of disparate impact under the plain text of §623 (a)(2).").

For instance, the Tenth Circuit determined in *Frappied*—a case Defendants rely on—that statistical data detailing the differences in the ages of retained and laid off employees is sufficient to raise an inference of a disparate impact. *Frappied*, 966 F.3d at 1055. In *Frappied*, the plaintiffs provided the following data in support of their disparate impact claim under the ADEA: 31 laid off employees were under the age of forty, whereas 29 employees were forty or older; and 32 retained employees were under the age of forty and 14 were forty or older. *Id.* at 1054. The Tenth Circuit was able to use the data provided by the plaintiffs to calculate the percentage of employees over the age of forty that were terminated by the defendant. *Id.* at 1055. The plaintiffs used Fisher's Exact test to interpret their provided data. *Id.* The case explains the statistical significance in greater detail which is unnecessary to reiterate here because that pleading was being evaluated under the summary judgment stage, and still passed muster. Here, at the motion to dismiss stage, Plaintiffs' pleadings meet even that higher standard.

In the present case, Plaintiffs provided the statistical data expected in this jurisdiction to survive a motion to dismiss. In the Amended Complaint, Plaintiffs state that 29[9] employees were terminated under the WMP and ESU Framework. *See* Doc. 25 at ¶¶ 239-40. Plaintiffs pleaded that,

---

[9] Initially, 30 employees were terminated. However, one of the terminated employees was rehired, leaving 29 terminated employees under the WMP and ESU Framework. Doc. 25 at ¶ 240.

"At the time of termination, approximately 73% of ESU employees were over the age of 40, however 90% of the 29 employees terminated under the WPM and the ESU plan were over the age of 40, establishing a statistical disparity resulting from ESU and KBOR's action." Doc. 25 at ¶ 241. Plaintiffs calculated this data from *publicly available* data on KBOR's website based on the total number of faculty employed.[10] The statistical data provided by Plaintiffs is consistent with data accepted by the *Frappied* court.

Defendants also attempt to argue that alleged disparities should be based on "appropriate" or "relevant" comparables, arguing that "in reduction-in-force cases like this one, it would be improper to simply compare the persons terminated under forty and the persons terminated over forty." Doc. 31 at p. 22. While Defendants are citing *Frappied* for "relevant" comparables, they ignore the context of that citation. *Frappied* relies on a case in which the plaintiff was not specific in his allegations against his employer. The Tenth Circuit determined that arguing only that "more over-forty workers than under forty workers," without providing data to enforce that allegation, is not enough to allege discrimination. *Id.* at 1055 (citing *Pippin v. Burlington Res. Oil And Gas Co.*, 440 F.3d 1186, 1201 (10th Cir. 2006)). The present case is distinguishable from *Pippin* because Plaintiffs pleaded statistical data with "relevant" comparables.

Defendants also argue that Plaintiffs did not compare the relevant positions. Doc. 31 at p. 22-24. However, as detailed above, that is not an element of a prima facie case for disparate impact under the ADEA. Plaintiffs have sufficiently pleaded the necessary elements of a prima facie disparate impact claim, and their claim should not be dismissed.

**H.  The state court proceedings do not preclude this federal case or claims.**

Defendants are once again trying to bar the method and pursuit of justice for Plaintiffs by

---

[10]https://www.kansasregents.org/resources/PDF/Data/2023_State_University_Data_Book/2023_State_University_Data_Book_Section_4.pdf

barring them from litigating any issue concerning "bias" or "discrimination" because those were two of only three factors which were allowed to be considered on appeal to OAH.

### A.  Preclusion is not applicable.

Plaintiffs believe that Kansas preclusion law applies concerning state law claims but federal preclusion law applies concerning Plaintiffs' federal claims. *See Herington v. City of Wichita*, 314 Kan. 447, 500 P.3d 1168 (Kan. 2021). If this court applies Kansas issue preclusion law to the underlying Kansas agency action, preclusion does not apply because the same claims were not at stake in Plaintiffs Koerner's, Lidzy's, Lovett's, and McCoy's cases as compared to their federal claims, the same parties were not involved (none of the Individual Defendants were parties to the case, nor was KBOR), and some of these claims were not raised, nor could have been raised before OAH, especially considering the narrow standard to appeal and disallowance of discovery or calling of witnesses. *In re Application of Fleet for Relief from a Tax Grievance in Shawnee County,* 293 Kan. 768, 272 P.3d 583, 589-90 (2012).

