Exhibit 7

**To The**

**Kansas Office of Administrative Hearings**

---

**Emporia State University's Response**

**To The Administrative Appeal**

**Of**

**Dr. Amanda Miracle, Professor**

---

**Pursuant To The**

**Workforce Management Policy**

**As Approved By The Kansas Board Of Regents On**

**September 14, 2022**

---

**Submitted On**

**November 10, 2022**

0025

# I. INTRODUCTION

On September 15, 2022, Professor, Dr. Amanda Miracle, was provided written notice her employment with Emporia State University would end as of May 16, 2023, approximately seven months later.[1] Dr. Miracle was also informed that upon completion of her responsibilities, she would become eligible for an additional three (3) months' severance pay.

In the same notice, Dr. Miracle was advised that the decision to end her employment was authorized by, and made pursuant to, a governing Kansas Board of Regent's policy, as well as Emporia State University's Workforce Management policy, which had been unanimously approved by the Board of Regents on September 14, 2022.[2] In accordance with those policy requirements, Dr. Miracle's notice further advised that her lay-off was based "[s]pecifically … but not limited to" low enrollment, cost of operations, the restructuring of a program[3] or department, and other potential considerations.[4]

Thereafter, on or about October 12, 2022, Dr. Miracle filed an administrative appeal of the University's decision, challenging President Hush's decision based on: (1) the quality and sufficiency of her performance as a long-standing faculty member and (2) that her most recent, and previous, Notice(s) of Appointment carries "continuous tenure."[5]

## II. SOURCES OF AUTHORITY FOR BOARD POLICY AND ESU POLICY

The Kansas Board of Regents (hereinafter "KBOR" and/or the "Board") is a policy-making body created by Article 6 of the Constitution of the State of Kansas and invested with the statutory responsibility to control, supervise, and operate the state universities within Kansas.[6] KBOR's lawful obligation to operate the state universities includes, but is not limited to, supervising their operations and budgets and developing policies on a wide range of issues, including but not limited to employment issues.[7]

As part of its statutory authority, the Board has the exclusive right to appoint a chief executive officer for Emporia State University, according to its own standards and policies.[8] Pursuant to

---

[1] See Exhibit A. Letter to Dr. Miracle, dated September 15, 2022.
[2] Id.
[3] Herein at all times, the term "program" is intended as a holistic, generic description to include, but is not necessarily limited to, major degrees, minor degrees, concentrations, certifications, and academic disciplines of study.
[4] See Exhibit A.
[5] See "Appeal of Emporia State University's Decision Based on the 'Workforce Management Policy'," Miracle, A., October 2022.
[6] See K.S.A. 76-780. "The board of regents shall have all the powers necessary to carry out the purposes and provisions of this act, including, without limitation, the following powers: … (f) do any and all things necessary or convenient to exercise the powers authorized by this act[.]" See also K.S.A. 74-3202a.
[7] See K.S.A. 76-712. See also KBOR Policy Manual, Chapter II., Section C. "Chief Executive Officer, Faculty and Staff."
[8] See K.S.A. 76-714. "The chief executive officers of the state educational institutions shall be appointed by the board of regents." Also see K.S.A. 76-725. "Any such person or committee may be selected or elected in any manner approved by the board of regents." Also see KBOR Policy Manual Chapter II., Section C.2.a., et al.

2

this authority, the Board appointed Ken Hush as the 18th President of Emporia State University on June 22, 2022.[9] As the chief executive officer (designated as "President" for Emporia State University), President Hush possesses the statutory and policy authority, and mandate, to "administer the affairs of the university … [and to be] accountable for all operations of the university[.]"[10] This includes the authority to "make all employee appointment decisions" at ESU.[11]

### III. KANSAS BOARD OF REGENTS' GOVERNING POLICY AND THE BOARD'S SUBSEQUENT APPROVAL OF ESU'S WORKFORCE MANAGEMENT POLICY

At its January 2021 meeting, the Kansas Board of Regents considered a proposed, temporary change in the section of Board policy related to the dismissal or termination of university employees, including but not limited to, faculty members "because of the extreme financial pressures that the state universities are facing due to the COVID-19 pandemic, decreased program and university enrollments, and the state's declining fiscal support."[12] At that time, Regent Mark Hutton noted "the proposed policy is not a threat to tenure because tenure does not mean that a job is guaranteed regardless of financial circumstances. Tenure was put in place to ensure academic freedom, which the Board highly values, and handcuffing a university's ability to ensure financial strength in the name of tenure is counter to its purpose."[13]

---

[9] See Exhibit B. "Kansas Board of Regents Minutes of Special Meeting, June 22, 2022". The process used to identify and select Ken Hush as ESU's President, *i.e.*, through a closed search process, is the standard practice for the Board's hiring practices for state institution chief executive officers.

[10] See KBOR Policy Manual Chapter II., Section C.2.a.i.(1). See also K.S.A. 76-725. "[T]he chief executive officer of each state educational institution shall administer the affairs of such institution and may delegate to any officer, employee, student, faculty committee, student-faculty committee, or student committee any part of such authority or any of such duties."

[11] See KBOR Policy Manual, Chapter II., Section C.2.b.i.(1). "[T]he Board has authorized each state university chief executive officer to make all employee appointment decisions at her or her institution." President Hush may also, at her discretion, delegate that authority. See id. See also K.A.R. 1-2-4 definition of Agency and 1-2-9 definition of Appointing Authority which gives specific human resource authorities by the State of Kansas, enacting K.S.A. 75-2935 and 75-2935b

[12] See Exhibit C. "Kansas Board of Regents Minutes, January 20, 2021" p. 12.

[13] See Id at p. 13. See also KBOR Policy Manual, Chapter II., Section C.2.b.vii.(f). "Tenure is a privilege that must be affirmatively granted by the institution in recognition of meritorious performance." See also, *e.g.*, *Vaughn v. Nadel*, 228 Kan. 469, 473-74, 618 P.2d 778, 783 (Kan. 1980) ("Rights are vested when the right to enjoyment, present or prospective, has become the property of some particular person or persons as a present interest. On the other hand, **a mere expectancy of future benefit**, or a contingent interest in property founded on anticipated continuance of existing laws, **does not constitute a vested right** … A vested right is a right so fixed that it is not dependent on any future act, contingency or decision to make it more secure") (citations omitted) (emphasis added). Neither Kansas statutory law, Board policy, nor University policy create an explicit right to tenure, nor a property interest in tenure, for university tenured faculty members. Instead, even under normal policy standards, tenured employment is a characterized as a "privilege" to which the Board and/or the University reserve discretion to withdraw for various reasons, such as a felony conviction, **significant reduction in or elimination of a position's funding source**, program discontinuance, financial exigency, or for just cause. See KBOR Policy Manual, Chapter II., Section C.6.a.i. and b.i. Even detailed, procedural protections for dismissing a tenured faculty member are not sufficient to create a protected property interest. See *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541, 105

The proposed new policy stated, in part, that "any state university employee, including a tenured faculty member, may be suspended, dismissed, or terminated from employment by their respective university."[14] Additionally, said policy stated that a "[d]eclaration of financial exigency and the processes associated with declaration of financial exigency shall not be a prerequisite to any suspension, dismissal, or termination authorized by this provision, and no existing university policy hearing procedures shall apply to such decisions."[15] After a roll call vote, the Board approved the policy, which made the new policy effective through December 31, 2022.[16]

The following month at the Board's February 2021 meeting, the Board "amended the policy to allow universities more time to develop the framework required for implementation of the policy, and to attempt to address their financial situation short of using the policy."[17]

At the request of the Council of Faculty Senate Presidents, the Board's standing Governance Committee created a workgroup in March 2021 whose charge included the Board's justification for its newly enacted Workforce Management Policy, to-wit:

> *Pursuant to the Kansas Constitution, the role of the Board of Regents is to control and supervise the state universities in accordance with state law. The Board has broad statutory authority to control and supervise the operation and management of the six state universities and has a fiduciary duty to those institutions to ensure their long-term financial health while maintaining quality and affordability to both current and future generations of Kansans. While the Board continues to advocate for adequate state funding, it must also strive to keep tuition and fees reasonable while not sacrificing the value of the education and research that our State has come to rely on and expect from these institutions. As expressed in the Board's temporary, pandemic-related workforce management policy, **the COVID-19 pandemic combined with flat to lower enrollments and the long-term downward trend in State funding has placed extreme financial pressures on the state universities, making time and precision of the essence in addressing those financial pressures**. It is in this context, and because salary is by far the greatest expense on every campus, the Board determined it necessary to provide the institutions with a short-term workforce management tool that will enable them to address current financial difficulties.*[18]

A year later, during the Board's May 2022 meeting, it was noted that while "the Board was successful in obtaining state funding increases during the current Session, the **enrollment and**

---

S.Ct. 1487, 84 L.Ed.2d 494 (1985). See also, *Bunger v. University of Oklahoma*, 95 F.3d 987, 990–91 (10th Cir.1996) (procedural guidelines in Faculty Handbook did not create interest in reappointment).

[14] See KBOR Policy Manual, Chapter II., Section C.6.b.ii.

[15] Id.

[16] See Exhibit C. "Kansas Board of Regents Minutes, January 20, 2021" p. 14.

[17] See Exhibit D. "Kansas Board of Regents Minutes, February 17, 2021" p. 2.

[18] See Exhibit E. "Meeting Agenda, April 14, 2021" Section VII.C.1. "Consideration of Discussion Agenda: Governance: Receive and Act on Recommendations from Workgroup" p. 66 – 67 (emphasis added).

