ELECTRONICALLY FILED 05/05/2023 11:43:48 OFFICE OF ADMINISTRATIVE HEARINGS

**Exhibit K**

## BEFORE THE OFFICE OF ADMINISTRATIVE HEARINGS
## STATE OF KANSAS

SIEVERT, Lynette,

      Respondent,

                             OAH No.      23BR0006 BR

v.

Emporia State University,

      Agency.

## ORDER

### Statement of Case

This matter comes before the Office of Administrative Hearings (OAH) for an Administrative Hearing pursuant to the Kansas Board of Regents (KBOR) approval of Emporia State University's (ESU) *Framework For Workforce Management*.[1] An administrative hearing was held February 7, 2023. The issue in this matter is whether ESU's action to terminate Lynette Sievert, PhD, is in compliance with ESU's Framework as approved by KBOR.  Dr. Sievert appears *pro se*. ESU appears through its attorney Steven Lovette. The parties each filed written arguments and made oral arguments. This proceeding was held pursuant to KBOR's Suspension, Terminations and Dismissals policy.[2]

### Findings of Fact

1.    Dr. Sievert is a tenured professor with ESU and has been since1999.  On September 15, 2022, Dr. Sievert was notified that her employment with ESU would end May 16, 2023.  It is this action that is the basis of Dr. Sievert's appeal to OAH.

2.    The ESU Framework was submitted to the KBOR at its meeting on September 14, 2022. KBOR determined that the Framework was in compliance with its policy[3] and authorized ESU to implement the Framework.

---

[1] *Kansas Board of Regents Policy Manual*, Chapter II, §C, ¶6(b)(ii)(5) and *Emporia State University Framework for Workforce Management.*
[2] *Kansas Board of Regents Policy Manual*, Chapter II, §C, ¶6 (b).
[3] *Kansas Board of Regents Policy Manual*, Chapter II, §C, ¶6(b)(ii).

3.      The letter terminating Dr. Sievert indicated the action was being taken pursuant to KBOR's policy and ESU's Framework[4] approved by KBOR.

4.      The correspondence notifying Dr. Sievert that her appointment as Professor, Biological Sciences, was being terminated indicated that the action was being taken pursuant to the *Kansas Board Of Regent's Policy Manual* and *Emporia State University Framework For Workforce Management* (Framework). The notice cited extreme financial pressures accelerated by the COVID-19 pandemic, decreased program and university enrollment, continuing and ongoing increases in the cost of operations, and substantive changes in the educational marketplace.

5.      The letter terminating Dr. Sievert indicates:

Specifically, this action is based on factors such as, but not limited to:
- Restructuring of a program, department, or school as determined to be necessary by the university.
- Realignment of resources.

Secondary considerations may include:
- Cost of operations.
- Reduction in revenues for specific departments or schools.
- Realignment of resources.
- Performance evaluations.
- Teaching and research productivity.
- Low service productivity.

6.      The termination letter does not articulate a reason Dr. Sievert was chosen to be terminated. It contain the statements, "Specifically, this action is based on factors such as, but not limited to" and "…considerations may include"  However, a specific reason(s) for her termination is not provided to Dr. Sievert.

7.      Dr. Sievert identifies the following areas for her appeal: she does not know the reason she was terminated; she has had no negative performance feedback/reviews; her termination is substantially inconsistent with the ESU Framework; ESU has committed age discrimination against her; and the action taken against her by ESU is unreasonable, arbitrary, and capricious.

8.      Dr. Sievert argues that the action to terminate her was made without learning about who she is and her experiences and abilities in Human Anatomy and her ability to teach a curriculum

---

[4] *Emporia State University Framework for Workforce Management.*

focused on preparing students for medical professions. In his Affidavit, Dr. Brent Thomas[5], made the following statements:

- The creation of the new Healthcare concentration coupled with other recent developments (*e.g.*, the ESU Pre-medical program) has resulted in an increase in the number of inquiries into the University's pre-medical program over the past year.[6]
- The Department of Biological Sciences has an opportunity to build upon this recent momentum by shifting the focus of its curriculum away from vertebrate Physiology and to refocus its limited resources towards Human Anatomy and Physiology curriculum.[7]
- Although mammalian and vertebrate/invertebrate physiologist can teach, and often teach, Human Anatomy and physiology courses as a matter of necessity, the University's realignment of its curriculum's focus on human Physiology as a springboard into medical programs need the quality and professional knowledge of a human physiologist.[8]
- Dr. Sievert is not a human physiologist.[9]
- As a result, the University will need to hire a human anatomist/physiologist with an academic background focused on applications to the modern human medicine.[10]
- While there was not evaluation or consideration of Dr. Sievert's teaching performance or her load, or her scholarships, or her service activities, Dr. Sievert's ongoing contribution as a faculty member to the programs within the Department of Biological sciences was determined to be unnecessary and not sustainable.[11]

9.    Dr. Sievert expressly addresses Dr. Thomas' statements. She argues, human anatomy is derived through mammalian anatomy, human anatomy is a subset of mammalian anatomy and she is qualified to teach both. She cites her background of six years of being mentored, supervised, and assessed in the teaching of human anatomy; one year of being mentored, supervised, and assessed in teaching human physiology; teaching Principles of Physiology targeted for pre-med students; teaching human anatomy and supervising the lab including the use of cadavers which had were her responsibility to supervise and maintain. She performed these activities as an expert in human physiology. She also developed a manual for her lab responsibilities. She has taught Human Anatomy and Physiology Lecture and Lab courses at ESU for at least seven years.

---

[5] Interim Provost & Vice President of Academic Affairs, and Dean of the College of Liberal Arts & Sciences at Emporia State University, Exhibit T.
[6] *Id.*, ¶22.
[7] *Id.*, ¶23.
[8] *Id.*, ¶25.
[9] *Id.*, ¶26.
[10] *Id.*, ¶27.
[11] *Id.*, ¶28.