If this court applies Federal law, preclusion only applies where the basic requirements are met, i.e., "when an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or different claim." *B&B Hardware, Inc. v. Hargis Indus., Inc.,* 575 U.S. 138, 135 S.Ct. 1293, 1303, 191 L.Ed. 2d 222 (2015). In *Eby v. United States,* 133 Fed. Cl. 706, 710 (2017), the government tried to argue that the EEOC's findings concerning a reprisal claim had preclusive effect to a subsequent lawsuit concerning a settlement agreement involving the same parties and an employment discrimination claim. It was not evident whether the claim was litigated and there was no determination concerning the settlement agreement. Also, even if the EEOC awarded the complainant damages, there was evidence that she did not receive most of that relief and therefore the effects of the employer's

breach of contract had not been completely and irrevocably eradicated.

In *Salguero v. City of Clovis*, 366 F.3d 1168, 1173 (10th Cir. 2004), the court examined whether Salguero "had a full and fair opportunity to litigate an issue" and, focused on "whether there were significant procedural limitations in the prior proceeding, whether the party had the incentive to litigate fully the issue, or whether effective litigation was limited by the nature or relationship of the parties." Salguero was represented by counsel. He was able to call witnesses, cross-examine witnesses and present other evidence unlike all our Plaintiffs at the time of the OAH hearings. *Id.*

Plaintiffs were not able to call witnesses or cross-examine witnesses. Although they could attach documents to their letter of appeal, they could not introduce any evidence or do any discovery. There is no evidence in the pleadings that establish whether attorneys represented any of the Plaintiffs at the hearing[11], although ESU only had attorneys Johnson and S. Lovett present at many of the hearings. A full and fair opportunity to litigate the issue of whether the termination was biased or discriminatory was not provided. Moreover, the administrative hearing judgments had a limited review in Plaintiffs' cases. Only ESU was a party to the OAH hearing, and no Individual Defendants were present. Further, Plaintiffs' federal claims encompass the problematic procedural limitations established by KBOR's WMP and ESU's Framework, and the full effect of those limitations could not have been realized until the ALJs issued their opinions, which means the same issue could not have been litigated in the OAH hearings and will not be considered by the state court. Plaintiffs did not have a fair chance to argue or prove "bias" because their notices were so broad. They were not notified of the reason for termination, regardless of any ALJ decision; all Plaintiffs received formulaic notices using all-encompassing language.

---

[11] To the undersigned's knowledge, only Plaintiff Christopher Lovett had an attorney present at his hearing.

Defendants seek dismissal of Koerner's, Lidzy's, Lovett's, and McCoy's First Amendment retaliation claims because they require a finding of bias. The elements of a First Amendment retaliation claim do not require proof of bias. *Martley v. Basehor, Kansas, City* of, 537 F.Supp. 3d 1260 (D. Kan. 2021); *Douglass v. Garden City Community College,* 652 F.Supp.3d 1329, 1347 (D. Kan. 2023) (the court looks at whether defendants "acted on the basis of a culpable subjective state of mind" to show an offender's "substantial motivation."). The First Amendment issue was not decided or litigated in Plaintiffs' OAH appeals. Thus, preclusion does not apply.

## B.  Pullman Abstention

 "Pullman doctrine is limited to uncertain questions of state law." *Hawaii Hous. Auth. v. Midkiff*, 467 U.S. 229, 236, 104 S.Ct. 2321, 81 L.Ed.2d 186 (1984) (citing *Colorado River*, 424 U.S. at 813, 96 S.Ct. 1236). The federal court should not abstain from exercising jurisdiction to decide the federal constitutional claim where there is no ambiguity in the state statute. *Marie v. Moser,* 65 F.Supp.3d 1175, 1196 (D. Kan. 2014); see also *Zwickler v. Koota*, 389 U.S. 241, 251, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967) (a federal court should not abstain under *Pullman* simply to give a state court the first opportunity to decide a federal constitutional claim).

Defendants have cited no authority which indicates there is ambiguity or uncertainty in the Kansas laws concerning tenure. The purpose of abstaining under *Pullman* is to avoid unnecessary state-federal friction where deference to a state court decision may negate the federal question involved. That concern is missing here, so *Pullman* should not be applied.