Dr. Miracle's appeal does not state any claim based on the allegation that President Hush's decision was not reasonable or based on a foundation of fact.[114] Even in the absence of an explicitly stated claim, Dr. Miracle's appeal fails to produce any, or any adequate, evidence that President Hush's decision was arbitrary or capricious. Accordingly, Dr. Miracle has failed to meet her burden of proof.[115]

Dr. Miracle does complain, however, that her most recent, and previous, Notice(s) of Appointment carries "continuous tenure"[116] and therefore she should remain employed at ESU regardless of her discipline's restructuring, loss of revenue, or low enrollment. As noted above, and as a matter of Board policy, "[t]enure is a **privilege** that must be affirmatively granted by the institution in recognition of meritorious performance."[117] Neither Kansas statutory law, Board policy, nor University policy create an explicit right to tenure, nor a property interest in tenure, for university tenured faculty members. Instead, even under normal policy standards, tenured employment is a characterized as a "privilege" to which the Board and/or the University reserve discretion to withdraw for various reasons, such as a felony conviction, significant reduction in or elimination of a position's funding source, program discontinuance, financial exigency, or for just cause.[118] Probationary tenure-track and tenured appointments are annual appointments limited in terms, notably to one academic year, a 12-month period, or summer sessions.[119] All academic appointments are subject to annual review and annual renewal, including those for tenured faculty.[120] As a faculty member, Dr. Miracle has performed in line with expectations and conditions to remain employed (*i.e.*, sufficient teaching, scholarship, and service performance); her performance as an employee does not spontaneously create a property interest or right.

---

[114] See Exhibit H. See also "Appeal of Emporia State University's Decision Based on the 'Workforce Management Policy'," Miracle, M., October 2022.

[115] See Exhibit H. See also, *Country Club Home, Inc. v. Harder*, 228 Kan. 756, 763 (Kan. 1980) ("A rebuttable presumption of validity attaches to actions of administrative agencies; the burden of proof rests with the party or parties challenging the action of an administrative agency") (citations omitted).

[116] See "Appeal of Emporia State University's Decision Based on the 'Workforce Management Policy'," Miracle, A., October 2022. The concept of "continuous," if strictly applied as Dr. Miracle's argument implies, would lead to absurd results, *i.e.*, an employee would forever be employed, regardless of any other intervening or mitigating factor or circumstance. See, *e.g.*, Morton County Hosp. v. Howell, 51 Kan.App.2d 1103, 1106 – 07, 361 P.3d 515, 519 (Kan.App. 2015) (a fundamental rule of statutory interpretation is that "courts should construe statutes to avoid unreasonable or absurd results").

[117] See KBOR Policy Manual, Chapter II., Section C.2.b.vii.(f). (emphasis added). See also, *e.g.*, *Vaughn v. Nadel*, 228 Kan. 469, 473-74, 618 P.2d 778, 783 (Kan. 1980) ("Rights are vested when the right to enjoyment, present or prospective, has become the property of some particular person or persons as a present interest. On the other hand, a mere expectancy of future benefit, or a contingent interest in property founded on anticipated continuance of existing laws, does not constitute a vested right … A vested right is a right so fixed that it is not dependent on any future act, contingency or decision to make it more secure") (citations omitted) (emphasis added).

[118] See KBOR Policy Manual, Chapter II., Section C.6.a.i. and b.i. Even detailed, procedural protections for dismissing a tenured faculty member are not sufficient to create a protected property interest. See *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). See also, *Bunger v. University of Oklahoma*, 95 F.3d 987, 990–91 (10th Cir.1996) (procedural guidelines in Faculty Handbook did not create interest in reappointment).

[119] See Exhibit S at 1B.01.

[120] See Exhibit S at 1A.0101 and 1A.0102.

To The

Kansas Office of Administrative Hearings

———————————————

Emporia State University's Response

To The Administrative Appeal

Of

Dr. Lynnette Sievert, Professor

———————————————

Pursuant To The

Workforce Management Policy

As Approved By The Kansas Board Of Regents On

September 14, 2022

———————————————

Submitted On

November 10, 2022

# I. INTRODUCTION

On September 15, 2022, Professor, Dr. Lynnette Sievert, was provided written notice her employment with Emporia State University would end as of May 16, 2023, approximately seven months later.[1] Dr. Sievert was also informed that upon completion of her responsibilities, she would become eligible for an additional three (3) months' severance pay.

In the same notice, Dr. Sievert was advised that the decision to end her employment was authorized by, and made pursuant to, a governing Kansas Board of Regent's policy, as well as Emporia State University's Workforce Management policy, which had been unanimously approved by the Board of Regents on September 14, 2022.[2] In accordance with those policy requirements, Dr. Sievert's notice further advised that her lay-off was based "[s]pecifically … but not limited to" the restructuring of a program[3] or department, realignment of resources, and other potential considerations.[4]

Thereafter, on or about October 12, 2022, Dr. Sievert filed an administrative appeal of the University's decision, challenging President Hush's decision based on: (1) the quality and sufficiency of her performance as a long-standing faculty member; (2) the ongoing need for a physiologist in the Department of Biological Sciences; (3) that her "dismissal is based on age;" and (4) that President Hush's decision is arbitrary and capricious because it "serves no valuable purpose."[5]

## II. SOURCES OF AUTHORITY FOR BOARD POLICY AND ESU POLICY

The Kansas Board of Regents (hereinafter "KBOR" and/or the "Board") is a policy-making body created by Article 6 of the Constitution of the State of Kansas and invested with the statutory responsibility to control, supervise, and operate the state universities within Kansas.[6] KBOR's lawful obligation to operate the state universities includes, but is not limited to, supervising their operations and budgets and developing policies on a wide range of issues, including but not limited to employment issues.[7]

---

[1] See Exhibit A. Letter to Dr. Sievert, dated September 15, 2022.
[2] Id.
[3] Herein at all times, the term "program" is intended as a holistic, generic description to include, but is not necessarily limited to, major degrees, minor degrees, concentrations, certifications, and academic disciplines of study.
[4] See Exhibit A.
[5] See "Appeal of Emporia State University's Decision Based on the Workforce Management Policy," Sievert, L., October 2022.
[6] See K.S.A. 76-780. "The board of regents shall have all the powers necessary to carry out the purposes and provisions of this act, including, without limitation, the following powers: … (f) do any and all things necessary or convenient to exercise the powers authorized by this act[.]" See also K.S.A. 74-3202a.
[7] See K.S.A. 76-712. See also KBOR Policy Manual, Chapter II., Section C. "Chief Executive Officer, Faculty and Staff."

As part of its statutory authority, the Board has the exclusive right to appoint a chief executive officer for Emporia State University, according to its own standards and policies.[8] Pursuant to this authority, the Board appointed Ken Hush as the 18th President of Emporia State University on June 22, 2022.[9] As the chief executive officer (designated as "President" for Emporia State University), President Hush possesses the statutory and policy authority, and mandate, to "administer the affairs of the university … [and to be] accountable for all operations of the university[.]"[10] This includes the authority to "make all employee appointment decisions" at ESU.[11]

### III. KANSAS BOARD OF REGENTS' GOVERNING POLICY AND THE BOARD'S SUBSEQUENT APPROVAL OF ESU'S WORKFORCE MANAGEMENT POLICY

At its January 2021 meeting, the Kansas Board of Regents considered a proposed, temporary change in the section of Board policy related to the dismissal or termination of university employees, including but not limited to, faculty members "because of the extreme financial pressures that the state universities are facing due to the COVID-19 pandemic, decreased program and university enrollments, and the state's declining fiscal support."[12] At that time, Regent Mark Hutton noted "the proposed policy is not a threat to tenure because tenure does not mean that a job is guaranteed regardless of financial circumstances. Tenure was put in place to ensure academic freedom, which the Board highly values, and handcuffing a university's ability to ensure financial strength in the name of tenure is counter to its purpose."[13]

---

[8] See K.S.A. 76-714. "The chief executive officers of the state educational institutions shall be appointed by the board of regents." Also see K.S.A. 76-725. "Any such person or committee may be selected or elected in any manner approved by the board of regents." Also see KBOR Policy Manual Chapter II., Section C.2.a., *et al*.

[9] See Exhibit B. "Kansas Board of Regents Minutes of Special Meeting, June 22, 2022". The process used to identify and select Ken Hush as ESU's President, *i.e.*, through a closed search process, is the standard practice for the Board's hiring practices for state institution chief executive officers.

[10] See KBOR Policy Manual Chapter II., Section C.2.a.i.(1). See also K.S.A. 76-725. "[T]he chief executive officer of each state educational institution shall administer the affairs of such institution and may delegate to any officer, employee, student, faculty committee, student-faculty committee, or student committee any part of such authority or any of such duties."

[11] See KBOR Policy Manual, Chapter II., Section C.2.b.i.(1). "[T]he Board has authorized each state university chief executive officer to make all employee appointment decisions at her or her institution." President Hush may also, at her discretion, delegate that authority. See id. also see K.A.R. 1-2-4 definition of Agency and 1-2-9 definition of Appointing Authority which gives specific human resource authorities by the State of Kansas, enacting K.S.A. 75-2935 and 75-2935b

[12] See Exhibit C. "Kansas Board of Regents Minutes, January 20, 2021" p. 12.