3

## Conclusions of Law

1.  In light of the extreme financial pressures placed on the state universities due to the COVID-19 pandemic, decreased program and university enrollment, and state fiscal issues, effective immediately through December 31, 2022 and notwithstanding any other Board or institutional policy, any state university employee, including a tenured faculty member, may be suspended, dismissed, or terminated from employment by their respective university. Declaration of financial exigency and the processes associated with declaration of financial exigency shall not be a prerequisite to any suspension, dismissal, or termination authorized by this provision.[12]

2.  While ESU is not facing financial exigency, extreme financial pressures do require a prudent review and restructuring, which will require modification, reorganization, suspension or elimination of certain operations, programs, and curriculum.[13]

3.  Decision-making within the Framework may be based on factors such as, but not limited to, performance evaluations, teaching and research productivity, low service productivity, low enrollment, cost of operations, market considerations as to the need for a program or department, restructuring of a program, department or school, or reduction in revenues for specific departments or schools.[14]

4.  The notice of suspension, dismissal, or termination to the affected employee shall include a statement that this action is being taken pursuant to the Framework, the reasons for the action being taken, the effective date of the action, and any consideration to be provided by the University to the affected employee.[15]

5.  The only grounds for reversing the state university chief executive officer's decision to suspend, dismiss, or terminate the employee (a) is substantially inconsistent with the university's decision-making framework approved by the Board, (b) was the result of unlawful bias or discrimination; or (c) was otherwise unreasonable, arbitrary or capricious.[16]

6.  The burden of proof in any appeal shall be on the employee. There shall be no right of discovery. The review shall be based on the written submissions, and the hearing shall allow oral presentation to the administrative hearing officer by the employee and the university, each of whom may be represented by counsel.[17]

---

[12] *Id.,* page 1, Exhibit T.
[13] *Id.*
[14] *Id.*, The Framework, page 1.
[15] *Id.*, page 2.
[16] *Id.* Page 2, number 3, *and Kansas Board of Regents Policy Manual*, Chapter II, §C, ¶6(b)(ii)(3).
[17] *Kansas Board of Regents Policy Manual at* ¶6(b)(ii)(6).

7.  ESU argues a rebuttable presumption of validity attaches to its action and it is up to Dr. Sievert to show the decision to terminate her is not consistent with ESU's Framework.[18]

Analysis

8.  The action taken to terminate Dr. Sievert was conveyed in ESU's September 15, 2022 letter to Dr. Sievert. The letter acknowledges ESU is experiencing extreme financial pressures. It goes on to say, "Specifically, this action is based on factors such as, but not limited to:" and then identifies three areas.[19] It does not identify which factor is applicable to Dr. Sievert's termination. The letter goes on to identify secondary considerations that ESU may have identified.[20]

9.  All-inclusive statements, such as "but not limited to, " and "may include" as contained in the termination letter to Dr. Sievert are not effective to identify the reason for the action taken against her taken by ESU. According to the Framework, the reason(s) for Dr. Sievert's termination is to be given to her in the termination letter.

10. Because Dr. Sievert has shown that a reason for her termination was not provided to her, she has overcome the presumption of the validity of her termination. She has shown that ESU failed to provide the reason(s) for the action taken against him. She has shown that ESU's action is substantially inconsistent with the university's decision-making framework approved by the Board. [21]

11. Dr. Sievert argues that she does not know the reason(s) she was chosen to be terminated. She argues that because she was not given a specific reason for her termination the decision to terminate her is substantially inconsistent with the ESU Framework. She argues against this unknown by addressing her lack of negative performance feedback. She sets out her history with teaching human anatomy. She argues that the action is unreasonable, arbitrary, or capricious. She also argues that she has been subject to age discrimination.

12. Because ESU has not identified its reason(s) for Dr. Sievert's termination, her termination is without an adequate determining principle. With unfounded motivation for Dr. Sievert's termination, the action against her is arbitrary and capricious. Again, Dr. Sievert has overcome the presumption of the validity of her termination.

13. ESU put forth the position (through Dr. Thomas' affidavit) that Dr. Sievert is not qualified to stay in her position to contribute to the direction the Biological Sciences Department is headed and it must hire someone else in her stead. Dr. Sievert addressed this as supposition

---

[18] Emporia State University's Response to the Administrative Appeal of Dr. Dan Colson, Associate Professor.

[19] Low enrollment; current or future market considerations as to the need for a program or department; restructuring of a program, department, or school as determined to be necessary by the university.

[20] Cost of operations, reduction in revenues, realignment of resources, performance evaluations, teaching and research productivity, and low service productivity.

[21] *Framework*, page 2, numbers 1 and 3.

5

asserting that she did in fact have an academic background on applications to human physiology. A synopsis of her history in the field is in *Findings of Fact*, paragraph nine, above.

14.  ESU has outlined and attested to that it is not appropriate to maintain Dr. Sievert as a Professor of Biological Science ESU. However, just saying it does not make it so. Dr Sievert has responded to the allegations by showing she has the background in the area of human anatomy and physiology, has taught it in lecture and laboratory and has even done so for ESU. She has overcome the presumption that she is unnecessary and not sustainable for the direction ESU is taking its Biological Sciences Department.

15.  Dr. Sievert alleges that ESU has engaged in age discrimination against her. The nature of the process provided through the KBOR Policy[22] and ESU's Framework[23] is not adequate to provide the evidence necessary to establish or disprove age discrimination allegations. Whether ESU engaged in age discrimination against Dr. Sievert is factual determination that cannot be determined here.

Conclusion

After review of the action taken by ESU in light of the KBOR's Policy Manual and the ESU Framework, for the reasons outlined above, ESU's action is not in compliance with KBOR's Suspensions, Terminations and Dismissals policy. The action to terminate Professor Lynette Sievert, PhD is reversed.

Right to Seek Relief from the Decision

The above proceeding was conducted pursuant to the Emporia State University Framework for Workforce Management (Framework), which was approved by the Kansas Board of Regents on September 14, 2022. Pursuant to the Framework, the above proceeding was not conducted pursuant to the Kansas Administrative Procedures Act.[24]

This order is effective on the date reflected on the certificate of service.