Staying the federal case will not resolve any issue of tenure in Kansas because the state proceedings are so narrowly governed by the KJRA. Under the KJRA, the party challenging an agency order has the burden of showing to the district court that the agency's order is invalid. See K.S.A. 77-261(a)(1) & K.S.A. 77-621(c) (setting out the eight standards under which this court shall grant relief). Moreover, the state district court will be focusing on whether the agency's action

was arbitrary and capricious. *Denning v. Johnson Cty., Sheriff's Civil Serv. Bd.*, 46 Kan. App. 3d 688, 701, 266 P.3d 557 (2011) *aff'd sub nom.* 299 Kan. 1070, 329 P.3d 440 (2014). The OAH administrative law judge's orders do not focus on tenure, rather they focus on whether the termination notices complied with Framework and WMP. *Pullman* is inapplicable.

### C.  Colorado River Abstention

 The circumstances appropriate for abstention under *Colorado River "*are 'considerably more limited than the circumstances appropriate for abstention' and must be 'exceptional.'" *BNSF Ry. Co. v. Brown*, 250 F.R.D. 544 (2008) (citation omitted). The Court must determine whether there exists some exceptional circumstance and the clearest of justification to use this doctrine. *Id.* To even apply *Colorado River*, there must be a showing that the state suit and this federal suit are parallel, and that is where the analysis stops because they are not. *Id.* "Suits are parallel if substantially the same parties litigate substantially the same issues in different forums." *Id.*

First, the parties are not completely the same. Four Plaintiffs are not even involved in the state cases and the Individual Defendants are not parties in the state cases. The remedy sought by ESU in the state cases is a reversal of the reinstatement orders and an injunction. There are no money damages sought in the state cases. The defense in the state cases is based on KSA 77-621(a)(1) which is not at issue in this case. The state court action will not dispose of all claims before this Court as Plaintiffs did not initiate or assert Plaintiffs' federal constitutional claims under Section 1983 or Plaintiffs' ADEA claim. Nor do the state cases involve Defendants' action in placing the seven reinstated professors on administrative leave from engaging in those academic activities necessary to maintain tenure. Under *BNSF Railway Company*, the Court should deny Defendants motion on this issue as the cases are not parallel. This court should exercise jurisdiction.

The eight factors favored by the Tenth Circuit also favor Plaintiffs on this issue. Four of

the eight are discretionary. See *Fox v. Maulding*, 16 F.3d 1079, 1082 (10th Cir. 1994). The first factor is not present. The second factor weighs in favor of Plaintiffs since there are multiple plaintiffs and defendants who reside in various locations including in another state and outside Lyon County (venue for KJRA appeals). The third factor is not pronounced in this case because the state court is only considering whether to overturn reinstatement under a limited review standard. Further, K.S.A. 77-617 limits new issues in the state court's review; and judicial review is confined to the agency record (which contained no discovery, testimony). K.S.A. 77-618. Receipt of additional evidence in the state case is completely discretionary. K.S.A. 77-619. The order in which the courts obtained jurisdiction is a required factor that favors Plaintiffs since some state cases were filed after the federal filing—and of course no state cases involving four Plaintiffs.

Out of the four discretionary factors, the majority weigh in favor of the federal court exercising jurisdiction. The federal law provides the rule of decision on the federal constitutional arguments and interpretation of *Tonkovich*. Plaintiffs have not asserted their 1983 money judgment claims against the individual defendants in any other forum than this Court. As such, balancing all factors results in this court exercising jurisdiction in the federal case.

Lastly, regarding the reinstated Plaintiffs, each has a duty to mitigate the damages caused by the Individual Defendants' actions in violation of their constitutional rights. The seven Plaintiffs' "action" in opposing the ESU KJRA appeals is nothing more than a reasonable step to mitigate their damages. Yet, Defendants argument serves to simply punish Plaintiffs for trying to minimize the damages caused by Defendants. Opposing the ESU appeals in no way precludes Plaintiffs' claims against the Individual Defendants.

## IV.    CONCLUSION

For the foregoing reasons, and others, the Motion should be denied. Plaintiffs respectfully request oral argument on all matters concerning this pleading.

Respectfully submitted,

/s/ J. Phillip Gragson
J. Phillip Gragson, #16103
Amanda S. Vogelsberg, #23360
HENSON, HUTTON, MUDRICK,
GRAGSON & VOGELSBERG, LLP
3649 SW Burlingame Rd., Ste. 200
Topeka, KS 66611-2155
(785) 232-2200; (785) 232-3344 (fax)
jpgragson@hhmglaw.com
avogelsberg@hhmglaw.com
*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was filed on this 5th day of March, 2024 with the clerk using the CM-ECF system which will send notice to all parties of record.

/s/ J. Phillip Gragson
*Attorneys For Plaintiffs*