[13] See Id at p. 13. See also KBOR Policy Manual, Chapter II., Section C.2.b.vii.(f). "Tenure is a privilege that must be affirmatively granted by the institution in recognition of meritorious performance." See also, *e.g.*, *Vaughn v. Nadel*, 228 Kan. 469, 473-74, 618 P.2d 778, 783 (Kan. 1980) ("Rights are vested when the right to enjoyment, present or prospective, has become the property of some particular person or persons as a present interest. On the other hand, a mere contingency or future benefit, or a contingent interest in property founded on anticipated continuance of existing laws, does not constitute a vested right ... A vested right is a right so fixed that it is not dependent on any future act, contingency or decision to make it more secure") (citations omitted) (emphasis added). Neither Kansas statutory law, Board policy, nor University policy create an explicit right to tenure, nor a

The proposed new policy stated, in part, that "any state university employee, including a tenured faculty member, may be suspended, dismissed, or terminated from employment by their respective university."[14] Additionally, said policy stated that a "[d]eclaration of financial exigency and the processes associated with declaration of financial exigency shall not be a prerequisite to any suspension, dismissal, or termination authorized by this provision, and no existing university policy hearing procedures shall apply to such decisions."[15] After a roll call vote, the Board approved the policy, which made the new policy effective through December 31, 2022.[16]

The following month at the Board's February 2021 meeting, the Board "amended the policy to allow universities more time to develop the framework required for implementation of the policy, and to attempt to address their financial situation short of using the policy."[17]

At the request of the Council of Faculty Senate Presidents, the Board's standing Governance Committee created a workgroup in March 2021 whose charge included the Board's justification for its newly enacted Workforce Management Policy, to-wit:

> *Pursuant to the Kansas Constitution, the role of the Board of Regents is to control and supervise the state universities in accordance with state law. The Board has broad statutory authority to control and supervise the operation and management of the six state universities and has a fiduciary duty to those institutions to ensure their long-term financial health while maintaining quality and affordability while both current and future generations of Kansans. While the Board continues to advocate for adequate state funding, it must also strive to keep tuition and fees reasonable while not sacrificing the value of the education and research that our State has come to rely on and expect from these institutions. As expressed in the Board's temporary, pandemic-related workforce management policy, **the COVID-19 pandemic combined with flat to lower enrollments and the long-term downward trend in State funding has placed extreme financial pressures on the state universities, making time and precision of the essence in addressing those financial pressures.** It is in this context, and because salary is by far the greatest expense on every campus, the Board determined it necessary to provide the*

---

property interest in tenure, for university tenured faculty members. Instead, even under normal policy standards, tenured employment is a characterized as a "privilege" to which the Board and/or the University reserve discretion to withdraw for various reasons, such as a felony conviction, significant reduction in or elimination of a position's funding source, program discontinuance, financial exigency, or for just cause. See KBOR Policy Manual, Chapter II., Section C.6.a.i. and b.i. Even detailed, procedural protections for dismissing a tenured faculty member are not sufficient to create a protected property interest. See *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). See also, *Bunger v. University of Oklahoma*, 95 F.3d 987, 990–91 (10th Cir.1996) (procedural guidelines in Faculty Handbook did not create interest in reappointment).

[14] See KBOR Policy Manual, Chapter II., Section C.6.b.ii.

[15] Id.

[16] See Exhibit C. "Kansas Board of Regents Minutes, January 20, 2021" p. 14.

[17] See Exhibit D. "Kansas Board of Regents Minutes, February 17, 2021" p. 2.

As a result, Dr. Sievert's appeal fails to produce any, or any adequate, evidence that President Hush's decision was not substantially consistent with ESU's Workforce Management policy. Accordingly, Dr. Sievert has failed to meet her burden of proof.[98]

For the foregoing reasons, *supra*, the Office of Administrative Hearings must find that President Hush's decision to lay-off Dr. Sievert was substantially consistent with ESU's Workforce Management policy and must be affirmed as a matter of controlling law and policy.[99]

### V.B.   THE DECISION TO LAY-OFF DR. SIEVERT WAS NOT THE RESULT OF UNLAWFUL BIAS OR UNLAWFUL DISCRIMINATION

Because the decision to lay-off Dr. Sievert was not the result of unlawful bias or unlawful discrimination, said decision is proper and must be affirmed as a matter of controlling law and policy.[100] Indeed, a "rebuttable presumption of validity" attaches to President Hush's decision.[101]

As discussed at length above, *supra*, President Hush's decision to lay-off Dr. Sievert was based entirely on legitimate, non-discriminatory reasons.[102] No part of President Hush's decision, nor the underlying recommendations of ESU's leadership, considered, much less relied on, any unlawful bias or unlawful discrimination.

However, Dr. Sievert's appeal alleges that her "dismissal is an opportunity to hire someone with my skill set who will not be tenured and will be earning a beginning level salary. I conclude that this dismissal is based on age[.]"[103] Apart from this allegation, her appeal offers no other proof or evidence in support of this claim except Dr. Sievert's own observation that "[n]ext year nobody in the department will be 65 or older."[104]

As explained above, it is not the University's intention to hire another Comparative Animal Physiologist, *see supra*. None of the evaluative recommendations which led to, and which

---

[98] See Exhibit H. See also, *Country Club Home, Inc. v. Harder*, 228 Kan. 756, 763 (Kan. 1980) ("A rebuttable presumption of validity attaches to actions of administrative agencies; the burden of proof rests with the party or parties challenging the action of an administrative agency") (citations omitted).

[99] See K.S.A. 76-712. "[S]tate institutions ... shall be controlled by and operated and managed under the supervision of the board of regents. For such control, operation, management or supervision, the board of regents may make ... policies or rules and regulations[.]"

[100] See K.S.A. 76-712. "[S]tate institutions ... shall be controlled by and operated and managed under the supervision of the board of regents. For such control, operation, management or supervision, the board of regents may make ... policies or rules and regulations[.]"

[101] See, *Country Club Home, Inc. v. Harder*, 228 Kan. 756, 763 (Kan. 1980) ("A rebuttable presumption of validity attaches to actions of administrative agencies; the burden of proof rests with the party or parties challenging the action of an administrative agency") (citations omitted).

[102] See Exhibit T. See also Exhibit Q. See also Exhibit L. See also, *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253-54, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207, 254 (1981). If a claimant creates a sufficient presumption of discrimination, the burden shifts to the defendant to produce evidence that an action was taken for a legitimate, non-discriminatory purpose.

[103] See "Appeal of Emporia State University's Decision Based on the Workforce Management Policy," Sievert, L., October 2022, page 4.

[104] See "Appeal of Emporia State University's Decision Based on the Workforce Management Policy," Sievert, L., October 2022, page 4.

ELECTRONICALLY FILED 11/28/2022 15:40:05 OFFICE OF ADMINISTRATIVE HEARINGS

To The

Kansas Office of Administrative Hearings

———————————————

Emporia State University's Response

To The Administrative Appeal

Of

Dr. Sheryl Lidzy, Associate Professor

———————————————

Pursuant To The

Workforce Management Policy

As Approved By The Kansas Board Of Regents On

September 14, 2022

———————————————

Submitted On

November 22, 2022

# I. INTRODUCTION

On September 15, 2022, Associate Professor, Dr. Sheryl Lidzy, was provided written notice her employment with Emporia State University would end as of May 16, 2023, approximately seven months later.[1] Dr. Lidzy was also informed that upon completion of her responsibilities, she would become eligible for an additional three (3) months' severance pay.

In the same notice, Dr. Lidzy was advised that the decision to end her employment was authorized by, and made pursuant to, a governing Kansas Board of Regent's policy, as well as Emporia State University's Workforce Management policy, which had been unanimously approved by the Board of Regents on September 14, 2022.[2] In accordance with those policy requirements, Dr. Lidzy's notice further advised that her lay-off was based "[s]pecifically … but not limited to" current or future market considerations, realignment of resources, and other potential considerations.[3]

Thereafter, on or about October 13, 2022,[4] Dr. Lidzy filed an administrative appeal of the University's decision, challenging President Hush's decision alleging that: (1) "[t]he decision-making framework focuses heavily on the need for and enrollment in specific programs;" (2) "[Dr. Lidzy] could easily move into [Leadership Communication or Communication, Emerging Technology & Society] … and cover any of those courses;" (3) "improper bias and discrimination in the selection of which faculty to terminate will be uncovered;" and (4) "[n]either length of, and service, quality of contributions, number of courses or students taught, or any other objective factor explains why [Dr. Lidzy] … was terminated and other faculty in [Dr. Lidzy's] department and school were not." [5]

## II. SOURCES OF AUTHORITY FOR BOARD POLICY AND ESU POLICY

The Kansas Board of Regents (hereinafter "KBOR" and/or the "Board") is a policy-making body created by Article 6 of the Constitution of the State of Kansas and invested with the statutory responsibility to control, supervise, and operate the state universities within Kansas.[6] KBOR's lawful obligation to operate the state universities includes, but is not limited to, supervising their operations and budgets and developing policies on a wide range of issues, including but not limited to employment issues.[7]

---

[1] See Exhibit A. Letter to Dr. Lidzy, dated September 15, 2022.

[2] Id.

[3] See Exhibit A.

[4] On Thursday, November 10, 2022, Dr. Blake Flanders, President and CEO of the Kansas Board of Regents, granted an extension of time to the University to submit the instant response, pursuant to KBOR Policy Manual, Chapter II., Chapter II., Section C.6.b.ii.(4).

[5] See "Appeal of Dr. Lidzy Termination," Lidzy, S., October 2022, pages 1 – 2.

[6] See K.S.A. 76-780. "The board of regents shall have all the powers necessary to carry out the purposes and provisions of this act, including, without limitation, the following powers: ... (f) do any and all things necessary or convenient to exercise the powers authorized by this act[.]" See also K.S.A. 74-3202a.

[7] See K.S.A. 76-712. See also KBOR Policy Manual, Chapter II., Section C. "Chief Executive Officer, Faculty and Staff."

As part of its statutory authority, the Board has the exclusive right to appoint a chief executive officer for Emporia State University, according to its own standards and policies.[8] Pursuant to this authority, the Board appointed Ken Hush as the 18th President of Emporia State University on June 22, 2022.[9] As the chief executive officer (designated as "President" for Emporia State University), President Hush possesses the statutory and policy authority, and mandate, to "administer the affairs of the university … [and to be] accountable for all operations of the university[.]"[10] This includes the authority to "make all employee appointment decisions" at ESU.[11]

### III. KANSAS BOARD OF REGENTS' GOVERNING POLICY AND THE BOARD'S SUBSEQUENT APPROVAL OF ESU'S WORKFORCE MANAGEMENT POLICY

At its January 2021 meeting, the Kansas Board of Regents considered a proposed, temporary change in the section of Board policy related to the dismissal or termination of university employees, including but not limited to, faculty members "because of the extreme financial pressures that the state universities are facing due to the COVID-19 pandemic, decreased program and university enrollments, and the state's declining fiscal support."[12] At that time, Regent Mark Hutton noted "the proposed policy is not a threat to tenure because tenure does not mean that a job is guaranteed regardless of financial circumstances. Tenure was put in place to ensure academic freedom, which the Board highly values, and handcuffing a university's ability to ensure financial strength in the name of tenure is counter to its purpose."[13]

---

[8] See K.S.A. 76-714. "The chief executive officers of the state educational institutions shall be appointed by the board of regents." Also see K.S.A. 76-725. "Any such person or committee may be selected or elected in any manner approved by the board of regents." Also see KBOR Policy Manual Chapter II., Section C.2.a., *et al.*

[9] See Exhibit B. "Kansas Board of Regents Minutes of Special Meeting, June 22, 2022". The process used to identify and select Ken Hush as ESU's President, *i.e.*, through a closed search process, is the standard practice for the Board's hiring practices for state institution chief executive officers.