According to the Framework this order is not subject to further administrative review by any officer or committee of Emporia State University or the Kansas Board of Regents. This order therefore constitutes final agency action which may grant further appeal rights pursuant to the Kansas Judicial Review Act (KJRA).[25] The KJRA applies to "all agencies and all proceedings for

---

[22] *Kansas Board of Regents Policy Manual*, Chapter II, §C, ¶6(b).
[23] *Emporia State University Framework for Workforce Management*, page 2.
[24] K.S.A. 77-501 *et seq.*
[25] K.S.A. 77-601 *et seq.*

judicial review and civil enforcement of agency actions not specifically exempted by statute from the provisions of this act."[26]  According to the KJRA:

> A person who qualifies under this act regarding (1) standing (K.S.A. 77-611), (2) exhaustion of administrative remedies (K.S.A. 77-612) and (3) time for filing the petition for judicial review (K.S.A. 77-613) and other applicable provisions of law regarding bond, compliance and other preconditions is entitled to judicial review of final agency action, whether or not the person has sought judicial review of any related nonfinal agency action.[27]

Judicial review is governed by the KJRA.[28]  A party seeking judicial review may do so by filing a petition in a district court in the county in which the order or agency action was entered or is effective.[29]  A petition for judicial review must be filed with the district court within 30 days from the date this order was served.[30]  If a petition for judicial review is filed, a copy must be served on the opposing party as required by law.


Sandra L. Sharon
Administrative Law Judge/Presiding Officer
Office of Administrative Hearings
1020 S. Kansas Ave.
Topeka, KS  66612
Telephone: 785-296-2433

---

[26] K.S.A. 77-603.
[27] K.S.A. 77-607(a).
[28] K.S.A. 77-606(d).
[29] K.S.A. 77-609(b).
[30] K.S.A. 77-613.

## CERTIFICATE OF SERVICE

On ___May 5___, 2023, I certify that I mailed a copy of this document in the United States Post Office, first class, postage prepaid to:

> Kevin Johnson, General Counsel
> Emporia State University
> 1 Kellogg Circle
> PO Box 4001
> Emporia, KS 66801

> John Yeary
> General Counsel
> Kansas Board of Regents
> Curtis State Office Building
> 1000 SW Jackson, Suite 520
> Topeka, KS 66612

and, I further certify that I caused a copy of the foregoing to be served electronically through OAH's e-filing system to:

> Lynette Siefert
> 1611 Casa Loma Dr
> Emporia, KS 66801

> Steven Lovett
> Associate General Counsel for Academic Affairs
> 1 Kellogg Circle
> PO Box 4001
> Emporia, KS 66801

_____
Staff Person
Office of Administrative Hearings

ELECTRONICALLY FILED
2023 May 19 PM 3:02
CLERK OF THE LYON COUNTY DISTRICT COURT
CASE NUMBER:  LY-2023-CV-000057
PII COMPLIANT

## IN THE FIFTH JUDICIAL DISTRICT
## DISTRICT COURT OF LYON COUNTY, KANSAS

| | |
|---|---|
| **EMPORIA STATE UNIVERSITY,**<br>    **Petitioner,**<br><br>**v**<br><br>**LYNNETTE SIEVERT,**<br>**Individually;**<br>**THE KANSAS OFFICE OF**<br>**ADMINISTRATIVE HEARINGS;**<br>**SANDRA SHARON, In her**<br>**Capacity as Presiding Officer/**<br>**Administrative Law Judge**<br>**for the Kansas Office of**<br>**Administrative Hearings,**<br>    **Respondents.** | **Case No. _____** |

**Proceeding Pursuant to K.S.A. Chapter 77.**

### PETITION FOR REVIEW

COMES NOW, Petitioner, Emporia State University, by and through its undersigned counsel, Paul Dean of Putnam & Dean, LLC, and for this Petition for Review hereby alleges and petitions as follows:

### PARTIES

1.    Petitioner, Emporia State University, is a state agency and one of the six state universities under the control and supervision of KBOR. *See* K.S.A. 76-711; K.S.A. 76-712; K.S.A. 76-601 *et seq.*

2.    Petitioner has standing to bring this petition pursuant to K.S.A. 77-611.

3.    Respondent, Lynnette Sievert ("Respondent Sievert"), is a natural person and a resident of Butler County, Kansas, who may be served with process at 1611 Casa

1

Loma Dr., Emporia, KS 66801.

4.      Respondent, The Kansas Office of Administrative Hearings ("OAH"), is a Kansas state agency located at 1020 S. Kansas Avenue, Topeka, Kansas 66612-1327.

5.      Respondent, Sandra Sharon ("Respondent Sharon"), in her official capacity as the Presiding Officer/Administrative Law Judge for the OAH, whose office is located at 1020 S. Kansas Avenue, Topeka, Kansas 66612-1327, was the presiding officer for Respondent Sievert's administrative appeal process and hearing.

## JURISDICTION

6.      Jurisdiction in this court is proper pursuant to K.S.A. 77-609(a) *et seq.*

7.      All conditions precedent have been satisfied prior to the filing of this petition.

## VENUE

8.      Proper venue for resolution of this dispute is Lyon County, Kansas, pursuant to K.S.A. 77-609(b).

## STATEMENT OF FACTS

9.      The Kansas Board of Regents ("KBOR") is empowered by the Kansas Constitution and state statute to control, supervise, operate, and manage the six state universities in Kansas. *See* Kan. Const., Art. 6, § 2(b); K.S.A. 74-3202a; K.S.A. 74-3202c; K.S.A. 76-712.

10.      KBOR policy states:

> In light of the extreme financial pressures placed on the state universities due to the COVID-19 pandemic, decreased program and university enrollment, and state fiscal issues, effective immediately through December 31, 2022 and notwithstanding any other Board or institutional policy, any state university employee, including a tenured faculty member, may be suspended, dismissed, or terminated from employment by their respective university. Such terminations, suspensions, or dismissals shall

2

follow the procedure set forth below. KBOR Policy Chapter II.C.6.b.ii.[1]

11.     Pursuant to said KBOR policy, on September 14, 2022, Petitioner presented a proposed framework (hereinafter "Workforce Management Framework") to KBOR, which was unanimously approved by KBOR on that same day.