[10] See KBOR Policy Manual Chapter II., Section C.2.a.i.(1). See also K.S.A. 76-725. "[T]he chief executive officer of each state educational institution shall administer the affairs of such institution and may delegate to any officer, employee, student, faculty committee, student-faculty committee, or student committee any part of such authority or any of such duties."

[11] See KBOR Policy Manual, Chapter II., Section C.2.b.i.(1). "[T]he Board has authorized each state university chief executive officer to make all employee appointment decisions at his or her institution." President Hush may also, at his discretion, delegate that authority. See id. also see K.A.R. 1-2-4 definition of Agency and 1-2-9 definition of Appointing Authority which gives specific human resource authorities by the State of Kansas, enacting K.S.A. 75-2935 and 75-2935b

[12] See Exhibit C. "Kansas Board of Regents Minutes, January 20, 2021" p. 12.

[13] See Id at p. 13. See also KBOR Policy Manual, Chapter II., Section C.2.b.vii.(f). "Tenure is a privilege that must be affirmatively granted by the institution in recognition of meritorious performance." See also, *e.g.*, *Vaughn v. Nadel*, 228 Kan. 469, 473-74, 618 P.2d 778, 783 (Kan. 1980) ("Rights are vested when the right to enjoyment, present or prospective, has become the property of some particular person or persons as a present interest. On the other hand, **a mere expectancy of future benefit**, or a contingent interest in property founded on anticipated continuance of existing laws, **does not constitute a vested right** … A vested right is a right so fixed that it is not dependent on any future act, contingency or decision to make it more secure") (citations omitted) (emphasis added). Neither Kansas statutory law, Board policy, nor University policy create an explicit right to tenure, nor a

The proposed new policy stated, in part, that "any state university employee, including a tenured faculty member, may be suspended, dismissed, or terminated from employment by their respective university."[14] Additionally, said policy stated that a "[d]eclaration of financial exigency and the processes associated with declaration of financial exigency shall not be a prerequisite to any suspension, dismissal, or termination authorized by this provision, and no existing university policy hearing procedures shall apply to such decisions."[15] After a roll call vote, the Board approved the policy, which made the new policy effective through December 31, 2022.[16]

The following month at the Board's February 2021 meeting, the Board "amended the policy to allow universities more time to develop the framework required for implementation of the policy, and to attempt to address their financial situation short of using the policy."[17]

At the request of the Council of Faculty Senate Presidents, the Board's standing Governance Committee created a workgroup in March 2021 whose charge included the Board's justification for its newly enacted Workforce Management Policy, to-wit:

> *Pursuant to the Kansas Constitution, the role of the Board of Regents is to control and supervise the state universities in accordance with state law. The Board has **broad statutory authority** to control and supervise the operation and management of the six state universities and has **a fiduciary duty** to those institutions **to ensure their long-term financial health while maintaining quality and affordability** to both current and future generations of Kansans. While the Board continues to advocate for adequate state funding, it must also strive to keep tuition and fees reasonable while not sacrificing the value of the education and research that our State has come to rely on and expect from these institutions. As expressed in the Board's temporary, pandemic-related workforce management policy, **the COVID-19 pandemic combined with flat to lower enrollments and the long-term downward trend in State funding has placed extreme financial pressures on the state universities, making time and precision of the essence in addressing those financial pressures.** It is in this context, and because salary is by far the greatest expense on every campus, the Board determined it necessary to provide the*

---

property interest in tenure, for university tenured faculty members. Instead, even under normal policy standards, tenured employment is a characterized as a "privilege" to which the Board and/or the University reserve discretion to withdraw for various reasons, such as a felony conviction, **significant reduction in or elimination of a position's funding source**, program discontinuance, financial exigency, or for just cause. See KBOR Policy Manual, Chapter II., Section C.6.a.i. and b.i. Even detailed, procedural protections for dismissing a tenured faculty member are not sufficient to create a protected property interest. See *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). See also, *Bunger v. University of Oklahoma*, 95 F.3d 987, 990–91 (10th Cir.1996) (procedural guidelines in Faculty Handbook did not create interest in reappointment).

[14] See KBOR Policy Manual, Chapter II., Section C.6.b.ii.

[15] Id.

[16] See <u>Exhibit C</u>. "Kansas Board of Regents Minutes, January 20, 2021" p. 14.

[17] See <u>Exhibit D</u>. "Kansas Board of Regents Minutes, February 17, 2021" p. 2.

those categories was irrelevant to the rationale underlying the University's decisions regarding the Communications program—pointedly, there was no comparison between Dr. Lidzy and other faculty members in her department based on any of those categories. The University leadership's recommendations, and the President's decision, depended entirely on those factors permitted to be considered pursuant to ESU's Workforce Management policy as explained above, *see supra*.[120]

Dr. Lidzy's appeal closes with an assertion that she has "fulfilled the terms of [her] contract" and that she "expected to be able to complete [her] career at Emporia State University as promised … in [her] appointment as a tenured professor."[121] However, Dr. Lidzy's assertion and statement are based on an inaccurate characterization of her employment and a flawed impression about the scope and nature of tenure.[122]

For purposes of the instant appeal and the evaluation of President Hush's decision to lay-off Dr. Lidzy, the controlling Board policy specifically states that "any state university employee, **including a tenured faculty member**, may be suspended, dismissed, or terminated from employment by their respective university … and no existing university policy hearing procedures shall apply to such decisions." President Hush's decision and the use of the University's Workforce Management policy was not in contravention to Dr. Lidzy's **status** as a tenured faculty member, nor the tenured status of any other faculty member at ESU. Significantly, as the Board noted, *see supra*, "the proposed policy is not a threat to tenure because **tenure does not mean that a job is guaranteed regardless of financial circumstances**. Tenure was put in place to ensure academic freedom, which the Board highly values, and handcuffing a university's ability to ensure financial strength in the name of tenure is

---

[120] See <u>Exhibit A</u>.

[121] See "Appeal of Dr. Lidzy Termination," Lidzy, S., October 2022, page 3.

[122] While state universities have the authority to enter into contracts (KBOR Policy Manual Chapter II., Section D.13.), including employment contracts, the vast majority of faculty employed by ESU, including Dr. Lidzy, are not employed via contracts. Probationary tenure-track and tenured appointments are annual appointments limited in terms, notably to one academic year, a 12-month period, or summer sessions. See <u>Exhibit S</u> at 1B.01. All academic appointments are subject to annual review and annual renewal. See <u>Exhibit S</u> at 1A.0101 and 1A.0102. Notably, the condition of tenure is specifically characterized by Board policy as a "privilege," not as conveying a contractual right (KBOR Policy Manual, Chapter II., Section C.2.b.vii.(f)). However, even if the status of tenure creates an expectancy of future benefit, it does not automatically confer an enforceable property interest. See *Vaughn v. Nadel*, 228 Kan. 469, 473-74, 618 P.2d 778, 783 (Kan. 1980) ("Rights are vested when the right to enjoyment, present or prospective, has become the property of some particular person or persons as a present interest. On the other hand, **a mere expectancy of future benefit**, or a contingent interest in property founded on anticipated continuance of existing laws, **does not constitute a vested right** … A vested right is a right so fixed that it is not dependent on any future act, contingency or decision to make it more secure") (citations omitted) (emphasis added).

counter to its purpose."[123] The appointment status[124] of tenure acknowledges a faculty member's achievement of performance requirements[125] and a faculty member's right to additional employment protections in the event of a "for cause" termination based on teaching, scholarship, or service.[126] Indeed, interpreting tenure as compelling indefinite, *i.e.*, "continuous" or assured employment, as Dr. Lidzy's statement implies, would lead to absurd results, *i.e.*, a public employee would forever be employed, regardless of any other intervening or mitigating factor or circumstance, such as the suspension of the academic program(s) in which she teaches or the lack of revenue with which to pay her.[127] In point of fact, neither the University's, nor President Hush's, use of the Workforce Management policy renders tenure status as moot. The status of tenure still exists at ESU. It continues to be held by many faculty and is in the process of being earned by many other "tenure-track" faculty during and after the life of the instant appeal.

Dr. Lidzy's statements notwithstanding, President Hush's decision was based on substantial, competent evidence, was reasonable and based in fact, and was in consistent alignment with the rationale and data supporting a conclusion of the need to reallocate resources within the Department of Communications and Theatre and to suspend certain Communications programs with that department. While Dr. Lidzy may disagree with, or negatively critique, President Hush's decision, or any of the underlying grounds for President Hush's decision, such disagreement does not demonstrate or establish arbitrariness or capriciousness.