12.     Pursuant to said KBOR policy, Respondent OAH was assigned jurisdictional authority to hold hearings for any of Petitioner's employees who might be directly impacted by Petitioner's use of its Workforce Management Framework and who might choose to administratively appeal Petitioner's decision under the Workforce Management Framework. KBOR Policy Chapter II.C.6.b.ii.(2).

13.     Pursuant to said KBOR policy, and based on Petitioner's Workforce Management Framework, Petitioner met with, and provided a notice letter to, Respondent Sievert, who is an employee of Petitioner, on September 15, 2022, notifying Respondent Sievert "that your appointment as Professor, Biological Sciences, with Emporia State University (ESU) is ending effective Tuesday, May 16, 2023, [… pursuant to] Kansas Board of Regents (Board) policy Chapter II, Section C., Paragraph 6.b., and in accordance with the required framework approved by the Board." Ex. 1.

14.     Pursuant to said KBOR policy and pursuant to Petitioner's Workforce Management Framework, Respondent Sievert thereafter provided her appeal of Petitioner's decision on or about October 12, 2022, and requested an appeal hearing. Ex. 2.

15.     On or about November 15, 2022, Petitioner filed its response to Respondent Sievert's appeal, along with supporting exhibits. Ex. 3.

16.     On February 7, 2023, Respondent Sharon held a teleconference hearing on Respondent Sievert's appeal.

17.     On May 5, 2023, Respondent Sharon entered a final Order disposing of Respondent Sievert's administrative appeal. Ex. 4.

---

[1] The complete body of relevant KBOR policy is available at: https://kansasregents.org/about/policies-by-laws-missions/board_policy_manual_2/chapter_ii_governance_state_universities_2

## ARGUMENT

**I.      Respondent Sharon Lacked Jurisdiction to Rule on the Adequacy of Notice, or in the alternative, Misapplied the Controlling Law**

18.     As a matter of law, the administrative appeals processes underlying the instant petition are authorized and defined solely by KBOR's and Petitioner's policies. *See* K.S.A. 76-715 ("Employees in the unclassified service shall serve at the pleasure of the chief executive officer of the state educational institution, subject to policies approved by the board of regents.").

19.     The KBOR policy and Petitioner's policy relevant to the underlying administrative appeals requires that:

> The burden of proof in any appeal shall be on the employee. There shall be no right of discovery. The review shall be based on the written submissions, and the hearing shall allow oral presentation to the administrative hearing officer by the employee and the university, each of whom may be represented by counsel. KBOR Policy Chapter II.C.6.b.ii.(6).

20.     KBOR policy and Petitioner's policy also impose a clear limitation to the scope of review conducted by Respondent OAH's administrative law judges based on the only three allegations that are permitted to be brought by an appealing employee, *to-wit*:

> The [employee's appeal] must include a … written statement, including any relevant supporting evidence or documentation, setting forth the reasons the employee believes the **decision** to suspend, dismiss, or terminate the employee (a) is substantially inconsistent with the university's decision-making framework approved by the Board, (b) was the result of unlawful bias or discrimination; or (c) was otherwise unreasonable, arbitrary or capricious. These shall be the **only** grounds for reversing the state university chief executive officer's decision. KBOR Policy Chapter II.C.6.b.ii.(3) (**emphasis added**); *see also*, Ex. 4 at 4 ¶ 5.

21.     Therefore, on its face, this policy assigns narrow jurisdictional authority to reverse Petitioner's decision to terminate an employee **only** if the appealing employee proves by a preponderance of the evidence that Petitioner's **decision** did not

4

substantially comply with KBOR policy, was unlawfully biased or discriminatory, or was otherwise arbitrary and capricious. *See*, Ex. 5.

22.     While a terminated employee may have the right to bring other allegations or claims before other tribunals, such as a claim of inadequate due process, KBOR policy and Petitioner's policy controlling the underlying administrative appeal's process does not grant any jurisdictional authority to Respondent OAH or Respondent Sharon to analyze, evaluate, or rule upon the adequacy or validity of anything other than Petitioner's **decision** to terminate an employee. *See*, Ex. 5.

23.     Although Respondent Sharon's final Order correctly acknowledges the narrow authority of review granted by KBOR policy and the Petitioner's Workforce Management Framework, Respondent Sharon's ruling ignores that limitation and instead focus solely on what occurred **after** Petitioner's decision was made, *i.e.*, the issue of adequate notice, *to-wit*:

> The [notice] letter does not articulate a reason Dr. Sievert was chosen to be terminated. … [A] specific reason(s) for [Respondent Sievert's] termination is not provided[.] … [The notice letter] does not identify which factor is applicable to Dr. Sievert's termination. [The reasons listed in the notice letter] are not effective to identify the reason for the action taken against [Respondent Sievert] by ESU. *See*, Ex. 4 at 2 ¶ 6, 5 ¶'s 8 and 9.

24.     The concept and use of "notice" is exclusively a key component of procedural due process. *See, e.g., Bd. of County Comr's of Reno County v. Akins*, 271 Kan. 192, 196, 21 P.3d 535, 539 (Kan. 2001) (notice is "[a]n elementary and fundamental requirement of due process [intended to] apprise interested parties of the pendency of the action and afford them the opportunity to present their objections.")

25.     Notice, as a tool of awareness, is legally and logically distinguishable from the concept and meaning of a "decision," which is a conclusion or judgment—two words with different ordinary meanings and distinct functions. *See, e.g., Johnson v. U.S. Food Service*, 312 Kan. 597, 600-01, 478 P.3d 776 (2021) ("The most fundamental rule of statutory construction is [to begin with] giving common words their ordinary meaning.")

26.     While the use and meaning of the word "decision" in both KBOR and Petitioner's policies is clear and unambiguous, an application of the doctrine of *in pari*

*materia* further establishes that the word "decision" was not intended to include, nor does it incorporate, the concept of "notice." *See, e.g., State v. Batson*, 99 Haw. 118, 122, 53 P.3d 257 (2002) (employing *in pari materia* analysis to support validity of plain meaning interpretation of statute); *see also*, <u>Ex. 5</u>.