---

[123] See Exhibit C. "Kansas Board of Regents Minutes, January 20, 2021" p. 13 (emphasis added). See also KBOR Policy Manual, Chapter II., Section C.2.b.vii.(f). "Tenure is a privilege that must be affirmatively granted by the institution in recognition of meritorious performance." See also, *e.g.*, *Vaughn v. Nadel*, 228 Kan. 469, 473-74, 618 P.2d 778, 783 (Kan. 1980) ("Rights are vested when the right to enjoyment, present or prospective, has become the property of some particular person or persons as a present interest. On the other hand, a mere expectancy of future benefit, or a contingent interest in property founded on anticipated continuance of existing laws, does not constitute a vested right … A vested right is a right so fixed that it is not dependent on any future act, contingency or decision to make it more secure") (citations omitted) (emphasis added). Neither Kansas statutory law, Board policy, nor University policy create an explicit right to tenure, nor a property interest in tenure, for university tenured faculty members. Instead, even under normal policy standards, tenured employment is a characterized as a "privilege" to which the Board and/or the University reserve discretion to withdraw for various reasons, such as a felony conviction, significant reduction in or elimination of a position's funding source, program discontinuance, financial exigency, or for just cause. See KBOR Policy Manual, Chapter II., Section C.6.a.i. and b.i. Even detailed, procedural protections for dismissing a tenured faculty member are not sufficient to create a protected property interest. See *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). See also, *Bunger v. University of Oklahoma*, 95 F.3d 987, 990–91 (10th Cir.1996) (procedural guidelines in Faculty Handbook did not create interest in reappointment).
[124] See Exhibit S at 1B.01.
[125] Although tenure is not automatically awarded simply on this basis.
[126] See Exhibit S at 1A.0102. "Termination of a tenured faculty member must follow appropriate policies and procedures." See also Exhibit S at 1B.0805.01.
[127] See, *e.g.*, *Morton County Hosp. v. Howell*, 51 Kan.App.2d 1103, 1106 – 07, 361 P.3d 515, 519 (Kan.App. 2015) (a fundamental rule of statutory interpretation is that "courts should construe statutes to avoid unreasonable or absurd results").

To The

Kansas Office of Administrative Hearings

———————————————————

Emporia State University's Response

To The Administrative Appeal

Of

Dr. Dan Colson, Associate Professor

———————————————————

Pursuant To The

Workforce Management Policy

As Approved By The Kansas Board Of Regents On

September 14, 2022

———————————————————

Submitted On

October 31, 2022

## I. INTRODUCTION

On September 15, 2022, Associate Professor, Dr. Dan Colson, was provided written notice that his employment with Emporia State University would end as of May 16, 2023, approximately seven months later.[1] Dr. Colson was also informed that upon completion of his responsibilities, he would become eligible for an additional three (3) months' severance pay.

In the same notice, Dr. Colson was advised that the decision to end his employment was authorized by, and made pursuant to, a governing Kansas Board of Regent's policy, as well as Emporia State University's Workforce Management policy, which had been unanimously approved by the Board of Regents on September 14, 2022.[2] In accordance with those policy requirements, Dr. Colson's notice further advised that his lay-off was based "[s]pecifically … but not limited to" low enrollment, market considerations, the restructuring of a program or department, and other potential considerations.[3]

Thereafter, on or about October 3, 2022, Dr. Colson filed an administrative appeal of the University's decision, alleging: (1) the University's failure to utilize its Workforce Management policy in accordance with Kansas Board of Regent's policy; (2) the University's failure to provide reasons for its decision to lay-off Dr. Colson; (3) the arbitrary nature of the University's decision to lay-off Dr. Colson; and (4) the University's retaliation against Dr. Colson.[4]

## II. SOURCES OF AUTHORITY FOR BOARD POLICY AND ESU POLICY

The Kansas Board of Regents (hereinafter "KBOR" and/or the "Board") is a policy-making body created by Article 6 of the Constitution of the State of Kansas and invested with the statutory responsibility to control, supervise, and operate the state universities within Kansas.[5] KBOR's lawful obligation to operate the state universities includes, but is not limited to, supervising their operations and budgets and developing policies on a wide range of issues, including but not limited to employment issues.[6]

As part of its statutory authority, the Board has the exclusive right to appoint a chief executive officer for Emporia State University, according to its own standards and policies.[7] Pursuant to this authority, the Board appointed Ken Hush as the 18th President of Emporia State University

---

[1] See Exhibit A. Letter to Dr. Colson, dated September 15, 2022.
[2] Id.
[3] Id.
[4] See "Initial Appeal of Termination," Colson, D., October 2022, "Table of Contents."
[5] See K.S.A. 76-780. "The board of regents shall have all the powers necessary to carry out the purposes and provisions of this act, including, without limitation, the following powers: … (f) do any and all things necessary or convenient to exercise the powers authorized by this act[.]" See also K.S.A. 74-3202a.
[6] See K.S.A. 76-712. See also KBOR Policy Manual, Chapter II., Section C. "Chief Executive Officer, Faculty and Staff."
[7] See K.S.A. 76-714. "The chief executive officers of the state educational institutions shall be appointed by the board of regents." Also see K.S.A. 76-725. "Any such person or committee may be selected or elected in any manner approved by the board of regents." Also see KBOR Policy Manual Chapter II., Section C.2.a., *et al.*

on June 22, 2022.[8] As the chief executive officer (designated as "President" for Emporia State University), President Hush possesses the statutory and policy authority, and mandate, to "administer the affairs of the university … [and to be] accountable for all operations of the university[.]"[9] This includes the authority to "make all employee appointment decisions" at ESU.[10]

### III. KANSAS BOARD OF REGENTS' GOVERNING POLICY AND THE BOARD'S SUBSEQUENT APPROVAL OF ESU'S WORKFORCE MANAGEMENT POLICY

At its January 2021 meeting, the Kansas Board of Regents considered a proposed, temporary change in the section of Board policy related to the dismissal or termination of university employees, including but not limited to, faculty members "because of the extreme financial pressures that the state universities are facing due to the COVID-19 pandemic, decreased program and university enrollments, and the state's declining fiscal support."[11] At that time, Regent Mark Hutton noted "the proposed policy is not a threat to tenure because tenure does not mean that a job is guaranteed regardless of financial circumstances. Tenure was put in place to ensure academic freedom, which the Board highly values, and handcuffing a university's ability to ensure financial strength in the name of tenure is counter to its purpose."[12]

---

[8] See Exhibit B. "Kansas Board of Regents Minutes of Special Meeting, June 22, 2022". The process used to identify and select Ken Hush as ESU's President, *i.e.*, through a closed search process, is the standard practice for the Board's hiring practices for state institution chief executive officers.

[9] See KBOR Policy Manual Chapter II., Section C.2.a.i.(1). See also K.S.A. 76-725. "[T]he chief executive officer of each state educational institution shall administer the affairs of such institution and may delegate to any officer, employee, student, faculty committee, student-faculty committee, or student committee any part of such authority or any of such duties."

[10] See KBOR Policy Manual, Chapter II., Section C.2.b.i.(1). "[T]he Board has authorized each state university chief executive officer to make all employee appointment decisions at his or her institution." President Hush may also, at his discretion, delegate that authority. See id. See also K.A.R. 1-2-4 definition of Agency and 1-2-9 definition of Appointing Authority which gives specific human resource authorities by the State of Kansas, enacting K.S.A. 75-2935 and 75-2935b

[11] See Exhibit C. "Kansas Board of Regents Minutes, January 20, 2021" p. 12.

[12] See Id at p. 13. See also KBOR Policy Manual, Chapter II., Section C.2.b.vii.(f). "Tenure is a privilege that must be affirmatively granted by the institution in recognition of meritorious performance." See also, *e.g.*, *Vaughn v. Nadel*, 228 Kan. 469, 473-74, 618 P.2d 778, 783 (Kan. 1980) ("Rights are vested when the right to enjoyment, present or prospective, has become the property of some particular person or persons as a present interest. On the other hand, **a mere expectancy of future benefit**, or a contingent interest in property founded on anticipated continuance of existing laws, **does not constitute a vested right** … A vested right is a right so fixed that it is not dependent on any future act, contingency or decision to make it more secure") (citations omitted) (emphasis added). Neither Kansas statutory law, Board policy, nor University policy create an explicit right to tenure for university tenured faculty members. Instead, even under normal policy standards, tenured employment is a "privilege" to which the Board and/or the University reserve discretion to withdraw for various reasons, such as a felony conviction, significant reduction in or elimination of a position's funding source, program discontinuance, financial exigency, or for just cause. See KBOR Policy Manual, Chapter II., Section C.6.a.i. and b.i. Even detailed, procedural protections for dismissing a tenured faculty member are not sufficient to create a protected property interest. See *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). See

ELECTRONICALLY FILED 11/30/2022 15:22:19 OFFICE OF ADMINISTRATIVE HEARINGS

**TO THE**

**KANSAS OFFICE OF ADMINISTRATIVE HEARINGS**

---

**EMPORIA STATE UNIVERSITY'S RESPONSE**

**TO THE ADMINISTRATIVE APPEAL**

**OF**

**DR. BRENDA KOERNER, ASSOCIATE PROFESSOR**

---

**PURSUANT TO THE**

**WORKFORCE MANAGEMENT POLICY**

**AS APPROVED BY THE KANSAS BOARD OF REGENTS ON**

**SEPTEMBER 14, 2022**

---

**SUBMITTED ON**

**NOVEMBER 29, 2022**

# I. INTRODUCTION

On September 15, 2022, Professor, Dr. Brenda Koerner, was provided written notice her employment with Emporia State University would end as of May 16, 2023, approximately seven months later.[1] Dr. Koerner was also informed that upon completion of her responsibilities, she would become eligible for an additional three (3) months' severance pay.

In the same notice, Dr. Koerner was advised that the decision to end her employment was authorized by, and made pursuant to, a governing Kansas Board of Regent's policy, as well as Emporia State University's Workforce Management policy, which had been unanimously approved by the Board of Regents on September 14, 2022.[2] In accordance with those policy requirements, Dr. Koerner's notice further advised that her lay-off was based "[s]pecifically … but not limited to" the restructuring of a program[3] or department, realignment of resources, and other potential considerations.[4]

Thereafter, on or about October 17, 2022,[5] Dr. Koerner filed an administrative appeal of the University's decision, challenging President Hush's decision generally based on: (1) why the Workforce Management policy "never should have been passed, and how it was used inappropriately;" (2) "the lack of defined criteria to justify [Dr. Koerner's] dismissal;" (3) age discrimination; (4) retaliation as a result of Dr. Koerner's "outspoken views on the draft framework;" and (5) the "disregard of tenure and any associate due process[.]"[6]

## II. SOURCES OF AUTHORITY FOR BOARD POLICY AND ESU POLICY

The Kansas Board of Regents (hereinafter "KBOR" and/or the "Board") is a policy-making body created by Article 6 of the Constitution of the State of Kansas and invested with the statutory responsibility to control, supervise, and operate the state universities within Kansas.[7] KBOR's lawful obligation to operate the state universities includes, but is not limited to, supervising their operations and budgets and developing policies on a wide range of issues, including but not limited to employment issues.[8]

---

[1] See Exhibit A. Letter to Dr. Koerner, dated September 15, 2022.