27.     For instance, at least two of the points of permitted administrative review within the KBOR policy (*i.e.*, discrimination and arbitrariness) unmistakably address the issue of evaluating the merits of Petitioner's **decision**, not any part of the appeal or grievance process that took place **after** Petitioner's decision was made.

28.     Regardless of whether Respondent Sharon's analysis and conclusions are correct or incorrect—whether the notice letter did or did not provide sufficient reasons for Petitioner's actions—such an analysis and conclusion is distinct from an analysis or conclusion about Petitioner's actual and preceding **decision** to terminate Respondent Sievert.

29.     Of significant note, in a companion case[2] in which the appealing employee received an almost identical notice letter[3] as Respondent Sievert and in which the appealing employee also complained of the inadequacy or insufficiency of the notice letter, Respondent Sharon did **not** provide any analysis or comment on the alleged lack of adequate notice letter, and therefore did not make any "but for" conclusions related to arbitrariness or capriciousness, or whether Petitioner had substantially complied with the controlling policies. *See*, <u>Ex. 6</u> (compare <u>Ex. 4</u> at 5 ¶ and <u>Ex. 6</u> at 4 ¶ 3).

30.     However, in the instant case, instead of analyzing, evaluating, calling into question, disagreeing with, or affirming Petitioner's **decision** to terminate Respondent Sievert, the final Order's findings rely exclusively on its improper analysis of the notice letter—an element of the administrative process that occurred **after** Petitioner's decision was made to terminate Respondent Sievert.

31.     Respondent Sharon's final Order ignores the narrow grant of jurisdictional

---

[2] Seventeen (17) faculty members who were laid off as a result of Petitioner's reduction-in-force actions, filed administrative appeals with the OAH. Respondent Sharon served as the hearing officer for four (4) of those appeals.
[3] The notice letters contain all of the same reasons for Petitioner's decision, including "Restructuring of a program, department, or school as determined to be necessary by the university."

authority provided by the controlling KBOR and Petitioner's policies and/or misapplies the controlling law, improperly arriving at its decision based only on an analysis of the notice letter and not on an analysis of Petitioner's decision.

32.     Therefore, and pursuant to K.S.A. 77-621(c)(2), (3), (4), and/or (5), because the final Order entered by Respondent Sharon is clearly beyond the jurisdiction conferred by KBOR policy, and/or has failed to decide an issue requiring resolution, and/or has erroneously interpreted or applied controlling law, and/or has failed to follow prescribed procedure, it must be reversed.

**II.      Respondent Sharon Erroneously Interpreted or Misapplied Controlling Law, and/or Failed to Follow Prescribed Procedure, When Analyzing the Basis for Petitioner's Decision to Terminate Respondent Sievert**

33.     Alternatively, and in addition to the discussion *supra*, KBOR policy and Petitioner's policy clearly require that Respondent OAH's and Respondent Sharon's "review **shall** be based on the **written submissions**, and ... oral presentation[s]," a mandatory directive that is correctly recited in Respondent Sharon's final Order. *See*, <u>Ex. 4</u> at 4 ¶ 6 (**emphasis added**).

34.     Even if, *in arguendo*, the notice letter's recitation of reasons for Petitioner's decision was inadequate, the **written submissions** supplied by Petitioner, *i.e.*, Petitioner's response and attached exhibits, and the presentation made by Petitioner during the hearing, provided Respondent Sharon with a substantial body of competent evidence explaining, and in direct support of, Petitioner's decision to terminate Respondent Sievert. *See*, <u>Ex. 3</u> at 14 – 18.

35.     At no point in the final Order's analysis of whether an adequate reason(s) was provided to Respondent Sievert for Petitioner's decision, or of whether Petitioner's decision was based on a competent body of evidence, is there an examination of, a discussion about, or an acknowledgement of the detailed reasons and thorough explanations that are contained in the written submissions provided by Petitioner.

36.     Because Respondent Sharon's reasoning focused exclusively on her

analysis of the notice letter, Respondent Sharon ignored or otherwise undervalued Petitioner's written submissions in order to arrive at her conclusions, such as concluding that Respondent Sievert had met her burden of proof, or that Petitioner's actions were "arbitrary and capricious", and that Petitioner had not substantially complied with the controlling policies.

37.    Indeed, the basis for all of Respondent Sharon's analysis—that "[a]ll-inclusive statements … are not effective to identify the reason for the action taken against [Respondent Sievert]"—focuses solely on the notice letter; the "but for" foundation of Respondent Sharon's opinion offers no comment or reference to, nor allows for, any of Petitioner's written submissions. *See*, Ex. 4 at 5 ¶ 9 and 10.

38.    Even Respondent Sharon was dissatisfied with a perceived lack of specificity in the notice letter, reasons for Respondent Sievert's termination were nonetheless provided, and Petitioner's written submissions further augmented and supported and detailed those reasons. *See*, Ex. 3; *see also*, *Merriam Webster dictionary* (1981) *Merriam-Webster*. Springfield, MA: G & C Merriam Co. ("reason" defined as "a statement offered in explanation or justification" or "a rational ground or motive"), available at: https://www.merriam-webster.com/dictionary/reason.

39.    Therefore, not only is Respondent Sharon's conclusion about the adequacy of the notice letter outside her jurisdictional authority, but Respondent Sharon's restricted focus on the notice letter willfully ignores, and/or misapplies, the explicit and mandatory instruction that her review "be based on the written submissions[.]"

40.    In light of this, Respondent Sharon's determination that Petitioner's decision was "without an adequate determining principle" solely because the notice letter's reasons "are not effective to identify the reason for [Petitioner's] action" clearly fails to take into account the vast amount of description and accompanying documentation provided by Petitioner, which provides a "clear foundation in fact" based on reason and which is in alignment with statutory and policy mandates, responsibilities, and expectations of the university. *See*, Ex. 4 at 5 ¶ 9; *see also*, *Zinke & Trumbo, Ltd. v.*

8

*State Corp. Com'n of State of Kan.*, 242 Kan. 470, 474-5, 749 P.2d 21, 25 (1988) (quoting *Pork Motel, Corp. v. Kansas Dept. of Health & Environment*, 234 Kan. 374, 381, 673 P.2d 1126 (1983) ("An agency's action is 'arbitrary and capricious' if it is unreasonable or 'without foundation in fact.'")