[2] Id.

[3] Herein at all times, the term "program" is intended as a holistic, generic description to include, but is not necessarily limited to, major degrees, minor degrees, concentrations, certifications, and academic disciplines of study.

[4] See Exhibit A.

[5] On Thursday, November 10, 2022, Dr. Blake Flanders, President and CEO of the Kansas Board of Regents, granted an extension of time to the University to submit the instant response, pursuant to KBOR Policy Manual, Chapter II., Chapter II., Section C.6.b.ii.(4).

[6] See "Appeal of Emporia State University's Decision Based on the Workforce Management Policy," Koerner, B., October 2022.

[7] See K.S.A. 76-780. "The board of regents shall have all the powers necessary to carry out the purposes and provisions of this act, including, without limitation, the following powers: … (f) do any and all things necessary or convenient to exercise the powers authorized by this act[.]" See also K.S.A. 74-3202a.

[8] See K.S.A. 76-712. See also KBOR Policy Manual, Chapter II., Section C. "Chief Executive Officer, Faculty and Staff."

As part of its statutory authority, the Board has the exclusive right to appoint a chief executive officer for Emporia State University, according to its own standards and policies.[9] Pursuant to this authority, the Board appointed Ken Hush as the 18th President of Emporia State University on June 22, 2022.[10] As the chief executive officer (designated as "President" for Emporia State University), President Hush possesses the statutory and policy authority, and mandate, to "administer the affairs of the university … [and to be] accountable for all operations of the university[.]"[11] This includes the authority to "make all employee appointment decisions" at ESU.[12]

### III. KANSAS BOARD OF REGENTS' GOVERNING POLICY AND THE BOARD'S SUBSEQUENT APPROVAL OF ESU'S WORKFORCE MANAGEMENT POLICY

At its January 2021 meeting, the Kansas Board of Regents considered a proposed, temporary change in the section of Board policy related to the dismissal or termination of university employees, including but not limited to, faculty members "because of the extreme financial pressures that the state universities are facing due to the COVID-19 pandemic, decreased program and university enrollments, and the state's declining fiscal support."[13] At that time, Regent Mark Hutton noted "the proposed policy is not a threat to tenure because tenure does not mean that a job is guaranteed regardless of financial circumstances. Tenure was put in place to ensure academic freedom, which the Board highly values, and handcuffing a university's ability to ensure financial strength in the name of tenure is counter to its purpose."[14]

---

[9] See K.S.A. 76-714. "The chief executive officers of the state educational institutions shall be appointed by the board of regents." Also see K.S.A. 76-725. "Any such person or committee may be selected or elected in any manner approved by the board of regents." Also see KBOR Policy Manual Chapter II., Section C.2.a., *et al.*

[10] See **Exhibit B**. "Kansas Board of Regents Minutes of Special Meeting, June 22, 2022". The process used to identify and select Ken Hush as ESU's President, *i.e.*, through a closed search process, is the standard practice for the Board's hiring practices for state institution chief executive officers.

[11] See KBOR Policy Manual Chapter II., Section C.2.a.i.(1). See also K.S.A. 76-725. "[T]he chief executive officer of each state educational institution shall administer the affairs of such institution and may delegate to any officer, employee, student, faculty committee, student-faculty committee, or student committee any part of such authority or any of such duties."

[12] See KBOR Policy Manual, Chapter II., Section C.2.b.i.(1). "[T]he Board has authorized each state university chief executive officer to make all employee appointment decisions at her or his institution." President Hush may also, at her discretion, delegate that authority. See id. See also K.A.R. 1-2-4 definition of Agency and 1-2-9 definition of Appointing Authority which gives specific human resource authorities by the State of Kansas, enacting K.S.A. 75-2935 and 75-2935b

[13] See **Exhibit C**. "Kansas Board of Regents Minutes, January 20, 2021" p. 12.

[14] See Id at p. 13. See also KBOR Policy Manual, Chapter II., Section C.2.b.vii.(f). "Tenure is a privilege that must be affirmatively granted by the institution in recognition of meritorious performance." See also, *e.g.*, *Vaughn v. Nadel*, 228 Kan. 469, 473-74, 618 P.2d 778, 783 (Kan. 1980) ("Rights are vested when the right to enjoyment, present or prospective, has become the property of some particular person or persons as a present interest. On the other hand, a mere expectancy of future benefit, or a contingent interest in property founded on anticipated continuance of existing laws, does not constitute a vested right … A vested right is a right so fixed that it is not dependent on any future act, contingency or decision to make it more secure") (citations omitted) (emphasis added). Neither Kansas statutory law, Board policy, nor University policy create an explicit right to tenure, nor a

Case 5:23-cv-04056-JAR-GEB     Document 41-7     Filed 04/10/24     Page 23 of 31

The proposed new policy stated, in part, that "any state university employee, including a tenured faculty member, may be suspended, dismissed, or terminated from employment by their respective university."[15] Additionally, said policy stated that a "[d]eclaration of financial exigency and the processes associated with declaration of financial exigency shall not be a prerequisite to any suspension, dismissal, or termination authorized by this provision, and no existing university policy hearing procedures shall apply to such decisions."[16] After a roll call vote, the Board approved the policy, which made the new policy effective through December 31, 2022.[17]

The following month at the Board's February 2021 meeting, the Board "amended the policy to allow universities more time to develop the framework required for implementation of the policy, and to attempt to address their financial situation short of using the policy."[18]

At the request of the Council of Faculty Senate Presidents, the Board's standing Governance Committee created a workgroup in March 2021 whose charge included the Board's justification for its newly enacted Workforce Management Policy, to-wit:

> *Pursuant to the Kansas Constitution, the role of the Board of Regents is to control and supervise the state universities in accordance with state law. The Board has broad statutory authority to control and supervise the operation and management of the six state universities and has a fiduciary duty to those institutions to ensure their long-term financial health while maintaining quality and affordability to both current and future generations of Kansans. While the Board continues to advocate for adequate state funding, it must also strive to keep tuition and fees reasonable while not sacrificing the value of the education and research that our State has come to rely on and expect from these institutions. As expressed in the Board's temporary, pandemic-related workforce management policy, **the COVID-19 pandemic combined with flat to lower enrollments and the long-term downward trend in State funding has placed extreme financial pressures on the state universities, making time and precision of the essence in addressing those financial pressures.** It is in this context, and because salary is by far the greatest expense on every campus, the Board determined it necessary to provide the*

---

property interest in tenure, for university tenured faculty members. Instead, even under normal policy standards, tenured employment is a characterized as a "privilege" to which the Board and/or the University reserve discretion to withdraw for various reasons, such as a felony conviction, significant reduction in or elimination of a position's funding source, program discontinuance, financial exigency, or for just cause. See KBOR Policy Manual, Chapter II., Section C.6.a.i. and b.i. Even detailed, procedural protections for dismissing a tenured faculty member are not sufficient to create a protected property interest. See *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 541, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). See also, *Bunger v. University of Oklahoma,* 95 F.3d 987, 990–91 (10th Cir.1996) (procedural guidelines in Faculty Handbook did not create interest in reappointment).

[15] See KBOR Policy Manual, Chapter II., Section C.6.b.ii.

[16] Id.

[17] See Exhibit C. "Kansas Board of Regents Minutes, January 20, 2021" p. 14.

[18] See Exhibit D. "Kansas Board of Regents Minutes, February 17, 2021" p. 2.

Emporia State University
Response to Appeal
Page 5 of 31

Simply because Dr. Koerner personally believes the procedures within the University's Workforce Management policy do not provide rightful due process, does not mean they do not.[170]

In addition, if Dr. Koerner's complaint about a lack of due process were to be interpreted to mean she instead should be afforded the procedures required for faculty terminations that occur outside the parameters of the University's Workforce Management policy,[171] such an interpretation would contemplate an *unlawful* action.[172] For Dr. Koerner to be afforded the procedures she implies should be applicable by standard University policy, such action would require the University to intentionally disregard the statutory authority and the policy mandate controlling the instant action, *to-wit*: "Such terminations, suspensions, or dismissals [arising from the Workforce Management policy] **shall** follow the procedure set forth below. … [A]nd **no existing university policy hearing procedures** shall apply to such decisions."[173] This unambiguous mandate is not permissive and must be followed as a matter of law.[174]

Furthermore, President Hush's decision and the use of the University's Workforce Management policy is not in contravention to Dr. Koerner's *status* as a tenured faculty member, nor the tenured status of any other faculty member at ESU. Significantly, as the Board noted, *see supra*, "the proposed policy is not a threat to tenure because **tenure does not mean that a job is guaranteed** regardless of financial circumstances. Tenure was put in place to ensure academic freedom, which the Board highly values, and handcuffing a university's ability to ensure

---

[170] See, *e.g., Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 542, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985) ("[T]he root requirement of the Due Process Clause" is "that an individual be given an opportunity for a hearing before he is deprived of any significant protected interest") (internal quotations omitted).

[171] See Exhibit S at 1B.09 "Policies On Termination Of Employment."

[172] See, *e.g.,* K.S.A. 76-780. "The board of regents shall have all the powers necessary to carry out the purposes and provisions of this act, including, without limitation, the following powers: … (f) do any and all things necessary or convenient to exercise the powers authorized by this act[.]" See also K.S.A. 74-3202a.

[173] See KBOR Policy Manual, Chapter II., Section C.6.b.ii. (emphasis added).