41.     Therefore, and pursuant to K.S.A. 77-621(c)(4) and/or (5), because the final Order entered by Respondent Sharon was not "based on the written submissions, and ... oral presentation[s]" as required by controlling policy, the final Order has erroneously interpreted or applied controlling law, and/or has failed to follow prescribed procedure, and must be reversed.

III.     **Respondent Sharon Erroneously Interpreted or Misapplied Controlling Law, and/or Failed to Follow Prescribed Procedure, When Determining that Petitioner's Decision to Terminate Respondent Sievert Was "Arbitrary and Capricious"**

42.     Alternatively, and in addition to the discussion *supra*, because Respondent Sharon's finding of arbitrariness and capriciousness was based solely on an improper analysis of the notice letter, and without reference to, or reliance on, Petitioner's written submissions as required by law, and without any analysis of Petitioner's actual decision as also required by law, said finding has erroneously interpreted or misapplied controlling law.

43.     Respondent Sharon's conclusion that Petitioner's action was "arbitrary and capricious" depends exclusively on the determination that an alleged lack of "effective" reasons in the notice letter caused Respondent Sievert's termination to be "without adequate determining principle" and was therefore "[w]ith unfounded motivation[.]" *See*, Ex. 4 at 5 ¶ 9 and 12.

44.     This "but for" analysis not only disregards Petitioner's written submissions as required by the controlling policy but ironically ignores the final Order's own "Conclusions of Law," which recite the explanations and reasoning provided for within Petitioner's Workforce Management Framework—some of the same systematic rationale that was also provided in the notice letter. *See*, Ex. 4 at 4 ¶ 1, 2, and 3; *see*

9

*also*, Ex. 1.

45.     Such a legal analysis is also in contravention of well-settled case law regarding the characteristics for assessing arbitrariness and capriciousness. *See*, *Zinke & Trumbo, Ltd. v. State Corp. Com'n of State of Kan.*, 242 Kan. 470, 474-5, 749 P.2d 21, 25 (1988) (quoting *Pork Motel, Corp. v. Kansas Dept. of Health & Environment*, 234 Kan. 374, 381, 673 P.2d 1126 (1983) ("An agency's action is 'arbitrary and capricious' if it is unreasonable or 'without foundation in fact.'"); *see also*, *Dillon Stores v. Board of Sedgwick County Comm'rs,* 259 Kan. 295, Syl. ¶ 3, 912 P.2d 170 (1996) ("This court has defined 'arbitrary' to mean without adequate determining principles, not done or acting according to reason or judgment; 'oppressive' as harsh, rigorous, or severe; and 'capricious' as changing, apparently without regard to any laws.")

46.     Even if, *in arguendo*, Respondent Sievert had been able to demonstrate the notice letter provided inadequate reasons for her termination, that argument or evidence would only address the notice's sufficiency—a due process procedural element—but would **not** prove that Petitioner's **decision** lacked a substantial, competent body of evidence and was therefore arbitrary or capricious.

47.     Indeed, the final Order's "but for" dependency on an analysis of the sufficiency of the notice also neglects the final Order's own "Findings of Fact" which reiterate a portion of Petitioner's substantial, competent body of evidence by summarizing a number of evidence-based statements attested to by Dr. Brent Thomas, Interim Provost & Vice President of Academic Affairs and Dean of the College of Liberal Arts & Sciences; expert evidence with which Respondent Sharon simply disagrees without any rationale.[4] *See*, Ex. 4 at 2 – 3 ¶ 8; *see also*, Ex. 4 at 6 ¶ 14 ("ESU has outlined and attested to [the fact that Respondent Sievert is not properly credentialed to teach necessary courses ...] However, just saying it does not make it so.")

48.     Therefore, and pursuant to K.S.A. 77-621(c)(4) and/or (5), because the final Order entered by Respondent Sharon improperly relied on an analysis of the notice letter, and because the final Order's analysis otherwise ignored Petitioner's written

---

[4] Dr. Thomas' affidavit was included in Petitioner's appeal response as Exhibit T.

submissions and the explanations and rationale contained in Petitioner's Workforce Management Framework, the final Order's finding that Petitioner's action was arbitrary and capricious erroneously interpreted or misapplied controlling law, and/or failed to follow prescribed procedure, and therefore must be reversed.

### IV. Respondent Sharon Erroneously Interpreted or Misapplied Controlling Law, and/or Failed to Follow Prescribed Procedure, When Determining that Petitioner's Decision to Terminate Respondent Sievert Was "Arbitrary and Capricious"

49.     Alternatively, and in addition to the discussion *supra*, Respondent Sharon's finding that "Dr. Sievert has overcome the presumption of validity of her termination" based solely on an improper analysis of the notice letter is not only outside the limits of jurisdictional authority but also ignores the scope of review prescriptions as mandated by controlling policy and improperly substitutes Petitioner's lawful decision-making authority with the personal, and non-academic, opinion of the hearing officer. *See*, Ex. 4 at 5 – 6 ¶ 12 – 14.

50.     As noted above, KBOR policy and Petitioner's policy clearly prescribe the scope of review to have been conducted by Respondent Sharon, *to-wit*:

> [Whether] the **decision** to suspend, dismiss, or terminate the employee (a) is substantially inconsistent with the university's decision-making framework approved by the Board, (b) was the result of unlawful bias or discrimination; or (c) was otherwise unreasonable, arbitrary or capricious. These shall be the **only** grounds for reversing the state university chief executive officer's decision. KBOR Policy Chapter II.C.6.b.ii.(3) (**emphasis added**); *see also*, Ex. 4 at 4 ¶ 5.

51.     Said policies prescriptions do not allow for a hearing officer to compare or weigh Petitioner's arguments or evidence against the arguments or evidence of an appealing employee as to Petitioner's decision to terminate an employee, unless such a comparison goes to whether (1) Petitioner's decision substantially complied with policy, (2) Petitioner's decision was unlawfully discriminatory, or (3) Petitioner's decision was without foundation in fact or reason (*i.e.*, arbitrary or capricious).