[174] See K.S.A. 76-712 "Except as otherwise provided by act of the legislature, the state educational institutions … shall be controlled by and operated and managed under the supervision of the board of regents." See also K.S.A. 76-780 "The board of regents shall have all the powers necessary to carry out the purposes and provisions of this act, including, without limitation, the following powers: … (f) do any and all things necessary or convenient to exercise the powers authorized by this act[.]" See also K.S.A. 74-3202a.

financial strength in the name of tenure is counter to its purpose."[175] The appointment status[176] of tenure acknowledges a faculty member's achievement of performance requirements[177] and a tenured faculty member's right to additional employment protections in the event of a "for cause" termination based on teaching, scholarship, or service.[178] To interpret the status of tenure as compelling indefinite, *i.e.*, "continuous" or guaranteed employment, as Dr. Koerner's appeal implies, would lead to absurd results—*i.e.*, a tenured faculty member would be forever employed, regardless of any other intervening or mitigating factor or circumstance, such as the suspension of the academic program in which she teaches, or the lack of revenue with which to pay her, or the decline of student enrollment in the academic program in which she teaches.[179]

Notably, for the purpose of appreciating the limited need for, and nature of, tenure, both Board and University policy do not even treat the *status* of tenure as indispensable for the existence of academic freedom (although that may have been its origin).[180] The protections of academic freedom extend to *all* faculty, *regardless* of tenure status. In point of fact, neither the University's, nor President Hush's, use of the Workforce Management policy renders tenure as a meaningless status. Tenure not only still exists at ESU,[181] it continues to be held by many faculty and is in the process of being earned by many other "tenure-track" faculty during and after the life of the instant appeal.

---

[175] See Exhibit C. "Kansas Board of Regents Minutes, January 20, 2021" p. 13 (emphasis added). See also KBOR Policy Manual, Chapter II., Section C.2.b.vii.(f). "**Tenure is a privilege** that must be affirmatively granted by the institution in recognition of meritorious performance." See also, *e.g.*, *Vaughn v. Nadel*, 228 Kan. 469, 473-74, 618 P.2d 778, 783 (Kan. 1980) ("Rights are vested when the right to enjoyment, present or prospective, has become the property of some particular person or persons as a present interest. On the other hand, **a mere expectancy of future benef**it, or a contingent interest in property founded on anticipated continuance of existing laws, **does not constitute a vested right** ... A vested right is a right so fixed that it is not dependent on any future act, contingency or decision to make it more secure") (citations omitted) (emphasis added). Neither Kansas statutory law, Board policy, nor University policy create an explicit right to tenure, nor a property interest in tenure, for university tenured faculty members. Instead, even under normal policy standards, tenured employment is a characterized as a "privilege" to which the Board and/or the University reserve discretion to withdraw for various reasons, such as a felony conviction, **significant reduction in or elimination of a position's funding source**, program discontinuance, financial exigency, or for just cause. See KBOR Policy Manual, Chapter II., Section C.6.a.i. and b.i. Even detailed, procedural protections for dismissing a tenured faculty member are not sufficient to create a protected property interest. See *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). See also, *Bunger v. University of Oklahoma*, 95 F.3d 987, 990–91 (10th Cir.1996) (procedural guidelines in Faculty Handbook did not create interest in reappointment).
[176] See Exhibit S at 1B.01.
[177] Although tenure is not automatically awarded simply on this basis.
[178] See Exhibit S at 1A.0102. "Termination of a tenured faculty member must follow appropriate policies and procedures." See also Exhibit S at 1B.0805.01.
[179] See, *e.g.*, *Morton County Hosp. v. Howell*, 51 Kan.App.2d 1103, 1106 – 07, 361 P.3d 515, 519 (Kan.App. 2015) (a fundamental rule of statutory interpretation is that "courts should construe statutes to avoid unreasonable or absurd results").
[180] See, *e.g.*, Exhibit S at 1B.0805.01.(2)c. "During the probationary period a teacher should have the academic freedom that all other members of the faculty have."
[181] See, *e.g.*, Exhibit S.

ELECTRONICALLY FILED 11/28/2022 15:05:44 OFFICE OF ADMINISTRATIVE HEARINGS

TO THE

KANSAS OFFICE OF ADMINISTRATIVE HEARINGS

---

EMPORIA STATE UNIVERSITY'S RESPONSE

TO THE ADMINISTRATIVE APPEAL

OF

MR. ROB CATLETT, ASSOCIATE PROFESSOR

---

PURSUANT TO THE

WORKFORCE MANAGEMENT POLICY

AS APPROVED BY THE KANSAS BOARD OF REGENTS ON

SEPTEMBER 14, 2022

---

SUBMITTED ON

NOVEMBER 22, 2022

# I. INTRODUCTION

On September 15, 2022, Associate Professor, Mr. Rob Catlett, was provided written notice his employment with Emporia State University would end as of May 16, 2023, approximately seven months later.[1] Mr. Catlett was also informed that upon completion of his responsibilities, he would become eligible for an additional three (3) months' severance pay.

In the same notice, Mr. Catlett was advised that the decision to end his employment was authorized by, and made pursuant to, a governing Kansas Board of Regent's policy, as well as Emporia State University's Workforce Management policy, which had been unanimously approved by the Board of Regents on September 14, 2022.[2] In accordance with those policy requirements, Mr. Catlett's notice further advised that his lay-off was based "[s]pecifically … but not limited to" low enrollment, current or future market considerations, the restructuring of a program[3] or department, and other potential considerations.[4]

Thereafter, on or about October 14, 2022,[5] Mr. Catlett filed an administrative appeal of the University's decision, challenging President Hush's decision alleging that: (1) President Hush's decision resulted in "… the taking of the property rights afforded by tenure at ESU, without due process, both of which are substantial;" and (2) that President Hush's decision, and the work that led to the enactment and use of the University's Workforce Management policy, abandoned standard practices and the involvement of, or appropriate disclosure to, shared governance.[6]

## II. SOURCES OF AUTHORITY FOR BOARD POLICY AND ESU POLICY

The Kansas Board of Regents (hereinafter "KBOR" and/or the "Board") is a policy-making body created by Article 6 of the Constitution of the State of Kansas and invested with the statutory responsibility to control, supervise, and operate the state universities within Kansas.[7] KBOR's lawful obligation to operate the state universities includes, but is not limited to, supervising their operations and budgets and developing policies on a wide range of issues, including but not limited to employment issues.[8]

---

[1] See Exhibit A. Letter to Mr. Catlett, dated September 15, 2022.
[2] Id.
[3] Herein at all times, the term "program" is intended as a holistic, generic description to include, but is not necessarily limited to, major degrees, minor degrees, concentrations, certifications, and academic disciplines of study.
[4] See Exhibit A.
[5] On Thursday, November 10, 2022, Dr. Blake Flanders, President and CEO of the Kansas Board of Regents, granted an extension of time to the University to submit the instant response, pursuant to KBOR Policy Manual, Chapter II., Chapter II., Section C.6.b.ii.(4).
[6] See "Appeal of Emporia State University's (ESU) Decision Based on the Workforce Management Policy," Catlett, R., October 2022.
[7] See K.S.A. 76-780. "The board of regents shall have all the powers necessary to carry out the purposes and provisions of this act, including, without limitation, the following powers: … (f) do any and all things necessary or convenient to exercise the powers authorized by this act[.]" See also K.S.A. 74-3202a.
[8] See K.S.A. 76-712. See also KBOR Policy Manual, Chapter II., Section C. "Chief Executive Officer, Faculty and Staff."

As part of its statutory authority, the Board has the exclusive right to appoint a chief executive officer for Emporia State University, according to its own standards and policies.[9] Pursuant to this authority, the Board appointed Ken Hush as the 18th President of Emporia State University on June 22, 2022.[10] As the chief executive officer (designated as "President" for Emporia State University), President Hush possesses the statutory and policy authority, and mandate, to "administer the affairs of the university … [and to be] accountable for all operations of the university[.]"[11] This includes the authority to "make all employee appointment decisions" at ESU.[12]

### III. KANSAS BOARD OF REGENTS' GOVERNING POLICY AND THE BOARD'S SUBSEQUENT APPROVAL OF ESU'S WORKFORCE MANAGEMENT POLICY

At its January 2021 meeting, the Kansas Board of Regents considered a proposed, temporary change in the section of Board policy related to the dismissal or termination of university employees, including but not limited to, faculty members "because of the extreme financial pressures that the state universities are facing due to the COVID-19 pandemic, decreased program and university enrollments, and the state's declining fiscal support."[13] At that time, Regent Mark Hutton noted "the proposed policy is not a threat to tenure because tenure does not mean that a job is guaranteed regardless of financial circumstances. Tenure was put in place to ensure academic freedom, which the Board highly values, and handcuffing a university's ability to ensure financial strength in the name of tenure is counter to its purpose."[14]

---

[9] See K.S.A. 76-714. "The chief executive officers of the state educational institutions shall be appointed by the board of regents." Also see K.S.A. 76-725. "Any such person or committee may be selected or elected in any manner approved by the board of regents." Also see KBOR Policy Manual Chapter II., Section C.2.a., *et al.*

[10] See Exhibit B. "Kansas Board of Regents Minutes of Special Meeting, June 22, 2022". The process used to identify and select Ken Hush as ESU's President, *i.e.*, through a closed search process, is the standard practice for the Board's hiring practices for state institution chief executive officers.

[11] See KBOR Policy Manual Chapter II., Section C.2.a.i.(1). See also K.S.A. 76-725. "[T]he chief executive officer of each state educational institution shall administer the affairs of such institution and may delegate to any officer, employee, student, faculty committee, student-faculty committee, or student committee any part of such authority or any of such duties."

[12] See KBOR Policy Manual, Chapter II., Section C.2.b.i.(1). "[T]he Board has authorized each state university chief executive officer to make all employee appointment decisions at his or her institution." President Hush may also, at his discretion, delegate that authority. See id. See also K.A.R. 1-2-4 definition of Agency and 1-2-9 definition of Appointing Authority which gives specific human resource authorities by the State of Kansas, enacting K.S.A. 75-2935 and 75-2935b

[13] See Exhibit C. "Kansas Board of Regents Minutes, January 20, 2021" p. 12.