52.     However, Respondent Sharon disregards the proper scope of review and

11

states, "ESU has outlined and attested to that it is not appropriate to maintain Dr. Sievert as a Professor of Biological Sciences. However, just saying it does not make it so. … She has overcome the presumption that she is unnecessary and not sustainable for the direction ESU is taking its Biological Sciences Department." *See*, Ex. 4 at 6 ¶ 15.

53.     Respondent Sharon's personal opinions do not reflect or demonstrate that Petitioner's decision did not substantially comply with controlling policy, or that Petitioner's decision was unlawfully discriminatory, or that Petitioner's decision was without foundation in fact or reason; Respondent Sharon's conclusions only establish that Respondent Sievert provided evidence that disagreed with Petitioner's decision and that Respondent Sharon personally agreed with Respondent Sievert's arguments.

54.     Such conclusions not only disregard the limitations of the scope of review, but they also neglect well-established Supreme Court caselaw that a university has the lawful right to "determine for itself … who may teach, what may be taught, how it shall be taught, and who may be admitted to study" and that this requires "the exclusion of governmental intervention in the intellectual life of a university." *See*, *Sweezy v. New Hampshire*, 354 U.S. 234, 263, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957) (concurring opinion).

55.     Respondent Sharon's own opinion about Respondent Sievert's qualifications or credentials, or whether Respondent Sievert should have been laid off by Petitioner, improperly replaces the professional and academic opinions, evidence, and conclusions of the Petitioner as the university with Respondent Sharon's personal opinions.

56.     This kind of "governmental intervention" by a hearing officer to dictate "who may teach" is, therefore, an erroneous interpretation and misapplication of both controlling policy and controlling Supreme Court caselaw.

57.     Therefore, and pursuant to K.S.A. 77-621(c)(4), (5), and/or (7), because the final Order entered by Respondent Sharon improperly relied on an analysis of the notice letter, and because the final Order's analysis is outside the limits of jurisdictional authority and ignores the scope of review prescriptions as mandated by controlling

policy, and because the final Order's conclusions replace Petitioner's lawful decision-making authority with the subjective opinion of the hearing officer, the final Order's holding must be reversed.

## STATEMENT OF RELIEF SOUGHT

WHEREFORE, pursuant to K.S.A. 77-622(b), Petitioner requests this Court to:

1)     Reverse and/or set aside the decision of the final Order;

2)     Enjoin or stay the effectiveness of the final Order;

3)     Render a judgment in favor of Petitioner; and/or

4)     For such further and additional relief as the Court deems just and equitable.

Paul E. Dean, #18395
Putnam & Dean LLC
605 Lincoln, P.O. Box 1135
Emporia, KS  66801
(620) 342-2662
Fax (620) 343-7233
pauldean@pauldeanlawllc.com

**CERTIFICATE OF SERVICE**

I hereby certify that on this _19th_ day of May, 2023, I mailed through the U.S. Postal Service to the following:

Lynnette Sievert, 1611 Casa Loma Dr., Emporia, KS 66801

The Kansas Office of Administrative Hearings, 1020 S. Kansas Ave., Topeka, KS 66612-1327

Sandra Sharon, Presiding Officer/Administrative Law Judge, 1020 S. Kansas Ave., Topeka, KS 66612-1327

Paul E. Dean
Attorney for Emporia State University

14

ELECTRONICALLY FILED
2023 Jun 16 PM 3:05
CLERK OF THE LYON COUNTY DISTRICT COURT
CASE NUMBER:  LY-2023-CV-000057
PII COMPLIANT

IN THE FIFTH JUDICIAL DISTRICT
DISTRICT COURT OF LYON COUNTY, KANSAS

| | | |
|---|---|---|
| EMPORIA STATE UNIVERSITY, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No. LY-2023-CV-000057 |
| | ) | |
| LYNNETTE SIEVERT, | ) | |
| Individually; | ) | |
| THE KANSAS OFFICE OF | ) | |
| ADMINISTRATIVE HEARINGS; | ) | |
| SANDRA SHARON, In her | ) | |
| Capacity as Presiding Officer/ | ) | |
| Administrative Law Judge | ) | |
| For the Kansas Office of | ) | |
| Administrative Hearings, | ) | |
| | ) | |
| Respondents. | ) | |
| | ) | |
| | ) | |

Proceeding Pursuant to K.S.A. Chapter 77.

## RESPONDENT LYNNETTE SIEVERT'S ANSWER TO PETITION FOR JUDICIAL REVIEW AND REQUEST FOR AGENCY RECORD

Comes Now, Respondent, Lynnette Sievert, by and through her attorneys, J. Phillip Gragson and Amanda S. Vogelsberg, of Henson, Hutton, Mudrick, Gragson & Vogelsberg, LLP, and for her Answer to Petitioner Emporia State University's ("ESU") Petition and Request for Agency Record states and alleges as follows:

### ANSWER

1)      Respondent Lynnette Sievert denies all allegations contained in ESU's Petition for Review unless expressly admitted herein.

2)      Respondent Sievert admits the allegations set forth in paragraphs 1 and 2 of ESU's Petition.

3)      Respondent Sievert denies the allegation set forth in paragraph 3 of ESU's

1

Petition. Respondent is a natural person and resident of Lyon County, Kansas, not Butler County, Kansas.

4)      Respondent Sievert admits the allegations set forth in paragraphs 4 and 5 of ESU's Petition. However, the Kansas Office of Administrative Hearings and Presiding Officer Sandra Sharon are not proper parties to a KJRA appeal.

5)      Respondent Sievert admits the allegations contained in paragraphs 6, 7, 8 and 9 of ESU's Petition.

6)      Respondent Sievert admits that paragraph 10 of ESU's Petition contains part of the expired KBOR Policy that was adopted without appropriate notice to and without an opportunity to respond by affected tenured professors working for state universities under their supervision.