[14] See Id at p. 13. See also KBOR Policy Manual, Chapter II., Section C.2.b.vii.(f). "Tenure is a privilege that must be affirmatively granted by the institution in recognition of meritorious performance." See also, *e.g.*, *Vaughn v. Nadel*, 228 Kan. 469, 473-74, 618 P.2d 778, 783 (Kan. 1980) ("Rights are vested when the right to enjoyment, present or prospective, has become the property of some particular person or persons as a present interest. On the other hand, **a mere expectancy of future benefit**, or a contingent interest in property founded on anticipated continuance of existing laws, **does not constitute a vested right** … A vested right is a right so fixed that it is not dependent on any future act, contingency or decision to make it more secure") (citations omitted) (emphasis added). Neither Kansas statutory law, Board policy, nor University policy create an explicit right to tenure, nor a

The proposed new policy stated, in part, that "any state university employee, including a tenured faculty member, may be suspended, dismissed, or terminated from employment by their respective university."[15] Additionally, said policy stated that a "[d]eclaration of financial exigency and the processes associated with declaration of financial exigency shall not be a prerequisite to any suspension, dismissal, or termination authorized by this provision, and no existing university policy hearing procedures shall apply to such decisions."[16] After a roll call vote, the Board approved the policy, which made the new policy effective through December 31, 2022.[17]

The following month at the Board's February 2021 meeting, the Board "amended the policy to allow universities more time to develop the framework required for implementation of the policy, and to attempt to address their financial situation short of using the policy."[18]

At the request of the Council of Faculty Senate Presidents, the Board's standing Governance Committee created a workgroup in March 2021 whose charge included the Board's justification for its newly enacted Workforce Management Policy, to-wit:

> *Pursuant to the Kansas Constitution, the role of the Board of Regents is to control and supervise the state universities in accordance with state law. The Board has **broad statutory authority** to control and supervise the operation and management of the six state universities and has **a fiduciary duty** to those institutions **to ensure their long-term financial health while maintaining quality and affordability** to both current and future generations of Kansans. While the Board continues to advocate for adequate state funding, it must also strive to keep tuition and fees reasonable while not sacrificing the value of the education and research that our State has come to rely on and expect from these institutions. As expressed in the Board's temporary, pandemic-related workforce management policy, **the COVID-19 pandemic combined with flat to lower enrollments and the long-term downward trend in State funding has placed extreme financial pressures on the state universities, making time and precision of the essence in addressing those financial pressures**. It is in this context, and because salary is by far the greatest expense on every campus, the Board determined it necessary to provide the*

---

property interest in tenure, for university tenured faculty members. Instead, even under normal policy standards, tenured employment is a characterized as a "privilege" to which the Board and/or the University reserve discretion to withdraw for various reasons, such as a felony conviction, **significant reduction in or elimination of a position's funding source**, program discontinuance, financial exigency, or for just cause. See KBOR Policy Manual, Chapter II., Section C.6.a.i. and b.i. Even detailed, procedural protections for dismissing a tenured faculty member are not sufficient to create a protected property interest. See *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). See also, *Bunger v. University of Oklahoma*, 95 F.3d 987, 990–91 (10th Cir.1996) (procedural guidelines in Faculty Handbook did not create interest in reappointment).
[15] See KBOR Policy Manual, Chapter II., Section C.6.b.ii.
[16] Id.
[17] See Exhibit C. "Kansas Board of Regents Minutes, January 20, 2021" p. 14.
[18] See Exhibit D. "Kansas Board of Regents Minutes, February 17, 2021" p. 2.

property rights afforded by tenure at ESU, without due process, both of which are substantial[.]"[94]

As discussed above, *see supra*, the Board's policy[95] and the University's Workforce Management policy[96] mandate that an affected employee (*i.e.*, an employee whose employment is terminated pursuant to such policies) be afforded adequate procedural due process. These processes include notice, the reasonable opportunity to appeal, a response to the appeal, and a hearing to "decide the appeal based on the standards stated in the Board's policy and in the University's framework approved by the Board."[97] The review of President Hush's decision "shall be based on the written materials submitted, along with any oral presentation to the administrative officer by the employee and the University[,]" during which Mr. Catlett may be represented by legal counsel.[98] Significantly, these requirements of process and review all occur *prior* to the end of Mr. Catlett's employment on May 16, 2023.[99] Up to and until that date, Mr. Catlett may remain fully employed by the University with all attendant benefits and rights, and in return, will be expected to satisfactorily perform all his usual duties and obligations. Indeed, by virtue of the instant administrative appeal and hearing processes, Mr. Catlett is presently availing himself of the fundamental characteristic of procedural due process: a meaningful opportunity to challenge President Hush's decision and the reasons underlying President Hush's decision.[100]

Simply because Mr. Catlett personally believes the procedures within the University's Workforce Management policy do not provide rightful due process, does not mean they do not.[101]

In addition, if Mr. Catlett's complaint about a lack of due process were to be interpreted to mean he instead should be afforded the procedures required for faculty terminations that occur outside the parameters of the University's Workforce Management policy,[102] such an interpretation would contemplate an *unlawful* action. For Mr. Catlett to be afforded the procedures he deems should be applicable by standard University policy, such an action would require the University

---

[94] See "Appeal of Emporia State University's (ESU) Decision Based on the Workforce Management Policy," Catlett, R., October 2022, page 4.

[95] See KBOR Policy Manual, Chapter II., Section C.6.b.ii.

[96] See Exhibit H.

[97] See Exhibit H.

[98] See id.

[99] See Exhibit A.

[100] See Exhibit A "I regret to inform you that your appointment as Associate Professor, Mathematics and Economics, with Emporia State University (ESU) is ending effective Tuesday, May 16, 2023, due to extreme financial pressures". See, *e.g.*, *Benavidez v. City of Albuquerque*, 101 F.3d 620, 627 (10th Cir. 1996) (adopting a 3-part test to determine the amount and type of procedure required by the Due Process Clause in administrative proceedings). See also, *e.g.*, *Riggins v. Goodman*, 572 F.3d 1101, 1108 (10th Cir. 2009) ("[a] full evidentiary hearing is not required prior to an adverse employment action"; it suffices that the employee is "given notice and an opportunity to respond") (internal quotation marks omitted).

[101] See, *e.g.*, *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985) ("[T]he root requirement of the Due Process Clause" is "that an individual be given an opportunity for a hearing before he is deprived of any significant protected interest") (internal quotations omitted).

[102] See Exhibit S at 1B.09 "Policies On Termination Of Employment."

to intentionally disregard the statutory authority and the policy mandate controlling the instant action, *to-wit*: "Such terminations, suspensions, or dismissals [arising from the Workforce Management policy] **shall** follow the procedure set forth below. ... [A]nd **no existing university policy hearing procedures** shall apply to such decisions."[103] This unambiguous mandate is not permissive and must be followed as a matter of law.[104]

Furthermore, President Hush's decision and the use of the University's Workforce Management policy is not in contravention to Mr. Catlett's *status* as a tenured faculty member, nor the tenured status of any other faculty member at ESU. Significantly, as the Board noted, *see supra*, "the proposed policy is not a threat to tenure because **tenure does not mean that a job is guaranteed** regardless of financial circumstances. Tenure was put in place to ensure academic freedom, which the Board highly values, and handcuffing a university's ability to ensure financial strength in the name of tenure is counter to its purpose."[105] The appointment status[106] of tenure acknowledges a faculty member's achievement of performance requirements[107] and a tenured faculty member's right to additional employment protections in the event of a "for cause" termination based on teaching, scholarship, or service.[108] To interpret the status of tenure as compelling indefinite, *i.e.*, "continuous" or guaranteed employment, as Mr. Catlett's appeal implies, would lead to absurd results—*i.e.*, a tenured faculty member would be forever employed, regardless of any other intervening or mitigating factor or circumstance, such as the

---

[103] See KBOR Policy Manual, Chapter II., Section C.6.b.ii. (emphasis added).

[104] See K.S.A. 76-712 "Except as otherwise provided by act of the legislature, the state educational institutions ... shall be controlled by and operated and managed under the supervision of the board of regents." See also K.S.A. 76-780 "The board of regents shall have all the powers necessary to carry out the purposes and provisions of this act, including, without limitation, the following powers: ... (f) do any and all things necessary or convenient to exercise the powers authorized by this act[.]" See also K.S.A. 74-3202a.

[105] See Exhibit C. "Kansas Board of Regents Minutes, January 20, 2021" p. 13 (emphasis added). See also KBOR Policy Manual, Chapter II., Section C.2.b.vii.(f). "**Tenure is a privilege** that must be affirmatively granted by the institution in recognition of meritorious performance." See also, *e.g.*, *Vaughn v. Nadel*, 228 Kan. 469, 473-74, 618 P.2d 778, 783 (Kan. 1980) ("Rights are vested when the right to enjoyment, present or prospective, has become the property of some particular person or persons as a present interest. On the other hand, **a mere expectancy of future benefit**, or a contingent interest in property founded on anticipated continuance of existing laws, **does not constitute a vested right** ... A vested right is a right so fixed that it is not dependent on any future act, contingency or decision to make it more secure") (citations omitted) (emphasis added). Neither Kansas statutory law, Board policy, nor University policy create an explicit right to tenure, nor a property interest in tenure, for university tenured faculty members. Instead, even under normal policy standards, tenured employment is a characterized as a "privilege" to which the Board and/or the University reserve discretion to withdraw for various reasons, such as a felony conviction, **significant reduction in or elimination of a position's funding source**, program discontinuance, financial exigency, or for just cause. See KBOR Policy Manual, Chapter II., Section C.6.a.i. and b.i. Even detailed, procedural protections for dismissing a tenured faculty member are not sufficient to create a protected property interest. See *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). See also, *Bunger v. University of Oklahoma*, 95 F.3d 987, 990–91 (10th Cir.1996) (procedural guidelines in Faculty Handbook did not create interest in reappointment).

[106] See Exhibit S at 1B.01.

[107] Although tenure is not automatically awarded simply on this basis.

[108] See Exhibit S at 1A.0102. "Termination of a tenured faculty member must follow appropriate policies and procedures." See also Exhibit S at 1B.0805.01.