7)      Respondent Sievert admits in paragraph 11 of ESU's Petition that KBOR approved the "Workforce Management Framework" (hereinafter "WPM") which contains the same language as the KBOR policy at Chapter II.C.6.b.ii.

8)      Respondent Sievert admits in paragraph 12 of ESU's Petition that ESU entered into a contract with OAH to conduct "hearings" without discovery or the calling of witnesses through which terminated professors could "appeal" pursuant to the WPM/KBOR policy, but denies the remaining allegations as phrased therein.

9)      Respondent Sievert admits in paragraph 13 of ESU's Petition that ESU wrongfully terminated Respondent Sievert pursuant to the WPM/KBOR policy on Thursday, September 15, 2022, and without a pre-termination hearing.  Respondent Sievert also admits that ESU provided the notice letter attached as Ex. 1 to its Petition, but with other documents as well.

10)     Respondent Sievert admits in paragraph 14 of ESU's Petition that she properly appealed her wrongful termination under the WPM/KBOR Policy, including submitting the letter attached as Ex. 2 to ESU's Petition, but also submitted other documents as well.

11)     Respondent Sievert admits in paragraph 15 of ESU's Petition that ESU filed a Response with Exhibits, however, those exhibits are not included in Ex. 3 of ESU's Petition.

12)     Respondent Sievert admits in paragraph 16 of ESU's Petition that Hearing Officer Sharon conducted a "hearing" by Zoom (not telephone) wherein Respondent Sievert was denied discovery and the calling of witnesses.

13)     Respondent Sievert admits the allegations contained in paragraph 17 of ESU's petition that she was properly reinstated to her tenured position at ESU.

14)     Respondent Sievert denies the nonsensical legal arguments and allegations contained in paragraphs 18, 19, 20 and 21.

15)     Respondent Sievert admits in paragraph 22 of ESU's Petition that Respondent has a right to bring other claims before other courts or tribunals, including, but not limited to, a 42 U.S.C. 1983 action in Federal Court, but denies the remaining allegations contained in paragraph 22.

16)     Respondent Sievert denies the allegations in paragraph 23 of ESU's Petition as mere "argument," but Respondent admits the attachments relate to the topic of ESU's argument.

17)     Respondent Sievert admits in paragraph 24 of ESU's Petition that notice of the specific basis for state action against a tenured professor is required by due process. The notice must provide sufficient information justifying the state action to allow the ability to provide a meaningful response. As to the legal reference and citation to *Board of County Comr's of Reno County v. Akins*, the actual quote is from *Mullane v. Central Hanover Bank Tr. Co.*, 339 U.S.

306, 70 S.Ct. 652, 94 L.Ed. 865 (1950) and is as follows:

> An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections. [Citations omitted.] The notice must be of such nature as reasonably to convey the required information, [citation omitted] and it must afford a reasonable time for those interested to make their appearance....

18)     Respondent Sievert denies the nonsensical legal arguments and allegations contained in paragraphs 25, 26, 27, and 28.

19)     Respondent Sievert admits in paragraph 29 of ESU's Petition that Respondent Sharon issued the decision attached to the Petition wherein she wrongfully upheld the termination of Dr. Chris Lovett, however, the decision speaks for itself and therefor the remaining allegations contained in paragraph 29 are denied.

20)     Respondent Sievert denies the "argument" in paragraph 30 of ESU's Petition.

21)     Respondent Sievert denies the nonsensical legal arguments and allegations contained in paragraphs 31, 32, 33 and 34.

22)     Respondent Sievert denies paragraphs 35-57 of ESU's Petition as mere "argument." Respondent intends to request a scheduling conference for an appropriate briefing schedule and oral argument.

## DEFENSES

1)      The decision of the Hearing Officer constitutes a final agency action and pursuant to K.S.A. 77-621(a)(1), ESU has the burden of proving the invalidity of the Hearing Officer's Final Order, although reached utilizing unconstitutional procedures, as to reinstatement.

2)      The Hearing Officer's Final Order as to reinstatement although reached utilizing unconstitutional procedures, is presumed to be valid unless it is not supported by substantial competent evidence and "is so wide of the mark" as to be arbitrary and capricious, pursuant to *Vakas v. Kansas Bd. Of Healing Arts*, 248 Kan. 589, 808 P.2d 1355 (1991).

3)      The Hearing Officer's Final Order as to reinstatement, although reached utilizing unconstitutional procedures, is supported by the lack of substantial competent evidence to support an order upholding termination.

4)      The Hearing Officer's Final Order as to reinstatement, although reached utilizing unconstitutional procedures, is not arbitrary and is supported by law.

5)      ESU fails to state a claim upon which relief may be granted.

WHEREFORE, Respondent Lynnette Sievert respectfully requests that the Court deny ESU any relief and affirm the decision of Hearing Officer as to the issue of reinstatement and for such further and additional relief as the Court deems just and equitable.

## <u>REQUEST FOR AGENCY RECORD</u>

As required by K.S.A. 77-620 Respondent requests Appellant, at its cost, prepare, certify and file a full record of the administrative proceedings related to this appeal including all filings with OAH, transcript of hearing and recording of hearing.

Respectfully submitted,

 /s/ J. Phillip Gragson, #16103
J. Phillip Gragson, #16103
Amanda S. Vogelsberg, #23360
Henson, Hutton, Mudrick,
 Gragson & Vogelsberg, L.L.P.
3649 SW Burlingame Road, Ste. 200
Topeka, KS 66611
785 232-2200 (ph); 232-3344 (fax)
jpgragson@hhmglaw.com
avogelsberg@hhmglaw.com
*Attorneys for Respondent Sievert*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that an original of the above document was emailed on the 16th day of June, 2023, to:

Paul E. Dean
<u>Pauldean@pauldeanlawllc.com</u>
Attorney for ESU

And deposited in the U.S. Mail on the same date addressed to:

Kansas Office of Administrative Hearings
1020 S Kansas Ave
Topeka KS 66612-1327

Sandra Sharon, Presiding Judge
Administrative Law Judge
1020 S Kansas Ave
Topeka KS 66612-1327

/s/J. Phillip Gragson
J. Phillip Gragson